1  Christopher R. Dryden, Esq. (SBN 234476)
   Joshua J., Herndon, Esq. (SBN 244106)
2  **GLOBAL LEGAL LAW FIRM**
   380 Stevens Avenue, Suite 311
3  Solana Beach, California 92075
   Tel.:   (888) 846-8901
4  Fax:   (888) 846-8902
   Email:      jherndon@attorneygl.com
5
6  Attorneys for Creditor RETAIL CAPITAL LLC,
   doing business as Credibly
7

8              **UNITED STATES BANKRUPTCY COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

10  In re:                              ) Case No. 2:20-bk-11376-BB
                                        )
11  MONICA SHIUN OH AND JIMI P.         )
    CHAE,                               ) Chapter 7
12                                      )
                                        ) Adversary Case No.:
13          Debtors.                    )
                                        ) **COMPLAINT TO DETERMINE NON-**
14                                      ) **DISCHARGEABILITY OF DEBT**
                                        ) **UNDER 11 USC §§ 523(a)(2)(A) AND**
15                                      ) **523(a)(6)**
                                        )
16                                      )
                                        )
17                                      )
                                        )
18                                      )
                                        )
19                                      )
                                        )
20                                      )

21      **COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**

22          **UNDER 11 USC §§ 523(a)(2)(A) AND 523(a)(6)**

23          Plaintiff Retail Capital Partners, LLC, a New York limited liability company

24  doing business as Credibly ("Retail Capital"), a creditor and party in interest in the

25  above-referenced bankruptcy proceeding, files this Complaint to Determine Non-

26  Dischargeability of Debt Under 11 U.S.C. §§523(a)(2)(A) and 523(a)(6), against

27  debtors Monica Shiun Oh and Jimi P. Chae (collectively, the "Debtors"), and in

28  support thereof, respectfully represents to the Court as follows:

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

## I.    Jurisdiction and Venue

1.    Debtors commenced the above-captioned bankruptcy case, *In re* Monica Shiun Oh and Jimi P. Chae, Case No. 2:20-bk-11376-BB (C.D. Cal. Bankr.) (the "Bankruptcy Action"), by filing a Voluntary Petition for Relief under Chapter 7 of the U.S. Bankruptcy Code on February 7, 2020.

2.    This Court has jurisdiction over the subject matter of this complaint as a core proceeding pursuant to the provisions of 28 U.S.C. § 1334, and 11 U.S.C. § 523 since this is a proceeding to determine dischargeability of a particular debt.

3.    Venue herein is proper pursuant to the provisions of 28 U.S.C. § 1409.

4.    The purpose of this Complaint is to request an exception to discharge and obtain an order of non-dischargeability pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(a)(6).

5.    Plaintiff consents to the entry of a final order or judgment by the Court.

## II.    Parties

6.    Plaintiff is New York limited liability company in good standing, doing business as Credibly, and is a creditor of the Debtors.

7.    Debtors filed a Voluntary Petition for Relief under Chapter 7 of the U.S. Bankruptcy Code on February 7, 2020.

## III.    Statement of the Claim

8.    Retail Capital alleges that Debtors, on behalf of a business for which they served as officers, made false and/or fraudulent representations when Ms. Oh (on behalf of  Tobo Construction, Inc. ("Tobo"), and at the instruction of Mr. Chae), entered into a Business Loan and Security Agreement (the "Agreement") that induced Retail Capital to loan to the sum of $325,000.00 (the "Principal Amount"), the obligation to repay which Ms. Oh unconditionally agreed to personally guarantee (the "Guaranty").  Despite the fact that the Agreement clearly specified the only express limited business purposes for which the loan proceeds could be used, and Ms. Oh (on behalf of  Tobo, and at the instruction of Mr. Chae) represented that the loan proceeds

would only be used for such purposes, Retail Capital is informed and believes, and based thereon alleges, that Debtors obtained the loan proceeds knowing that the loan proceeds would be used for an unauthorized purpose. Said allegations are more fully discussed below. Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) also represented that there was no action, suit, proceeding, or investigation pending or, to her knowledge, threatened or against or affecting Tobo or any of its assets before or by any court or other governmental authority which, if determined adversely to Tobo, would have a material adverse effect on its financial condition, business or prospects or the value of the collateral that secured the loan proceeds, even though multiple such investigations, actions, suits, and proceedings were ongoing; and additional investigations, actions, suits, and proceedings were threatened; at the time Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) entered into the Agreement. Said allegations are more fully discussed below. Finally, Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) also represented that Tobo would not enter into any arrangement, agreement or commitment with any person or entity other than Retail Capital that requires or contemplates that Tobo would make regular payments more frequently than monthly. However, Retail Capital is informed and believes, and based thereon alleges, that Debtors obtained the loan proceeds knowing that Tobo would enter into an agreement with an entity other than Retail Capital that required it to make regular payments more frequently than monthly. Said allegations are more fully discussed below:

## IV.    Statement of Facts

### A.    Background Facts re Tobo Construction, Ms. Oh, and Mr. Chae.

9.    On April 27, 2020, counsel for Retail Capital, Mr. Joshua J. Herndon, conducted an examination of Ms. Oh and Mr. Chae pursuant to Federal Rules of Bankruptcy Procedure Rule 2004 (the "Examination").

10.    Tobo Construction ("Tobo") is a California corporation that was created approximately 18 to 20 years ago, and it is a general contractor construction company.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

[*See* transcript of Examination, a copy of which is attached hereto as Exhibit 1 (hereinafter, "Exhibit 1"), at page 8:22 to 9:7.] Depending on its projects, Tobo hires subcontractors to do specialty trade works. (*See* Exhibit 1, at page 9:12-16.)

11.    Ms. Oh is the President of Tobo, and she has been in that position for approximately 12 to 13 years. (*See* Exhibit 1, at page 9:17 to 10:3.) In her capacity as President of Tobo, Ms. Oh primarily signs financial documents, such as loan documents that were taken in her name, and those have been her duties for as long as she has served as Tobo's President. (*See* Exhibit 1, at page 10:4-6, 12-19.)

12.    Mr. Chae is the husband of Ms. Oh, and also the Corporate Secretary of Tobo, and he has been in that position for approximately 12 years. (*See* Exhibit 1, at page 10:21 to 11:1.) In Mr. Chae's capacity as Corporate Secretary, one of his duties is management of Tobo's staff, including project managers, superintendents, and office administrators. (*See* Exhibit 1, at page 11:5-7.) That has been Mr. Chae's duty for as long as he has been Tobo's Corporate Secretary. (*See* Exhibit 1, at page 11:18-21.) Mr. Chae's duties in his capacity as Corporate Secretary also include making decisions to obtain financing or funding for Tobo. (*See* Exhibit 1, at page 13:17-21.) Mr. Chae also has duties in his capacity as Corporate Secretary of Tobo related to mailings and notifications from the California Labor Commissioner (the "Commissioner") as set forth in greater detail below.

**B.    Mailings Tobo Receives From The California Labor Commissioner.**

13.    Mr. Chae testified that he is familiar with the California Labor Commissioner (the "Commissioner") because Tobo's "primary business is in public works, so that's just the normal part of the business we're involved as an entity." (*See* Exhibit 1, at page 15:2-9.) Mr. Chae testified that he knows that the Commissioner sends out mailings and notifications to businesses, and that Tobo has received mailings and notifications from the Commissioner. (*See* Exhibit 1, at page 15:11-17.) Mr. Chae is familiar with Tobo receiving mailings and notifications from the Commissioner because mailings and notifications from the Commissioner go to

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1 Tobo's subcontractors or office administrator, and because Tobo's office managers,
2 internal staff, and project managers bring mailings and notifications from the
3 Commissioner to Tobo's internal meetings. (*See* Exhibit 1, at page 15:18 to 16:3.)

4      14.    Tobo also has staff meetings about once a week. (*See* Exhibit 1, at page
5 16:7-8.) Tobo's staff meetings are attended by Mr. Chae, as well as by Tobo's
6 managers, including Misa Tang (who manages Tobo's administrative operations),
7 Suzie Na (who handles Tobo's accounting and administration), Michael Cha (one of
8 Tobo's project managers), Mr. Thomas Yoon (one of Tobo's project managers),
9 Chung Yu (Tobo's superintendent). (*See* Exhibit 1, at page 16:25 to 17:10; 28:2 to
10 29:12; 89:7-11.) If Tobo receives a mailing or notification from the Commissioner
11 prior to a particular staff meeting, that mailing or notification will be discussed at the
12 upcoming staff meeting by Mr. Chae and Tobo's management. (*See* Exhibit 1, at page
13 16:9-13; 26:8-12; 89:7-11.) It has been Tobo's practice to discuss mailings and
14 notifications from the Commissioner at a staff meeting right away for as long as Mr.
15 Chae has been employed by Tobo. (*See* Exhibit 1, at page 30:12-20.) In fact, Mr. Chae
16 could not think where Tobo received a mailing or a notification from the
17 Commissioner where that was not discussed at one of the staff meetings. (*See* Exhibit
18 1, at page 30:21-25.)

19      15.    If the topic of a staff meeting is a mailing or notification from the
20 Commissioner, the attendees first try to identify which project it belongs to, and then
21 whether it is a subcontractor issue or Tobo's field crew issue. (*See* Exhibit 1, at page
22 16:14-19.) A course of action for dealing with the mailing or notification from the
23 Commissioner is also determined at the staff meeting. (*See* Exhibit 1, at page 26:13-
24 16.) Thereafter, depending on the notice, and the type of notice, Tobo receives from
25 the Commissioner, Tobo does its "process of providing information through the labor
26 commissioner's office." (*See* Exhibit 1, at page 16:20-24.)

27      16.    During the timeframe from January 2017 to the present, Tobo has
28 received inquiries of questions and documents to be produced in a document titled

1  "Notice of Investigation". (*See* Exhibit 1, at page 17:17-23.) Mr. Chae testified that a

2  "Notice of Investigation" from the Commissioner is the first notification that Tobo

3  receives of a labor commission case. (*See* Exhibit 1, at page 88:24 to 85:2.)

4      17.    Tobo has also received wage assessments ("Wage Assessments") from

5  the Commissioner. (*See* Exhibit 1, at page 17:24 to 18:1.) Mr. Chae reviews all Wage

6  Assessments thar are issued to Tobo. (*See* Exhibit 1, at page 90:1-3.) all such wage

7  assessments are addressed at Tobo's weekly staff meetings by members of Tobo's

8  management team, including Mr. Chae.(*See* Exhibit 1, at page 90:4-7.)

9      18.    In Mr. Chae's experience, a Wage Assessment is preceded by an inquiry

10  or a questionnaire from the Commissioner. (*See* Exhibit 1, at page 18:5-7, 21-25.)

11  Sometimes, that process begins with a Notice of Investigation, or it begins with an

12  inquiry that may turn into an investigation. (*See* Exhibit 1, at page 19:1-7; 22:24 to

13  23:4.) Prior to the issuance of a Wage Assessment related only to Tobo's conduct,

14  Tobo received a notice of an inquiry, a questionnaire, or a Notice of Investigation.

15  (*See* Exhibit 1, at page 88:19-23.)

16      19.    In the next step of the process, Tobo provides documentation such as

17  payroll records to the Commissioner. (*See* Exhibit 1, at page 19:8-13.) Since January

18  2017, Mr. Chae, Misa Tang, and Susie Na have been involved with determining the

19  documents to be produced to the Commissioner. (*See* Exhibit 1, at page 31:5-9.) Since

20  January 2017, Mr. Chae, Misa Tang, and Susie Na have been involved in the process

21  of obtaining the documents to produce to the Commissioner. (*See* Exhibit 1, at page

22  31:10-13.)

23      20.    Tobo usually has 60 days from when it receives an inquiry or a Notice

24  of Investigation to turn over that documentation, but that period can be extended. (*See*

25  Exhibit 1, at page 19:14-19; 19:23 to 20:2; 23:5-9.)

26      21.    After Tobo turns over its documentation to the Commissioner, the

27  Commissioner reviews the record it received from whoever raised the issue, and

28  Tobo's documentation in response thereto. (*See* Exhibit 1, at page 20:3-9.) Thereafter,

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  one possible outcome is that the Commissioner will issue a Wage Assessment. (*See*

2  Exhibit 1, at page 20:10-14.) In Mr. Chae's experience, the shortest amount of time

3  where a Wage Assessment issued after Tobo provided all its documentation to the

4  Commissioner was 60 days after Tobo provided its documentation. (*See* Exhibit 1, at

5  page 20:24 to 21:6; 23:10-16.) On the other hand, Mr. Chae believes there have been

6  instances where it took more than one year for the Commissioner to issue a Wage

7  Assessment after Tobo provided all its documentation to the Commissioner. (*See*

8  Exhibit 1, at page 21:7-11, 17-18; 23:17-22.)

9      22.    Based on the foregoing, Mr. Chae testified that it was possible that by

10 the time a Wage Assessment is issued in a particular case, an investigation in that case

11 has been ongoing for at least 120 days after Tobo received a notice of inquiry, a

12 questionnaire, or a Notice of Investigation before the issuance of the Wage

13 Assessment. (*See* Exhibit 1, at page 24:4-9; 89:21-25.)

14     23.    Mr. Chae testified that Tobo's conduct has been the subject of a Wage

15 Assessment, and that he could not think of an instance where Tobo's conduct was the

16 subject of a Wage Assessment and where Tobo was not given notification of the

17 inquiry or the Notice of Investigation. (*See* Exhibit 1, at page 25:24 to 26:6.)

18     24.    Mr. Chae's duties as Corporate Secretary include reviewing and

19 determining how to respond to mailings, notifications, and Notices of Investigation"

20 from the Commissioner. (*See* Exhibit 1, at page 26:22-25; 89:3-6.) Related thereto, it

21 has been Mr. Chae's standard practice to review all mailings and notifications Tobo

22 received from the Commissioner the entire time he has been the Corporate Secretary

23 of Tobo. (*See* Exhibit 1, at page 27:2-7, 12-16.) It has also been Mr. Chae's standard

24 practice to play a role in deciding how to respond to mailings or notifications from

25 the Commissioner the entire time he has been the Corporate Secretary of Tobo.(*See*

26 Exhibit 1, at page 27:8-11, 17-21.)

27 /////

28 /////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

7
COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

25.    In addition to Mr. Chae, Tobo's managers Misa Tang, Suzie Na, Michael Cha, Thomas Yoon, and Chung Mu also receive notification when Tobo receives a mailing or notification from the Commissioner. (*See* Exhibit 1, at page 28:2 to 29:12.)

**C.    The Loan Tobo Obtained From Retail Capital.**

26.    In April or May of 2019, Tobo decided to obtain a loan from Retail Capital. (*See* Exhibit 1, at page 13:1-3.) Ms. Oh testified that she was familiar with that loan because "[i]t was another loan that -- for a line of credit that my husband told me that I needed to sign." (*See* Exhibit 1, at page 12:15-21.) Mr. Chae testified that Tobo decided to obtain that loan "[t]o help with cash flow on Tobo business," and because "we needed some relief in cash flow to make payments for the business." (*See* Exhibit 1, at page 13:4-8, 12-13.) Mr. Chae knew that the loan proceeds would be used for "[f]or Tobo's business purposes, making necessary payments" when Tobo decided to obtain the loan from Retail Capital. (*See* Exhibit 1, at page 13:22 to 14:4.)

27.    Mr. Chae was responsible for deciding to obtain the loan from Retail Capital. (*See* Exhibit 1, at page 13:14-16.) Mr. Chae was also responsible for deciding what the loan proceeds would be used for. (*See* Exhibit 1, at page 14:5-7.) Mr. Chae was also responsible for deciding what the final amount of the Retail Capital loan would be. (*See* Exhibit 1, at page 14:20-22.)

28.    During the Examination, the Retail Capital loan agreement that Ms. Oh entered into on behalf of Tobo (the "Retail Capital Loan Agreement") was marked as Exhibit 1. (*See* Exhibit 1, at page 37:13-15; 38:5-8.) Mr. Chae testified that he had seen the Retail Capital Loan Agreement before, and that he recalled seeing it for the first time in April or May of 2019. (*See* Exhibit 1, at page 38:18-24.) The Retail Capital Loan Agreement states that the amount of the loan that was the subject of the Retail Capital Loan Agreement (the "Retail Capital Loan") is $325,000.00, the disbursement amount was $316,875.00, and the total repayment amount was $380,250.00, and Mr. Chae recalled that each of those amounts was correct. (*See* Exhibit 1, at page 38:25 to 39:12; *see also* Retail Capital Loan Agreement, a copy of

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

which is attached hereto as Exhibit 2 (hereinafter, "Exhibit 2," at page B.) It was also Mr. Chae's understanding that, under the terms of the Retail Capital Loan Agreement, Tobo would repay $2,160.51 each business day for 177 days until the total repayment amount was paid in full. (*See* Exhibit 1, at page 39:18-22; *see also* Exhibit 2, at page B.)

29.    During the Examination, Mr. Chae acknowledged that page 1 of the Retail Capital Loan Agreement was initiated, and he testified that he recalled reviewing that page and that he did not recall not understanding any part of the subject matter of that page before it was initialed . (*See* Exhibit 1, at page 39:23 to 40:3; 40:16-20; 41:15-19; *see also* Exhibit 2, at page 1.)

30.    During the Examination, Mr. Chae acknowledged that page 2 of the Retail Capital Loan Agreement was initiated, and he testified that he did not recall not understanding any part of the subject matter of that page before it was initialed . (*See* Exhibit 1, at page 41:20-22, 42:5-10; *see also* Exhibit 2, at page 2.) Page 2 of Retail Capital Loan Agreement refers to an account at Pacific City Bank ending in 0876 (the "Pacific City Bank Account") as the account into which the Loan proceeds would be deposited. (*See* Exhibit 1, at page 41:22-25, 42:1-4; *see also* Exhibit 2, at page 2.)

31.    Page 3 of the Retail Capital Loan Agreement is entitled "KEY TERMS AND CONDITIONS," and it states in relevant part, in boldface font: "**You should read this entire Agreement before signing it. Your Agreement includes the following terms and conditions:**" (*See* Exhibit 2, at page 3.)

32.    The "KEY TERMS AND CONDITIONS" also include item 6, which states: "Section 21 restricts your ability to seek certain types of additional financing before you have paid off your obligations to us." (*See* Exhibit 2, at page 3.)

33.    Page 3 of the Retail Capital Loan Agreement states in relevant part in Section 3, which is titled "PRINCIPAL AMOUNT; USE OF LOAN PROCEEDS":

"You represent to us and agree that the Principal Amount will be used only:

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

(a) to buy merchandise, inventory or related goods you will rent or sell to your customers,

(b) to buy equipment or other goods for use in your business,

(c) for training or other services needed by your business, and/or

(d) to make improvements to your business location (but not to buy real estate)." (*See* Exhibit 2, at page 3.)

34.　During the Examination, Mr. Chae acknowledged that page 3 of the Retail Capital Loan Agreement was initiated, and he testified that he recalled reviewing that page, and that there was no part of that page that he did not understand. (*See* Exhibit 1, at page 42:11-14; 42:25 to 43:5; *see also* Exhibit 2, at page 3.)

35.　During the Examination, Mr. Chae acknowledged that page 4 of the Retail Capital Loan Agreement was initiated, and he testified that he recalled reviewing that page, and that there was no language on that page that he did not understand. (*See* Exhibit 1, at page 43:6-15; *see also* Exhibit 2, at page 4.)

36.　During the Examination, Mr. Chae acknowledged that page 5 of the Retail Capital Loan Agreement was initiated, and he testified that he recalled reviewing that page, and that there was no language on that page that he did not understand. (*See* Exhibit 1, at page 43:16 to 44:1; *see also* Exhibit 2, at page 5.)

37.　Page 6 of the Retail Capital Loan Agreement includes a section 10, titled "**REPRESENTATIONS, WARRANTIES AND COVENANTS**," which states in relevant part:

"You and each Signing Principal represent warrant and covenant the following as of the Effective Date and during the Term of this Agreement:

10.1. Name, Location, Authority, Etc.

\*\*\*

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

(h)there is no action, suit, proceeding or investigation pending or, to your knowledge, threatened against or affecting you or any of your assets before or by any court or other governmental authority which, if determined adversely to you, would have a material adverse effect on your financial condition, business or prospects or the value of the Collateral." (*See* Exhibit 2, at page 6.)

38.    Page 6 of the Retail Capital Loan Agreement includes a section 10.7 in the "**REPRESENTATIONS, WARRANTIES AND COVENANTS,**" which states:

"Business Information; Reliance; Compliance. **All information (financial and other) provided by or on your or any Signing Principal's behalf to us in connection with or pursuant to this Agreement is true, accurate and complete in all respects**. You and each Signing Principal shall furnish us and Designee such information as we may request from time to time. **You acknowledge and agree that all information (financial and other) provided by or on behalf of you and/or any Signing Principal has been relied upon by us in connection with our decision to loan you the Principal Amount.**" (Emphasis added.) (*See* Exhibit 2, at page 6.)

39.    During the Examination, Mr. Chae acknowledged that page 6 of the Retail Capital Loan Agreement was initiated, and he testified that he recalled reviewing that page, and that he didn't recall whether there were any words that he did not understand when he reviewed the document. (*See* Exhibit 1, at page 44:2-15; *see also* Exhibit 2, at page 6.)

40.    Page 7 of the Retail Capital Loan Agreement includes a section 10.13 in the "**REPRESENTATIONS, WARRANTIES AND COVENANTS,**" which states:

"Collection Costs and Fees. To the extent not prohibited by applicable law, you shall pay to us any and all expenses, including collection costs, attorneys' fees and expenses, expert fees and expenses, and all other expenses which may be incurred by us in the prosecution, defense, settlement and/or other resolution of any claim, demand, action or proceeding arising out of or relating to this Agreement, the Collateral or any of our related rights or interests, regardless of whether you are a party to that action or proceeding or made aware of the claim or demand before it is resolved. Without limiting the generality of the foregoing, the expenses you shall pay to us include counsel fees and expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by us for the purpose of administering, protecting or realizing our security under this Agreement. All amounts described in this Section shall be considered advances to protect our security, and shall be secured by this Agreement." (*See* Exhibit 2, at page 7.)

/////

/////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

41.    During the Examination, Ms. Oh testified that she probably initialed page 7 of the Retail Capital Loan Agreement, and Mr. Chae testified that he recalled reviewing that page. (*See* Exhibit 1, at page 46:17-21; 47:1-3; *see also* Exhibit 2, page 7.) When Mr. Chae was asked if there was any language he did not understand, he testified that: "I mean, generally I understood most of them at the time." (*See* Exhibit 1, at page 46:22-25.)

42.    During the Examination, Ms. Oh testified that she probably initialed page 8 of the Retail Capital Loan Agreement, and Mr. Chae testified that he recalled reviewing that page. (*See* Exhibit 1, at page 47:5-9, 13-16; *see also* Exhibit 2, page 8.)  When Mr. Chae was asked if there was any language on the page he did not understand, he testified that: "I generally understood the content of the page." (*See* Exhibit 2, at page 47:10-12.)

43.    Page 9 of the Retail Capital Loan Agreement includes a Section 21, titled "**PROHIBITED TRANSACTIONS**," which states:

> "You shall not enter into any arrangement, agreement or commitment with any person or entity other than us that involves the customers with credit cards, debit cards, charge cards, bank cards and/or other payment cards ("Card Receivables"), whether in the form of a purchase of a loan against, or the sale or purchase of credits against, Card Receivables; or that requires or contemplates that you will make regular payments more frequently than monthly." (*See* Exhibit 2, at page 9.)

44.    Page 9 of the Retail Capital Loan Agreement also includes a Section 24, titled "**PERSONAL GUARANTY**," which states:

> "THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS. READ IT CAREFULLY BEFORE SIGNING
>
> I hereby personally and unconditionally guaranty for the benefit of Lender and its successors and assigns the prompt payment to Lender of all amounts owed by the Borrower referenced above ("Borrower") under the above Agreement. This is a guaranty of payment and performance and not a guaranty of collection. This is an absolute, unconditional, primary and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full. I agree that Lender may extend, transfer and amend the Agreement and I agree to be bound by all such changes. I waive all defenses, legal or equitable, otherwise available to me, and I waive all notices to which I might otherwise be entitled by law, including notices of protest, presentment, transfer, demand and default. I agree Lender

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1   may proceed against me separately without first proceeding against
2   Borrower, any collateral or any other Guarantor." (*See* Exhibit 2, at page 9.)

3   45.    During the Examination, Ms. Oh testified that she probably initialed
4   page 9 of the Retail Capital Loan Agreement, and Mr. Chae testified that he recalled
5   reviewing that page. (*See* Exhibit 1, at page 47:18-21; 47:25 to 48:3; *see also* Exhibit
6   2, at page 9.) When Mr. Chae was asked if there was any language on the page he did
7   not understand, he testified that: "No. Generally I understood most of the content.
8   (*See* Exhibit 1, at page 47:22-24.)

9   46.    Page 10 of the Retail Capital Loan Agreement states in relevant part:

10  "**On behalf of the Borrower, I have read this entire Agreement**,
11  including the Arbitration Agreement in Section 18 (including Sections
    18.1 -18.6), and received a copy for our records. Borrower understands
12  that it has the right to consult with an attorney before signing this
    Agreement if it chooses to do so. **I certify that I am able to read and**
13  **understand the English language. By signing below, on behalf of**
    **Borrower and in my individual capacity as a Signing Principal, I**
14  **agree to all of the terms of this Agreement**, including the Arbitration
    Agreement and the other Key Terms and Conditions summarized on
15  Page 1, and offer to enter into the transaction it describes." (Emphasis
    added.) (*See* Exhibit 2, at page 10.)
16

17  47.    During the Examination, Mr. Chae testified that he recalled reviewing
18  that page. (*See* Exhibit 1, at page 48:8-10.) When Mr. Chae was asked if there was
19  any language on the page he did not understand, he testified that: "No. I generally
20  understood the content. (*See* Exhibit 1, at page 48:11-13.)

21  48.    Ms. Oh testified that she signed page 10 of the Retail Capital Loan
22  Agreement on the left-hand side that refers to "Guarantor No. 1". (*See* Exhibit 1, at
23  page 48:14-21; *see also* Exhibit 2, at page 10.) Ms. Oh also testified that she signed
24  page 10 of the Retail Capital Loan Agreement on the field that is titled "Borrower No.
25  1". (*See* Exhibit 1, at page 48:22 to 49:3; *see also* Exhibit 2, at page 10.)

26  49.    During the Examination, Ms. Oh testified that she signed page 11 of the
27  Retail Capital Loan Agreement under the reference to the borrower business legal
28

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  name, and beneath the reference to the guarantor signature. (*See* Exhibit 1, at page

2  49:4-19; *see also* Exhibit 2, at page 11.)

3      50.    During the Examination, Ms. Oh testified that she also signed the next

4  page in the Retail Capital Loan Agreement, titled "PERMISSION TO RELEASE

5  INFORMATION".  (*See* Exhibit 1, at page 49:20 to 50:3; *see also* Exhibit 2, at page

6  titled "PERMISSION TO RELEASE INFORMATION".)

7      51.    Ms. Oh testified at the Examination that Mr. Chae told her that she

8  needed to sign the Retail Capital Loan Agreement. (*See* Exhibit 1, at page 46:4-15.)

9  **D.    The Pacific City Bank Account, Into Which The Retail Capital Loan
        Proceeds Were Deposited.**

10

11     52.    During the Examination, Ms. Oh and Mr. Chae were examined

12  concerning the Pacific City Bank Account. When Ms. Oh and Mr. Chae were asked

13  what kind of expenses of Tobo were paid out of the Pacific City Bank Account, they

14  testified that "pretty much everything" was paid out of the Pacific City Bank Account,

15  including project costs (such as payments to subcontractors, and any fees or costs

16  related specific to projects), overhead costs (such as payroll), and utility fees. (*See*

17  Exhibit 1, at page 35:8-22.)

18     53.    During the Examination, certain bank statements for the Pacific City

19  Bank Account (the "Statements") were marked as Exhibit 3. (*See* Exhibit 1, at page

20  50:13-16.) The Statements include a deposit titled "Wire In -RETAIL CAPITAL

21  LLC," in the amount of $316,875.00, which confirmed the deposit of the Retail

22  Capital Loan proceeds (the "Retail Capital Loan Proceeds") into the Pacific City Bank

23  Account on May 16, 2019. (*See* Exhibit 1, at page 54:3-13; *see also* Statements, a

24  copy of which is attached hereto as Exhibit 3 (hereinafter, "Exhibit 3"), at page 1.)

25     54.    The Statements also include numerous withdrawals that include a

26  reference to "INET XFER" and "XXXXXXXX3383" during the period from May

27  2019 to September 2019. (*See* Exhibit 3, at pages 2, 3, 6, 7, 8, 9, 11, 12, 13, 14, 18,

28  19, 21, 22, 26, and 27.) The Statements also include numerous withdrawals that

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1   include a reference to "TRANSFERRED TO DEPOSIT ACCT XXXXXXXX3383"

2   during the period from May 2019 to October 2019. (*See* Exhibit 3, at pages 2, 3, 8 ,

3   12, 13, and 27.) Ms. Oh and Mr. Chae were both asked if Tobo had an account that

4   ends in 3383 at the Examination, and neither knew if Tobo does. (*See* Exhibit 1, at

5   page 58:7 to 59:4.)

6        55.    The Statements also include numerous withdrawals that include a

7   reference to "INET XFER" and "XXXXXXXX4960" during the period from May

8   2019 to August 2019. (*See* Exhibit 3, at pages 2, 3, 9, 14, 22.) Those withdrawals

9   include a transfer in the amount of $200,000.00 on May 17, 2020, the day after the

10  Retail Capital Loan Proceeds were deposited into the Account. (*See* Statements, at

11  page 1.) Ms. Oh and Mr. Chae were both asked if Tobo had an account that ends in

12  4960 at the Examination, and neither knew if Tobo does. (*See* Exhibit 1, at page 60:1-

13  5.) Ms. Oh and Mr. Chae were also both asked about the transfer in the amount of

14  $200,000.00 on May 17, 2020, and neither knew what the subject of that withdrawal

15  was. (*See* Exhibit 1, at page 59:15-25.)

16       56.    At the Examination, Ms. Oh and Mr. Chae were asked about a

17  withdrawal dated May 28, 2019, in the amount of $1,983.33, with a description of

18  "ON DECK CAPITAL TOBO CONSTRUCTION, INC ACH DEBIT 36523708

19  36523708". (*See* Exhibit 1, at page 60:11-20; *see also* Exhibit 3, at page 3.) They

20  testified that the subject of that withdrawal was a payment to OnDeck Capital, one of

21  Tobo's other lenders, to repay a loan that Tobo had obtained from OnDeck Capital

22  (the "OnDeck Capital Loan"). (*See* Exhibit 1, at page 60:21 to 61:12.) They also

23  testified that it was possible that Tobo could have obtained the OnDeck Capital Loan

24  before, or after, Tobo obtained the Retail Capital Loan. (*See* Exhibit 1, at page 61:17

25  to 62:3.)

26       57.    At the Examination, Ms. Oh and Mr. Chae were also asked about a

27  withdrawal dated June 3, 2019, in the amount of $2,519.58, with a description of

28  "TESLA 8 TOBO CONSTRUCTION INC ACH DEBIT WEB PYMNT 79815757".

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1  (*See* Exhibit 1, at page 66:15-19; *see also* Exhibit 3, at page 6.) They testified the

2  withdrawal was for a company car. (*See* Exhibit 1, at page 66:20-25.) A total of four

3  of these kinds of withdrawals are detailed in the statements, one in each of June 2019,

4  July 2019, August 2019, and September 2019, all after Tobo received the Retail

5  Capital Loan Proceeds. (*See* Exhibit 3, at pages 6, 11, 18, and 26.)

6       58.   At the Examination, Ms. Oh and Mr. Chae were also asked about a

7  deposit dated July 15, 2019, in the amount of $242,201.00,with a description of "Wire

8  In -KALAMATA CAPITAL GROUP, LLC". (*See* Exhibit 1, at page 70:24 to 71:4;

9  *see also* Statements, at page 11.) They testified that the subject of that deposit was

10  another loan, and Mr. Chae testified that he decided to obtain the loan to "help with

11  cash flow" in June or July of 2019. (*See* Exhibit 1, at page 71:5-20; 72:6-15.)

12       59.   At the Examination, Ms. Oh and Mr. Chae were also asked about a

13  withdrawal dated July 16, 2019, in the amount of $2,393.00, with a description of

14  "KALAMATA CAPITAL TOBO CONSTRUCTION INC ACH DEBIT

15  KALAMATA". (*See* Exhibit 1, at page 74:23 to 75:4; *see also* Exhibit 3, at page 12.)

16  They testified the withdrawal was for a repayment of the loan Tobo had obtained from

17  Kalamata Capital Group, LLC ("Kalamata"), and that the loan from Kalamata (the

18  "Kalamata Loan") was to be repaid a certain amount per day through an ACH debit .

19  (*See* Exhibit 1, at page 75:5-22.) The Statements show numerous of these kinds of

20  withdrawals during the period from July 2019 to September 2019, all after the Retail

21  Capital Loan Proceeds were deposited into the Pacific City Bank Account. (*See*

22  Exhibit 3, at pages 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 25, and 26.)

23       60.   At the Examination, Ms. Oh and Mr. Chae were also asked about a

24  deposit dated July 25, 2019, in the amount of $ 88,260.00, with a description of "Wire

25  In -EBF PARTNERS, LLC". (*See* Exhibit 1, at page 73:1-6; *see also* Exhibit 3, at

26  page 11.) They testified that the subject of that deposit was another loan for "cash

27  flow". (*See* Exhibit 1, at page 73:7-8.)

28  /////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

61.     At the Examination, Ms. Oh and Mr. Chae were also asked about a withdrawal dated August 8, 2019, in the amount of $1,087.50, with a description of "EBF PARTNERS LLC TOBO CONSTRUCTION INC. ACH DEBIT EBF DEBIT". (*See* Exhibit 1, at page 78:7-15; *see also* Exhibit 3, at page 19.) They testified the withdrawal was for a repayment of the loan Tobo had obtained from EBF Partners LLC (the "EBF Partners LLC Loan"). (*See* Exhibit 1, at page 79:2-6.) The Statements show numerous of these kinds of withdrawals during the period from July 2019 to September 2019, all after the Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account. (*See* Exhibit 1, at pages 14, 17, 18, 19, 20, 21, 22, 25, and 26.)

62.     At the examination, Ms. Oh and Mr. Chae were also asked about a series of withdrawals with a description of "STOP PAYMENT CHARGE," all dated September 13, 2019. (*See* Exhibit 1, at page 80:15-19; *see also* Exhibit 3, page 27.) Related thereto, they testified that on or about September 13, 2019, Tobo stopped repaying the Kalamata Loan. (*See* Exhibit 1, at page 81:4-10.) When asked why Tobo stopped repaying the Kalamata Loan at that time, Mr. Chae testified that: "I believe the cash flow wasn't there. Some of our progress payment didn't come in. The funds we were expecting didn't come into our account. We just kind of ran out of working capital." (*See* Exhibit 1, at page 81:13-16.) Mr. Chae also testified that Tobo stopped making repayments on the Retail Capital Loan in September 2019 for the same reason it stopped making repayments on the Kalamata Loan. (*See* Exhibit 1, at page 81:22 to 82:4.)

63.     Mr. Chae also testified that, in September 2019, Tobo had several projects, including "El Camino Student Services Project, Ventura County Fire Station Project, City of Signal Hill library project. I believe there was another one for Torrance, City of Torrance project." (*See* Exhibit 1, at page 84:21-24.) Mr. Chae also testified that in September 2019, Tobo stopped receiving payments for work related

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1    to some of its projects, in part, because of "wage assessments issued by the labor

2    commissioner with respect to those projects." (*See* Exhibit 1, at page 84:25 to 85:10.)

3         64.    At the examination, Ms. Oh and Mr. Chae were also asked about a

4    withdrawal in the amount of $200,000.00, dated September 23, 2019, with a

5    description of "OUTGOING WIRE TRANSFER". (*See* Exhibit 1, at page 82:17-20;

6    *see also* Exhibit 3, at page 27.) They testified that they did not know why that money

7    was transferred out of the Account on that date, or where the money was transferred

8    to. (*See* Exhibit 1, at page 82:21 to 83:5.

9    **E.**    <u>**Labor Commission Case No. 40-54384-757.**</u>

10        65.    During the Examination, Ms. Chae were examined about a letter on the

11   letterhead of the State of California Department of Industrial Relations, dated May

12   29, 2019, which was marked as Exhibit 3. (*See* Exhibit 1, at page 90:15-20, *see also*

13   May 29, 2019 letter, attached hereto as Exhibit 4 (hereinafter, "Exhibit 4").  The May

14   29, 2019 letter refers to DLSE Case No. 40-54384-757, as well as to "the civil wage

15   and penalty assessment the CWPA issued on March 26, 2019 in the above-captioned

16   matter ." (*See* Exhibit 1, at page 90:21-23; 91:8-14;, *see also* Exhibit 4.) When Mr.

17   Chae was asked if  Tobo received a wage assessment for DLSE Case No. 40-54384-

18   757 that was issued on March 26, 2019, Mr. Chae responded: "I believe so, yes." (*See*

19   Exhibit 1, at page 91:15-17.)

20        66.    During the Examination, Ms. Oh and Mr. Chae were also examined

21   about a spreadsheet (the "Spreadsheet") titled "Labor Violations; DLSE," which was

22   marked as Exhibit 4. (*See* Exhibit 1, at page 91:24 to 92:6; *see also* Spreadsheet, a

23   copy of which is attached hereto as Exhibit 5 (hereinafter, "Exhibit 5").) Mr. Chae

24   had seen the document before because Misa Tang or Suzie Na prepared it, and that it

25   was a "summary page of the DLSE cases" that was prepared in either November or

26   December of 2019. (*See* Exhibit 1, at page 92:7-22.) When Mr. Chae was asked if

27   Tobo maintains files of documents that were relied upon to create the Spreadsheet, he

28

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1    testified that he believed that the "spreadsheet was made from information based on

2    DLSE case files." (*See* Exhibit 1, at page 93:17-22.)

3          67.     Mr. Chae was examined concerning information related to DLSE Case

4    No. 40-54384-757 on the spreadsheet. (*See* Exhibit 1, at page 95:9-12; *see also*

5    Exhibit 5.) That information includes a reference to "LD, $800,585.90," "Penalty,

6    $537,025.00," and "Total, $1,337,883.90." (*See* Exhibit 5.)

7          68.     Mr. Chae was asked: "If there's a wage assessment and only Tobo's

8    alleged conduct is at issue in that wage assessment, ultimately is Tobo on the hook

9    for the amount of the assessment," to which Mr. Chae responded: "Yes, that's

10    possible." (*See* Exhibit 1, at page 97:16-20.)

11          69.     Mr. Chae was also asked whether "one possible outcome with this

12    particular wage assessment is that Tobo could be required to pay the $1,337,883.93

13    that's referenced in the amount column on the spreadsheet though, correct," to which

14    Mr. Chae responded: "Yes." (*See* Exhibit 1, at page 98:16-20; *see also* Exhibit 5.) Mr.

15    Chae was asked whether, if Tobo paid the $1,337,883.93 amount, whether that would

16    have had an adverse effect on Tobo's business, Mr. Chae replied: "It will have an

17    impact on the business." (*See* Exhibit 1, at page 121:7-10, 13-14.) In fact, the

18    following exchange took place during the Examination during questioning of Mr.

19    Chae:

20       "Q    I believe it was your testimony before that Tobo stopped paying on
         the loan that it received from Retail Capital because of cash flow
21       problems that Tobo was experiencing in September of 2019, correct?

22       A    That's correct.

23       Q    If Tobo had to pay a wage assessment in the amount of
         $1,337,883.90, wouldn't that – in September 2019, wouldn't that
24       exacerbate Tobo's cash flow problems at that time?

25       A    Yes. That's correct." (*See* Exhibit 1, at page 123:15-24.)

26   **F.**     **Labor Commission Case No. 40-54317-132.**

27          70.     During the Examination. Ms. Oh and Mr. Chae were also examined

28    concerning a pleading entitled "DLSE'S EXHIBIT LIST," which was marked as

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

Exhibit 5. (*See* Exhibit 1, at page 100:l6 to 101:1; *see also* DLSE'S EXHIBIT LIST, a copy of which is attached hereto as Exhibit 6 (hereinafter, "Exhibit 6").) Exhibit 6 refers to a "Civil Wage and Penalty Assessment dated October 5, 2018 in DLSE Case No. 40-54317-132." (*See* Exhibit 6.) Mr. Chae was asked whether Tobo received a civil wage and penalty assessment dated October 5, 2018, in DLSE Case No. 40-54317-132, and he responded "Yes, Tobo did." (*See* Exhibit 1, at page 102:6-9.) Mr. Chae reviewed that Wage Assessment. (*See* Exhibit 1, at page 105:9-19.)

71.     During the Examination, Ms. Oh and Mr. Chae were also examined about a document titled "ORDER DISMISSING REQUEST FOR REVIEW," which was marked as Exhibit 6. (*See* Exhibit 1, at page 102:23 to 103:-7; *see also* ORDER DISMISSING REQUEST FOR REVIEW, a copy of which is attached hereto as Exhibit 7 (hereinafter, "Exhibit 7").) That document refers to "Case No. 18-0406-PWH," as well as "From a Civil Wage and Penalty Assessment issued by: **Division of Labor Standards Enforcement**." (*See* Exhibit 7.) When Mr. Chae was asked whether one possible outcome with respect to this assessment is that Tobo could be on the hook for the amount of the assessment, he replied: "Yes". (*See* Exhibit 1, at page 104:21-23.)

72.     The Spreadsheet references **"**Case No. 18-0406-PWH" on the same line that it references "DLSE Case No. 40-54317-132," suggesting that the two case numbers refer to the same case. (*See* Exhibit 5.)

**G.     Labor Commission Case No. 40-65066-132.**

73.     During the Examination, Ms. Oh and Mr. Chae were also examined concerning a "Notice of Investigation," which was one of the documents marked as Exhibit 7. (*See* Exhibit 1, at page 105-2:8; *see also* Notice of Investigation, a copy of which is included in the documents attached hereto as Exhibit 8 (hereinafter, "Exhibit 8").) The Notice of Investigation is dated May 16, 2019, and it refers to Case No. 40-65066-132. (*See* Exhibit 8.) Mr. Chae testified that he did not know whether the Notice of Investigation was the first notification that Tobo received with respect to

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

this case, but he also testified it was possible that a request for documents may have preceded this notice of investigation in this case. (*See* Exhibit 1, at page 106:12-17; 107:15-18.)

74.    During the Examination, Ms. Oh and Mr. Chae were also examined concerning a "Notice of Apprenticeship Compliance," which was the other document marked as Exhibit 7. (*See* Exhibit 1, at page 107:22 to 108:1; *see also* Notice of Apprenticeship Compliance, a copy of which is included in Exhibit 8 hereto.) The Notice of Apprenticeship Compliance is dated May 16, 2019, it refers to Case No. 40-65066-132, and it refers to a number of alleged violations.(*See* Notice of Apprenticeship Compliance.) When Mr. Chae asked if Tobo was aware of the alleged violations that are set forth on that document prior to May 16, 2019, he replied: "I believe so.  Yes." (*See* Exhibit 1, at page 108:19-21.)

**H.    Labor Commission Case No. 40-60881-132.**

75.    The Spreadsheet also includes a reference to DLSE Case No. 40-60881-132. (*See* Exhibit 5.)  The information on the Spreadsheet related to that case includes a reference to "SSC," which Mr. Chae testified was a reference to the **Student Services Center** project at El Camino Community College. (*See* Exhibit 1, at page 113:2-8, *see also* Exhibit 5.) The information on the Spreadsheet related to that case includes a reference to "$2,998,536.05" in the "Amount" column, and a reference to "Plus penalties" in the "Status" column. (*See* Exhibit 5.) Mr. Chae testified not only that it was possible that the reference to the "$2,998,536.05" figure on the Spreadsheet for this case was because a Wage Assessment issued in this case, he could not think of another reason the amount would be on the Spreadsheet other than it resulting from a Wage Assessment. (*See* Exhibit 1, at page 114:9-16.) Mr. Chae also testified that, if a Wage Assessment had issued in this case, he would have reviewed it. (*See* Exhibit 1, at page 114:17-19.) When asked whether a notice, or a questionnaire, or a Notice of Investigation was received by Tobo with respect to this specific case, Mr. Chae answered: "I'm certain we received notices." (*See* Exhibit 5, at page 114:20-23.) Mr.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1  Chae also testified that he would have reviewed those notices. (*See* Exhibit 5, at page

2  114:24 to 115:1.)

3  **I.    Labor Commission Case No. 40-57020-218.**

4        76.    During the Examination, Ms. Oh and Mr. Chae were also examined

5  concerning a "Civil Wage and Penalty Assessment," which was marked as Exhibit 9.

6  (*See* Exhibit 1, at page 124:13-24 to 108:1; *see also* Labor Commission Case No. 40-

7  57020-218 Civil Wage and Penalty Assessment, a copy of which is attached hereto

8  as Exhibit 9 (hereinafter, "Exhibit 9").) Exhibit 9 is dated October 24, 2019, it refers

9  to Case No. 40-57020-218, and it refers to a project name of "Fire Station 27

10  Replacement-Fillmore". (*See* Exhibit 9.) Exhibit 9 also refers to Tobo as the "Prime

11  Contractor," and it does not refer to a subcontractor. (Exhibit 9.) Mr. Chae testified

12  that this case on the Spreadsheet, which included a reference to the acronym "FS27,"

13  referred to Tobo's "Fire Station 27 project". (*See* Exhibit 1, at page 124:8-11; *see also*

14  Exhibit 5.)

15        77.    Mr. Chae testified that before Tobo received this Wage Assessment,

16  Tobo would have received a questionnaire, an inquiry, or a Notice of Investigation

17  regarding this Case. (*See* Exhibit 1, at page 125:10-15.) Mr. Chae also testified that

18  he reviewed the notification or questionnaire or Notice of Investigation, and that it

19  was discussed at Tobo's weekly meetings by members of Tobo's management team.

20  (*See* Exhibit 1, at page 125:16-22.) Mr. Chae also acknowledged that the total amount

21  of wages due is $511,477.64, the total amount of penalties assessed under Labor Code

22  Sections 1775 and 1813 is $395,675, and that the amount of penalties assessed under

23  Labor Code Section 1777.7 is $56,680. (*See* Exhibit 1, at page 126:25 to 127:12; *see*

24  *also* Exhibit 5; *see also* Exhibit 9.)

25  **J.    Labor Commission Case No 40-54388-132.**

26        78.    During the Examination, Ms. Oh and Mr. Chae were also examined

27  concerning a "Civil Wage and Penalty Assessment," which was marked as Exhibit

28

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  10. (*See* Exhibit 1, at page 128:21 to 129:6; *see also* Labor Commission Case No. 40-
2  54388-132 Civil Wage and Penalty Assessment, a copy of which is attached hereto
3  as Exhibit 10 (hereinafter, "Exhibit 10").) Exhibit 10 is dated November 14, 2019,
4  and it refers to Case No. 40-54388-132. (*See* Exhibit 10.) Exhibit 10 also refers to
5  Tobo as the "Prime Contractor," and it does not refer to a subcontractor. (*See* Exhibit
6  10.) Mr. Chae testified that means that only Tobo is the subject of this Wage
7  Assessment. (*See* Exhibit 1, at page 129:12-25.)

8       79.    Mr. Chae also testified that before receiving this Wage Assessment, he
9  recalled Tobo receiving a notification, questionnaire, or Notice of Investigation, and
10  that he recalled reviewing it. (*See* Exhibit 1, at page 130:1-10.) Mr. Chae also
11  acknowledged that the total amount of wages due is $800,858.90, and that the total
12  amount of penalties assessed under Labor Code Sections 1775 and 1813 is $ 537,025.
13  (*See* Exhibit 1, at page 130:22 to 131:6; *see also* Exhibit 5; *see also* Exhibit 10.) Mr.
14  Chae also testified that one outcome with respect to this Wage Assessment is that
15  Tobo would be liable. (*See* Exhibit 1, at page 131:14-20.)

16  **K.**    **Labor Commission Case No 40-66318-716.**

17       80.    During the Examination, Ms. Oh and Mr. Chae were also examined
18  concerning a "Civil Wage and Penalty Assessment," which was marked as Exhibit
19  11. (*See* Exhibit 1, at page 132:13-25; *see also* Labor Commission Case No. 40-
20  66318-716 Civil Wage and Penalty Assessment, a copy of which is attached hereto
21  as Exhibit 11 (hereinafter, "Exhibit 11").) Exhibit 11 is dated October 31, 2019, and
22  it refers to Case No. 40-66318-716. (*See* Exhibit 11.) Exhibit 11 also refers to Tobo
23  as the "Prime Contractor," and it refers to "Mega Air Co., Inc. a corporation" as the
24  subcontractor. (*See* Exhibit 11.) Mr. Chae testified that this case on the Spreadsheet,
25  which included a reference to the acronym "SHL," referred to Tobo's "Signal Hill
26  Library project". (*See* Exhibit 1, at page 131:11-12; *see also* Exhibit 5.)

27       81.    Exhibit 11 refers to the total amount of wages due is $25,747.17, the total
28  amount of penalties assessed under Labor Code Sections 1775 and 1813 is

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  $29,700.00, and the amount of penalties assessed under Labor Code Section 1777.7

2  is $23,400.00. (*See* Exhibit 11.)

3       82.    Mr. Chae testified that the penalties and violations that are the subject of

4  this Wage Assessment were as a result of Mega Air Company's actions or inactions.

5  (*See* Exhibit 1, at page 133:16-19.) Mr. Chae also testified that, with respect to this

6  Wage Assessment, Tobo is a subject because the actions or inactions of one of its

7  subcontractors is at issue. (*See* Exhibit 1, at page 133:20-25.)   However, Mr. Chae

8  also testified that, where you have a circumstance where a civil wage and penalty

9  assessment based on actions or inactions of a subcontractor, a prime contractor can

10  nevertheless still be on the hook for having to pay the amount. (*See* Exhibit 1, at page

11  134:1-6.)

12       83.    Mr. Chae also testified that he was certain that Tobo received an inquiry,

13  questionnaire, or Notice of Investigation regarding this Wage Assessment. (*See*

14  Exhibit 1, at page 134:7-13.)

15  **L.    Labor Commission Case No 40-64276-716.**

16       84.    During the Examination, Ms. Oh and Mr. Chae were also examined

17  concerning a "Civil Wage and Penalty Assessment," which was marked as Exhibit

18  12. (*See* Exhibit 1, at page 137:10-18; *see also* Labor Commission Case No. 40-

19  64276-716 Civil Wage and Penalty Assessment, a copy of which is attached hereto

20  as Exhibit 12 (hereinafter, "Exhibit 12").) Exhibit 12 is dated October 31, 2019, and

21  it refers to Case No. 40-64276-716. (*See* Exhibit 12.) The Labor Commission Case

22  No. 40-64276-716 Civil Wage and Penalty Assessment also refers to Tobo as the

23  "Prime Contractor," and it refers to "Mega Air Co., Inc. a corporation" as the

24  subcontractor. (*See* Exhibit 12.)

25       85.    Mr. Chae also testified that Tobo received a notification, questionnaire,

26  or Notice of Investigation related to this case, and that he recalled reviewing it. (*See*

27  Exhibit 1, at page 138:1-7.) Mr. Chae also testified that Tobo received that document

28  as far back as 2018, and when he was asked whether Tobo received it before Tobo

1  obtained the loan from Retail Capital, he stated: "I'm certain we did before, but I don't

2  recall the specific date. (*See* Exhibit 1, at page 138:8-15.)

3      86.    The Labor Commission Case No. 40-64276-716 Civil Wage and Penalty

4  Assessment refers to the total amount of wages due is $36,139.26 the total amount of

5  penalties assessed under Labor Code Sections 1775 and 1813 is $15,480.00, and the

6  amount of penalties assessed under Labor Code Section 1777.7 is $23,920.00. (*See*

7  Exhibit 12.)

8      87.    Mr. Chae testified that one possible outcome of this Wage Assessment

9  is that Tobo may have to pay the amounts. (*See* Exhibit 1, at page 139:14-16.)

10     88.    When Mr. Chae was asked whether Tobo having to pay the amounts in

11  this Wage Assessment in September 2019 would have had an adverse effect on Tobo's

12  business, he denied that. (*See* Exhibit 1, at page 139:17-24.) When Mr. Chae was

13  asked whether Tobo having to pay the amounts in this Wage Assessment in September

14  2019 would have exacerbated the September 2019, he testified that Tobo "would have

15  taken this into consideration of our cash flow and perhaps adjusted accordingly". (*See*

16  Exhibit 1, at page 140:4-9:14-16.) However, Mr. Chae admitted that Tobo had to stop

17  making payments on the Loan in September 2019 because of reduced cash flow. (*See*

18  Exhibit 1, at page 139:25 to 140:3.) Mr. Chae also admitted that, in September 2019,

19  Tobo stopped making payments on three separate loans that Tobo had taken out from

20  three separate lenders (including Retail Capital). (*See* Exhibit 1, at page 140:21-24.)

21  Finally, Mr. Chae admitted that if Tobo had the means to come up with additional

22  capital to continue paying those loans, Tobo would have come up with that additional

23  cash flow. (*See* Exhibit 1, at page 140:25 to 141:3.)

24  **M.    Additional DLSE Case Related to Student Services Center at El Camino
        Community College.**

25

26     89.    During the Examination, Ms. Oh and Mr. Chae were also examined

27  concerning a second spreadsheet titled "LABOR VIOLATIONS; DLSE," (the

28  "Second Spreadsheet"), which was marked as Exhibit 13. (*See* Exhibit 1, at page

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1    141:7-16; *see also* Second Spreadsheet, a copy of which is attached hereto as Exhibit

2    13 (hereinafter, "Exhibit 13").) The Second Spreadsheet refers to some of the same

3    case numbers as the Spreadsheet (Case No. 40-61231-757, Case No. 40-54384-757,

4    Case No. 40-54317-132, and Case No. 40-60881-132.) (*See* Exhibit 5; *see also*

5    Exhibit 13.)

6        90.    However, the Second Spreadsheet contains information not contained in

7    the Spreadsheet. Ms. Oh and Mr. Chae were asked about those items, including a line

8    item referring to "200131, per Emily, CWPA $5,776,436.05". (*See* Exhibit 13, at page

9    142:22-25; *see also* Exhibit 13.) Mr. Chae testified that information is a reference to

10   the Student Services Center at El Camino Community College. (*See* Exhibit 1, at page

11   142:15-21.)

12       91.    Although Mr. Chae testified that he did not know what the reference to

13   "CWPA" stands for (*See* Exhibit 1, at page 143:7-9), it seems to be an acronym for

14   Civil Wage and Penalty Assessment, which would be consistent with the title of the

15   spreadsheet.

16       92.    Mr. Chae testified that he did not know why the "$5,776,436.05" figure

17   was on that part of the Second Spreadsheet, because the "line right above that is the

18   same project as SC," (*See* Exhibit 1, at page 144:11-16), meaning the line right above

19   also referred to the Student Services Center at El Camino Community College. (*See*

20   Exhibit 13.) The line right above refers to Case No. 40-60881-132, and Mr. Chae did

21   not know what that was in relation to. (*See* Exhibit 1, at page 144:18-20; *see also*

22   Exhibit 13.)

23       93.    With respect to this case, Mr. Chae testified that Tobo received an

24   inquiry, questionnaire, or Notice of Investigation, and that he reviewed that document.

25   (*See* Exhibit 1, at page 144:21 to 145:1.)  Mr. Chae also testified that he may have

26   reviewed that document sometime in the summer or fall of 2018. (*See* Exhibit 1, at

27   page 145:4-8.)

28   /////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

94.    Mr. Chae was asked if a Wage Assessment in the amount of $5,776,436.05 was issued in this case, one possible outcome is that Tobo would have to pay that assessment. (*See* Exhibit 1, at page 145:14-18.) When Mr. Chae was asked if Tobo having to pay an assessment in the amount of $5,776,436.05 would that have an adverse effect on Tobo's finances, Mr. Chae answered: "You're asking me to speculate.  So if I was to speculate that Tobo had to make 5 million plus in one-time payment, yes, it probably would have an adverse effect to Tobo Construction as a business." (*See* Exhibit 1, at page 14:19-25.)

**N.    Litigation Involving The Kalamata Loan.**

95.    During the Examination, Ms. Oh and Mr. Chae were also examined regarding a complaint filed by Kalamata against Tobo and Ms. Oh on September 18, 2019 (the "Kalamata Complaint"), which was marked as Exhibit 15, and a copy of which is attached hereto as Exhibit 14 (hereinafter, "Exhibit 14"). Related thereto, Mr. Chae testified that on or about July 15, 2019, Kalamata and Tobo entered into an agreement. (*See* Exhibit 1, at page 150:13-16.) It is alleged in the Kalamata Complaint that, pursuant to that agreement, Kalamata agreed to purchase all rights to Tobo's future receivables having an agreed upon value of $335,000.00. (*See* Exhibit 14, at paragraph 4.) Mr. Chae testified that the future receivables were related to Tobo's public work projects. (*See* Exhibit 1, at page 152:4-6.) When asked when Tobo first considered obtaining the loan from Kalamata, Mr. Chae answered: "I believe May, June of 2019." (*See* Exhibit 1, at page 152:7-10.) When asked whether Tobo may have considered obtaining that loan from Kalamata before it obtained the Loan from Retail Capital, Ms. Oh testified that she did not know, and Mr. Chae testified he didn't recall the exact timeline. (*See* Exhibit 1, at page 152:11-16.)

**O.    Lawsuit Filed bv International Fidelity Insurance Company Against Tobo, Ms. Oh, and Mr. Chae.**

96.    On January 3, 2020, International Fidelity Insurance Company ("IFIC") filed a complaint (the "IFIC Complaint") against numerous defendants, including

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1  Tobo, Ms. Oh, and Mr. Chae. (*See* IFIC Complaint, a copy of which is attached hereto

2  as Exhibit 15 (hereinafter, "Paragraph 15"), at page 2.) Tobo, Ms. Oh, and Mr. Chae

3  (along with defendant JC Development LLC) are referred to collectively as the

4  "Indemnitor/Defendants," and IFIC alleges that all are Jointly and Severally liable to

5  IFIC. (*See* Exhibit 15, page 2.)

6       97.    It is alleged in the IFIC Complaint that IFIC issued multiple

7  performance, payment and commercial line surety bonds (collectively the "Bonds")

8  on behalf of Tobo, as the bond principal, in connection with multiple construction

9  projects in the State of California. (*See* Exhibit 15, page 3, paragraph 22.) It is also

10  alleged in the IFIC Complaint that on or about April 25, 2014, to induce IFIC to issue

11  the Bonds, and as partial consideration for the Performance of the Bonds,

12  Indemnitor/Defendants executed an Agreement of Indemnity ("Indemnity

13  Agreement") in favor of IFIC under which they promised to completely indemnify

14  and hold IFIC harmless from all damage, loss or expense IFIC incurs as a result of

15  having issued the Bonds. (*See* Exhibit 15, pages 3 and 4, paragraph 23.)

16       98.    It is also alleged in the IFIC Complaint that Tobo entered into various

17  contracts to construct projects (Projects"), and requested that IFIC furnish the Bonds

18  for these Projects, and that IFIC, relying on, among other things, the

19  Indemnitor/Defendants' promises contained in the Indemnity Agreement, issued the

20  Bonds. (*See* IFIC Complaint, page 4, paragraph 24.)

21       99.    It is also alleged in the IFIC Complaint that:

22      "Tobo has since acknowledged and admitted that it is in default of its
contractual obligations on several of the Projects, in that, among other

23  things, Tobo cannot fulfill its obligation to complete the Projects and pay
its obligations, which has resulted, and will continue to result, in IFIC

24  incurring substantial losses, costs and expenses as a result of having
issued the Bonds, which losses are all recoverable under the express

25  terms of the Indemnity Agreement and California law." (*See* Exhibit 15,
page 4, paragraph 25.)

26  /////

27  /////

28  /////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

100.   It is also alleged in the IFIC Complaint that:

"From October 2018 through November 2019, TOBO has been served with multiple Civil Wage and Penalty Assessment ("CWPA") issued by Labor Commissioner, State of California, Division of Labor Standards Enforcement  ("DLSE") on several of the Projects. The DLSE alleges that TOBO has failed to pay its laborers, collectively, no less than $3,669,664, exclusive of interest, penalties and liquidated damages." (*See* Exhibit 15, page 4, paragraph 26.)

101.   It is also alleged in the IFIC Complaint that:

"IFIC is informed and believes and thereon alleges that based on an investigation conducted by the DLSE, defendants TOBO, JEC, Jaime Huerta, CW and DELGADO are alleged to have participated in a complex scheme involving kickbacks, wage theft and intentional violations of California's prevailing wages laws on the Projects, including the projects commonly known as the Student Services Center project that TOBO was performing for the El Camino Community College District in Los Angeles County and the Fire Station No. 27 Replacement project for the County of Ventura ("Fire Station Project"). (*See* Exhibit 15, pages 4 and 5, paragraph 27.)

102.   It is also alleged in the IFIC Complaint: "IFIC has paid $250,000.00 to the DLSE in response to the CWPA against TOBO on the Fire Station Project, and is actively investigating and attempting to resolve additional DLSE claims." (*See* Exhibit 15, page 5, paragraph 28.)

103.   It is also alleged in the IFIC Complaint:

"To date, IFIC has paid out and suffered a loss of no less than $3,200,000 as a result of TOBO's failure and inability to satisfy its obligations on the Projects. Based on the information currently available to it, IFIC anticipates that its net loss will exceed $4,000,000. The Indemnitor/Defendants are obligated to fully indemnify and reimburse IFIC for these and any other losses under the Indemnity Agreement." (*See* Exhibit 15, page 5, paragraph 30.)

104.   It is also alleged in the IFIC Complaint: "TOBO's financial inability to complete the Projects has resulted in IFIC receiving multiple claims against the Bonds." (*See* Exhibit 15, page 5, paragraph 31.)

/////

/////

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

**P.    Damages to Retail Capital Resulting From Non-Compliance With Retail Capital Loan Agreement.**

105.    On January 14, 2020, Retail Capital filed a complaint against Tobo, Ms. Oh, and JC Development, LLC, a California limited liability company ("JC", and collectively with Tobo and Ms. Oh, the "Defendants"), in the Superior Court for the State of Arizona, in and for the County of Maricopa (the "Retail Capital Arizona Action").(*See* Retail Capital Arizona Action, a copy of which is attached hereto as Exhibit 16 (hereinafter, "Exhibit 16").) It is alleged in the Retail Capital Arizona Action that on or about May 15, 2019, Tobo and Ms. Oh entered into the Retail Capital Loan Agreement, wherein Ms. Oh personally guaranteed Tobo's payment and performance. (*See* Exhibit 16, at page 3, paragraph 11). It is also alleged that on or about May 15, 2019, JC entered into the Addendum to Business Loan Agreement (collectively, the "Agreements"), and agreed to be jointly and severally liable for Tobo's obligations under the Agreements.  (*See* Exhibit 16, at page 3, paragraph 11).

106.    From May 10, 2019 to September 12, 2019, Defendants performed its obligations under the Agreements. (*See* Exhibit 16, at page 3, paragraph 18). As of September 13, 2019, Defendants have repaid $175,001.31 under the Agreements. (*See* Exhibit 16, at page 3, paragraph 19).

107.    On September 13, 2019, Defendants defaulted on the Agreements by issuing a stop payment to Retail Capital from its designated business bank account. (*See* Exhibit 16, at page 3, paragraph 18).

108.    Defendants have an outstanding balance, including fees accrued to date, of $248,588.22 due and owing to Retail Capital. (*See* Exhibit 16, at page 3, paragraph 20).

## V.    Count I

## Violation of 11 U.S.C. §523(a)(2)(A)

109.    Retail Capital realleges and incorporates by reference ¶¶ 1–108 of this Complaint as if specifically set forth herein.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

110.    Capital alleges that Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) made representations it knew to be false with respect to Section 4 of the Retail Capital Loan Agreement at the time it entered into the Retail Capital Loan Agreement as follows:

a.    When Tobo decided to obtain the Retail Capital Loan, Mr. Chae knew that the Retail Capital Loan Proceeds would be used for "[f]or Tobo's business purposes, making necessary payments". The Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account. When Ms. Oh and Mr. Chae were asked what kind of expenses of Tobo were paid out of the Pacific City Bank Account, they testified that "pretty much everything" was paid out of the Pacific City Bank Account, including project costs (such as payments to subcontractors, and any fees or costs related specific to projects), overhead costs (such as payroll), and utility fees. Therefore, when Tobo decided to obtain the Retail Capital Loan, it knew that the Retail Capital Loan Proceeds would be used to pay for "pretty much everything" that was paid out of the Pacific City Bank Account, including project costs (such as payments to subcontractors, and any fees or costs related specific to projects), overhead costs (such as payroll), and utility fees. Therefore, Retail Capital is informed and believes, and based thereon alleges, that Tobo knew that the Retail Capital Loan Proceeds would not be used only for the limited purposes set forth in Section 4 of the Retail Capital Loan Agreement when it entered into the Retail Capital Loan Agreement.

b.    The Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account, from which Tobo made numerous transfers, totaling hundreds of thousands of dollars, to an account ending in 3383 during the period from May 2019 to September 2019, which neither Ms. Oh nor Mr. Chae knew was even one of Tobo's accounts. Retail Capital is informed and believes, and based thereon alleges, that Tobo knew when it entered into the Retail Capital Loan Agreement that the Retail Capital Loan Proceeds would be used, in part, for this purpose.  Retail Capital is also informed

1 and believes, and based thereon alleges, that the funds that Tobo transferred from the

2 Pacific City Bank Account to the account ending in 3383 during the period from May

3 2019 to October 2019 were not used only for the limited purposes set forth in Section

4 4 of the Retail Capital Loan Agreement.

5        c.        The Retail Capital Loan Proceeds were deposited into the Pacific

6 City Bank Account, from which Tobo made numerous transfers, totaling hundreds of

7 thousands of dollars (including a $200,000.00 transfer the day after the retail Capital

8 Loan was deposited into the Pacific City Bank Account), to an account ending in 4960

9 during the period from May 2019 to August 2019, which neither Ms. Oh nor Mr. Chae

10 knew was even one of Tobo's accounts. Retail Capital is informed and believes, and

11 based thereon alleges, that Tobo knew when it entered into the Retail Capital Loan

12 Agreement that the Retail Capital Loan Proceeds would be used, in part, for this

13 purpose.  Retail Capital is also informed and believes, and based thereon alleges, that

14 the funds that Tobo transferred from the Pacific City Bank Account to the account

15 ending in 4960 during the period from May 2019 to August 2019 were not used only

16 for the limited purposes set forth in Section 4 of the Retail Capital Loan Agreement.

17        d.        The Retail Capital Loan Proceeds were deposited into the Pacific

18 City Bank Account, from which Tobo made payments to repay the OnDeck Capital

19 Loan, which Tobo may have obtained before it entered into the Retail Capital

20 Agreement. Retail Capital is informed and believes, and based thereon alleges, that

21 Tobo knew when it entered into the Retail Capital Loan Agreement that the Retail

22 Capital Loan Proceeds would be used, in part, for this purpose. Tobo's payments to

23 repay the OnDeck Capital Loan were not a use of the Retail Capital Loan Proceeds

24 for one of the limited purposes set forth in Section 4 of the Retail Capital Loan

25 Agreement.

26        e.        The Retail Capital Loan Proceeds were deposited into the Pacific

27 City Bank Account, from which Tobo made payments towards a company car. Retail

28 Capital is informed and believes, and based thereon alleges, that Tobo knew when it

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

entered into the Retail Capital Loan Agreement that the Retail Capital Loan Proceeds would be used, in part, for this purpose. Tobo's payments towards a company car were not a use of the Retail Capital Loan Proceeds for one of the limited purposes set forth in Section 4 of the Retail Capital Loan Agreement.

f.    The Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account, from which Tobo made payments to repay the Kalamata Loan. Retail Capital is informed and believes, and based thereon alleges, that Tobo knew when it entered into the Retail Capital Loan Agreement that the Retail Capital Loan Proceeds would be used, in part, for this purpose. Payments to repay the Kalamata Loan were not a use of the Retail Capital Loan Proceeds for one of the limited purposes set forth in Section 4 of the Retail Capital Loan Agreement.

g.    The Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account, from which Tobo made payments to repay the EBF Partners LLC Loan. Retail Capital is informed and believes, and based thereon alleges, that Tobo knew when it entered into the Retail Capital Loan Agreement that the Retail Capital Loan Proceeds would be used, in part, for this purpose. Payments to repay the EBF Partners LLC Loan were not a use of the Retail Capital Loan Proceeds for one of the limited purposes set forth in Section 4 of the Retail Capital Loan Agreement.

h.    The Retail Capital Loan Proceeds were deposited into the Pacific City Bank Account, from which Tobo made an outgoing wire transfer in the amount of $200,000.00 on September 23, 2019, approximately ten days after Tobo stopped making payments on the Retail Capital Loan. Neither Ms. Oh nor Mr. Chae knew why that money was transferred out of the Pacific City Bank Account on that date, or where the money was transferred to. Retail Capital is informed and believes, and based thereon alleges, that Tobo knew when it entered into the Retail Capital Loan Agreement that the Retail Capital Loan Proceeds would be used, in part, for this purpose. Retail Capital is also informed and believes, and based thereon alleges, that the $200,000.00 in funds that Tobo transferred from the Pacific City Bank Account

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1    on September 23, 2019 were not used only for the limited purposes set forth in Section

2    4 of the Retail Capital Loan Agreement.

3    111.   Retail Capital alleges that Ms. Oh (on behalf of Tobo, and at the

4    instruction of Mr. Chae) made representations it knew to be false with respect to

5    Section 10.1(h) of the Retail Capital Loan Agreement at the time it entered into the

6    Retail Capital Loan Agreement as follows:

7            a.    With respect to Labor Commission Case No. 40-54384-757, a

8    Wage Assessment in the amount of $1,337,883.90 issued on March 26, 2019, before

9    Tobo entered into the Retail Capital Loan Agreement. Tobo was aware of the Wage

10   Assessment in this case because Me. Chae testified that Tobo received that Wage

11   Assessment. Mr. Chae also testified that one possible outcome with respect to the

12   Wage Assessment in this case is that Tobo could be required to pay it.  Mr. Chae also

13   testified that if Tobo had to pay the Wage Assessment in this case in September 2019,

14   it would have exacerbated Tobo's cash flow problems at that time. Moreover, IFIC

15   contends in the IFIC Complaint that Tobo is in default of its contractual obligations

16   on several projects, in part, because it cannot pay its obligations, and that IFIC has

17   paid out no less than $3,200,000.00 as a result of Tobo's failure and inability to satisfy

18   its obligations on the projects. IFIC also contends that Tobo's financial inability to

19   complete projects has resulted in IFIC receiving multiple claims against bonds it

20   issued on Tobo's behalf with respect to the projects. Therefore, with respect to Labor

21   Commission Case No. 40-54384-757, when Tobo entered into the Retail Capital Loan

22   Agreement, it made a knowing misrepresentation when it represented that there was

23   no action, suit, proceeding or investigation pending against or affecting Tobo or any

24   of its assets before or by any court or other governmental authority which, if

25   determined adversely to Tobo, would have a material adverse effect on its financial

26   condition, business or prospects.

27           b.    With respect to Labor Commission Case No. 40-54317-132, a

28   Wage Assessment issued on October 5, 2018, before Tobo entered into the Retail

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  Capital Loan Agreement. Tobo was aware of the Wage Assessment in this case
2  because Me. Chae testified that Tobo received that Wage Assessment, and because
3  Mr. Chae testified that he reviewed that Wage Assessment. Mr. Chae also testified
4  that one possible outcome with respect to the Wage Assessment in this case is that
5  Tobo could be required to pay it. Moreover, IFIC contends in the IFIC Complaint that
6  Tobo is in default of its contractual obligations on several projects, in part, because it
7  cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a
8  result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC
9  also contends that Tobo's financial inability to complete projects has resulted in IFIC
10  receiving multiple claims against bonds it issued on Tobo's behalf with respect to the
11  projects. Based thereon, and also on Mr. Chae's testimony that Tobo ran out of
12  working capital and was having cash flow difficulties beginning in September 2019
13  (which was evidenced, in part, by Tobo ceasing repayments of the Retail Capital
14  Loan, the Kalamata Loan, and the EBF Partners LLC Loan), Retail Capital is
15  informed and believes, and based thereon alleges, that Tobo having to pay a Wage
16  Assessment in this case would have had a material adverse effect on Tobo's financial
17  condition, business or prospects. Therefore, with respect to Labor Commission Case
18  No. 40-54317-132, when Tobo entered into the Retail Capital Loan Agreement, it
19  made a knowing misrepresentation when it represented that there was no action, suit,
20  proceeding or investigation pending against or affecting Tobo or any of its assets
21  before or by any court or other governmental authority which, if determined adversely
22  to Tobo, would have a material adverse effect on its financial condition, business or
23  prospects.

24        c.     With respect to Labor Commission Case No. 40-65066-132,
25  Retail Capital is informed and believes, and based thereon alleges, that Tobo was
26  aware of the investigation related to this case before Tobo entered into the Retail
27  Capital Loan Agreement because Mr. Chae testified that he was aware of the
28  violations alleged in the "Notice of Apprenticeship Compliance" in this case prior to

1  May 16, 2019, at approximately the same time Tobo entered into the Retail Capital

2  Loan Agreement. Based on Mr. Chae's testimony during the Examination, if a Wage

3  Assessment resulted from the investigation in this case, one possible outcome is that

4  Tobo would have to pay that Wage Assessment. Moreover, IFIC contends in the IFIC

5  Complaint that Tobo is in default of its contractual obligations on several projects, in

6  part, because it cannot pay its obligations, and that IFIC has paid out no less than

7  $3,200,000.00 as a result of Tobo's failure and inability to satisfy its obligations on

8  the projects. IFIC also contends that Tobo's financial inability to complete projects

9  has resulted in IFIC receiving multiple claims against bonds it issued on Tobo's behalf

10  with respect to the projects. Based thereon, and also on Mr. Chae's testimony that

11  Tobo ran out of working capital and was having cash flow difficulties beginning in

12  September 2019 (which was evidenced, in part, by Tobo ceasing repayments of the

13  Retail Capital Loan, the Kalamata Loan, and the EBF Partners LLC Loan), Retail

14  Capital is informed and believes, and based thereon alleges, that Tobo having to pay

15  a Wage Assessment in this case would have had a material adverse effect on Tobo's

16  financial condition, business or prospects. Therefore, with respect to Labor

17  Commission Case No. 40-65066-132, Retail Capital is informed and believes, and

18  based thereon alleges, that  when Tobo entered into the Retail Capital Loan

19  Agreement, it made a knowing misrepresentation when it represented that there was

20  no action, suit, proceeding or investigation pending against or affecting Tobo or any

21  of its assets before or by any court or other governmental authority which, if

22  determined adversely to Tobo, would have a material adverse effect on its financial

23  condition, business or prospects.

24        d.    With respect to Labor Commission Case No. 40-60881-132,

25  Retail Capital is informed and believes, and based thereon alleges, that a Wage

26  Assessment issued in this case based on the fact the Spreadsheet refers to the issuance

27  of a Wage Assessment in the amount of $2,998,536.05 in this case. Mr. Chae also

28  testified that this case is related to the Student Services Center project at El Camino

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

Community College, and he referred to that project when he testified that Wage Assessments issued with respect to certain projects caused Tobo to stop receiving payments for work related to those projects in September 2019. Based on that timeframe from Mr. Chae, Retail Capital is informed and believes, and based thereon alleges, that Tobo was aware of the Wage Assessment that issued in this case, or the investigation that resulted in the Wage Assessment in this case, before Tobo entered into the Retail Capital Loan Agreement based on Mr. Chae's testimony concerning the amount of time that elapses between the beginning of an investigation and the issuance of a Wage Assessment (i.e., a minimum of 120 days, and potentially one year or more). Mr. Chae also testified that he was certain that Tobo received "notices" in this case, and that he would have reviewed a Wage Assessment in this case. Moreover, IFIC contends in the IFIC Complaint that Tobo is in default of its contractual obligations on several projects, in part, because it cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC also contends that Tobo's financial inability to complete projects has resulted in IFIC receiving multiple claims against bonds it issued on Tobo's behalf with respect to the projects. Based thereon, and also on Mr. Chae's testimony that Tobo ran out of working capital and was having cash flow difficulties beginning in September 2019 ((which was evidenced, in part, by Tobo ceasing repayments of the Retail Capital Loan, the Kalamata Loan, and the EBF Partners LLC Loan, and which may have resulted, in part, from the Wage Assessment that issued in this case), Retail Capital is informed and believes, and based thereon alleges, that Tobo having to pay a Wage Assessment in this case in the amount of $2,998,536.05 would have had a material adverse effect on Tobo's financial condition, business or prospects. Therefore, with respect to Labor Commission Case No. 40-60881-132, Retail Capital is informed and believes, and based thereon alleges, that when Tobo entered into the Retail Capital Loan Agreement, it made a knowing misrepresentation when it represented that there was

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  no action, suit, proceeding or investigation pending against or affecting Tobo or any

2  of its assets before or by any court or other governmental authority which, if

3  determined adversely to Tobo, would have a material adverse effect on its financial

4  condition, business or prospects.

5          e.      With respect to a second Labor Commission Case concerning the

6  Student Services Center project at El Camino Community College, the Second

7  Spreadsheet refers to "200131, per Emily, CWPA $5,776,436.05". Retail Capital is

8  informed and believes, and based thereon alleges, that information refers to a Wage

9  Assessment that was issued in this case in the amount of $5,776,436.05. Retail Capital

10  is informed and believes, and based thereon alleges, that Tobo was aware of the Wage

11  Assessment that issued in this case, or the investigation that resulted in the Wage

12  Assessment in this case, before Tobo entered into the Retail Capital Loan Agreement

13  based on Mr. Chae's testimony concerning the amount of time that elapses between

14  the beginning of an investigation and the issuance of a Wage Assessment (i.e., a

15  minimum of 120 days, and potentially one year or more). That is because Mr. Chae

16  referred to the Student Services Center project at El Camino Community College

17  project when he testified that Wage Assessments issued with respect to certain

18  projects caused Tobo to stop receiving payments for work related to those projects in

19  September 2019. Retail Capital is informed and believes, and based thereon alleges,

20  that the Wage Assessment that issued in this case could be one of the Wage

21  Assessments to which Mr. Chae referred. Retail Capital is also informed and believes,

22  and based thereon alleges, that Tobo was aware of the Wage Assessment that issued

23  in this case, or the investigation that resulted in the Wage Assessment in this case,

24  before Tobo entered into the Retail Capital Loan Agreement based on Mr. Chae's

25  testimony that Tobo received an inquiry, questionnaire, or Notice of Investigation

26  with respect to this case, and that he may have reviewed that document sometime in

27  the summer or fall of 2018, prior to Tobo entering into the Retail Capital Loan

28  Agreement. Mr. Chae also admitted that Tobo paying a Wage Assessment in the

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  amount of $5,776,436.05 "probably would have an adverse effect to Tobo

2  Construction as a business." Moreover, IFIC contends in the IFIC Complaint that

3  Tobo is in default of its contractual obligations on several projects, in part, because it

4  cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a

5  result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC

6  also contends that Tobo's financial inability to complete projects has resulted in IFIC

7  receiving multiple claims against bonds it issued on Tobo's behalf with respect to the

8  projects. Therefore, with respect to this Labor Commission Case, Retail Capital is

9  informed and believes, and based thereon alleges, that when Tobo entered into the

10 Retail Capital Loan Agreement, it made a knowing misrepresentation when it

11 represented that there was no action, suit, proceeding or investigation pending against

12 or affecting Tobo or any of its assets before or by any court or other governmental

13 authority which, if determined adversely to Tobo, would have a material adverse

14 effect on its financial condition, business or prospects.

15        f.        With respect to Labor Commission Case No. 40-57020-218, Mr.

16 Chae testified that this case is related to the "Fire Station 27 project", and Mr. Chae

17 referred to that project when he testified that Wage Assessments issued with respect

18 to certain projects caused Tobo to stop receiving payments for work related to those

19 projects in September 2019. Retail Capital is informed and believes, and based

20 thereon alleges, that although the Wage Assessment in this case did not issue until

21 October 24, 2019, Tobo was aware of the investigation that resulted in the Wage

22 Assessment in this case before Tobo entered into the Retail Capital Loan Agreement,

23 based on Mr. Chae's testimony concerning the amount of time that elapses between

24 the beginning of an investigation and the issuance of a Wage Assessment (i.e., a

25 minimum of 120 days, and potentially one year or more). Mr, Chae also testified that

26 before Tobo received this Wage Assessment, Tobo would have received a

27 questionnaire, an inquiry, or a Notice of Investigation regarding this case; that he

28 reviewed the notification or questionnaire or Notice of Investigation; and that it was

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

discussed at Tobo's weekly meetings by members of Tobo's management team. Moreover, IFIC contends in the IFIC Complaint that Tobo is in default of its contractual obligations on several projects, in part, because it cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC also contends that Tobo's financial inability to complete projects has resulted in IFIC receiving multiple claims against bonds it issued on Tobo's behalf with respect to the projects. Based thereon, and also on Mr. Chae's testimony that Tobo ran out of working capital and was having cash flow difficulties beginning in September 2019 (which was evidenced, in part, by Tobo ceasing repayments of the Retail Capital Loan, the Kalamata Loan, and the EBF Partners LLC Loan, and which may have resulted, in part, from the Wage Assessment that issued in this case), Retail Capital is also informed and believes, and based thereon alleges, that Tobo having to pay a Wage Assessment in this case would have had a material adverse effect on Tobo's financial condition, business or prospects. Related thereto is the fact that IRIC contends that it paid $250,000.00 in response to the Wage Assessment against Tobo related to this specific case, which is one basis for the IRIC Complaint. Therefore, with respect to Labor Commission Case No. 40-57020-218, Retail Capital is informed and believes, and based thereon alleges, that when Tobo entered into the Retail Capital Loan Agreement, it made a knowing misrepresentation when it represented that there was no action, suit, proceeding or investigation pending against or affecting Tobo or any of its assets before or by any court or other governmental authority which, if determined adversely to Tobo, would have a material adverse effect on its financial condition, business or prospects.

g.    With respect to Labor Commission Case No. 40-54388-132, Retail Capital is informed and believes, and based thereon alleges, that although the Wage Assessment in this case did not issue until November 14, 2019, Tobo was aware of the investigation that resulted in the Wage Assessment in this case before Tobo

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

1   entered into the Retail Capital Loan Agreement, based on Mr. Chae's testimony

2   concerning the amount of time that elapses between the beginning of an investigation

3   and the issuance of a Wage Assessment (i.e., a minimum of 120 days, and potentially

4   one year or more). Mr. Chae also testified that before receiving this Wage

5   Assessment, he recalled Tobo receiving a notification, questionnaire, or Notice of

6   Investigation, and that he recalled reviewing it. Mr. Chae also testified that one

7   outcome with respect to this Wage Assessment is that Tobo would be liable.

8   Moreover, IFIC contends in the IFIC Complaint that Tobo is in default of its

9   contractual obligations on several projects, in part, because it cannot pay its

10  obligations, and that IFIC has paid out no less than $3,200,000.00 as a result of Tobo's

11  failure and inability to satisfy its obligations on the projects. IFIC also contends that

12  Tobo's financial inability to complete projects has resulted in IFIC receiving multiple

13  claims against bonds it issued on Tobo's behalf with respect to the projects. Based

14  thereon, and also on Mr. Chae's testimony that Tobo ran out of working capital and

15  was having cash flow difficulties beginning in September 2019 (which was

16  evidenced, in part, by Tobo ceasing repayments of the Retail Capital Loan, the

17  Kalamata Loan, and the EBF Partners LLC Loan), Retail Capital is also informed and

18  believes, and based thereon alleges, that Tobo having to pay a Wage Assessment in

19  this case (in the total amount of $1,337,883.90) would have had a material adverse

20  effect on Tobo's financial condition, business or prospects. Therefore, with respect to

21  Labor Commission Case No. 40-54388-132, Retail Capital is informed and believes,

22  and based thereon alleges, that when Tobo entered into the Retail Capital Loan

23  Agreement, it made a knowing misrepresentation when it represented that there was

24  no action, suit, proceeding or investigation pending against or affecting Tobo or any

25  of its assets before or by any court or other governmental authority which, if

26  determined adversely to Tobo, would have a material adverse effect on its financial

27  condition, business or prospects.

28  /////

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

h.    With respect to Labor Commission Case No. 40-66318-716, Mr. Chae testified that this case is related to the "Signal Hill Library project", and Mr. Chae referred to that project when he testified that Wage Assessments issued with respect to certain projects caused Tobo to stop receiving payments for work related to those projects in September 2019. Retail Capital is informed and believes, and based thereon alleges, that although the Wage Assessment in this case did not issue until October 31, 2019, Tobo was aware of the investigation that resulted in the Wage Assessment in this case before Tobo entered into the Retail Capital Loan Agreement, based on Mr. Chae's testimony concerning the amount of time that elapses between the beginning of an investigation and the issuance of a Wage Assessment (i.e., a minimum of 120 days, and potentially one year or more). Mr. Chae also testified that he was certain that Tobo received an inquiry, questionnaire, or Notice of Investigation regarding this Wage Assessment. Mr. Chae also testified that Tobo could potentially be on the hook for this Wage Assessment. Moreover, IFIC contends in the IFIC Complaint that Tobo is in default of its contractual obligations on several projects, in part, because it cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC also contends that Tobo's financial inability to complete projects has resulted in IFIC receiving multiple claims against bonds it issued on Tobo's behalf with respect to the projects. Based thereon, and also on Mr. Chae's testimony that Tobo ran out of working capital and was having cash flow difficulties beginning in September 2019 (which was evidenced, in part, by Tobo ceasing repayments of the Retail Capital Loan, the Kalamata Loan, and the EBF Partners LLC Loan, and which may have resulted, in part, from the Wage Assessment that issued in this case), Retail Capital is also informed and believes, and based thereon alleges, that Tobo having to pay a Wage Assessment in this case (in the total amount of $78,847.17) would have had a material adverse effect on Tobo's financial condition, business or prospects. Therefore, with respect to Labor Commission Case No. 40-66318-716, Retail Capital

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

is informed and believes, and based thereon alleges, that when Tobo entered into the Retail Capital Loan Agreement, it made a knowing misrepresentation when it represented that there was no action, suit, proceeding or investigation pending against or affecting Tobo or any of its assets before or by any court or other governmental authority which, if determined adversely to Tobo, would have a material adverse effect on its financial condition, business or prospects.

          i.      With respect to Labor Commission Case No. 40-64276-716, although the Wage Assessment in this case did not issue until October 31, 2019, Tobo was aware of the investigation that resulted in the Wage Assessment in this case before Tobo entered into the Retail Capital Loan Agreement, based on Mr. Chae's testimony that Tobo received a notification, questionnaire, or Notice of Investigation related to this case (which he reviewed) before Tobo obtained the Retail Capital Loan (and possibly as far back as 2018). Mr. Chae testified that one possible outcome of this Wage Assessment is that Tobo may have to pay the amounts. Moreover, IFIC contends in the IFIC Complaint that Tobo is in default of its contractual obligations on several projects, in part, because it cannot pay its obligations, and that IFIC has paid out no less than $3,200,000.00 as a result of Tobo's failure and inability to satisfy its obligations on the projects. IFIC also contends that Tobo's financial inability to complete projects has resulted in IFIC receiving multiple claims against bonds it issued on Tobo's behalf with respect to the projects. Based thereon, and also on Mr. Chae's testimony that Tobo ran out of working capital and was having cash flow difficulties beginning in September 2019 ), Retail Capital is also informed and believes, and based thereon alleges, that Tobo having to pay a Wage Assessment in this case (in the total amount of $74,909.26) would have had a material adverse effect on Tobo's financial condition, business or prospects. Therefore, with respect to Labor Commission Case No. 40-64276-716, Retail Capital is informed and believes, and based thereon alleges, that when Tobo entered into the Retail Capital Loan Agreement, it made a knowing misrepresentation when it represented that there was

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

no action, suit, proceeding or investigation pending against or affecting Tobo or any of its assets before or by any court or other governmental authority which, if determined adversely to Tobo, would have a material adverse effect on its financial condition, business or prospects.

112.    Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) made representations it knew to be false with respect to Section 21 of the Retail Agreement Loan Agreement at the time it entered into the Retail Capital Loan Agreement as follows:

a.    On or about July 15, 2019, Kalamata and Tobo entered into an agreement whereby Kalamata agreed to purchase all rights to Tobo's future receivables having an agreed upon value of $335,000.00. Retail Capital is informed and believes, and based thereon alleges, that the subject of that Agreement is the Kalamata Loan.

b.    The Statements show that from July 2019 to September 2019, Tobo made regular payments on the Kalamata Loan more frequently than monthly.

c.    Although Tobo entered into the agreement to obtain the Kalamata Loan on or about July 15, 2019, Mr. Chae testified that Tobo first considered obtaining the Kalamata Loan in May or June of 2019. Moreover, neither Ms. Oh nor Mr. Chae knew whether or not Tobo first considered obtaining the Kalamata Loan before Tobo entered into the retail Capital Loan Agreement. Based thereon, Retail Capital alleges, based on information and belief, that Tobo first considered obtaining the Kalamata Loan before Tobo entered into the Retail Capital Loan Agreement. Retail Capital also alleges, based on information and belief, that when Tobo first considered obtaining the Kalamata Loan, it knew it would be required to make regular payments more frequently than monthly. Therefore, Retail Capital is informed and believes, and based thereon alleges, that when Tobo entered into the Retail Capital Loan Agreement, it had already considered obtaining the Kalamata Loan, which it knew would require regular payments more frequently than monthly.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

113.   As a result of the false representations set forth above by Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) Tobo obtained the Retail Capital Loan in the amount of $325,000.00.

114.   Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) made the false representations set forth above with the intention and purpose of deceiving Retail Capital. That is because Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) made the false representations set forth above while also acknowledging and agreeing, when she entered into the Retail Capital Loan Agreement, that Retail Capital relied on all information (financial and other) provided by her or on behalf of Tobo in connection with Retail Capital's decision to make the Retail Capital Loan.

115.   Retail Capital justifiably relied on the false representations set forth above by Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) in making the Retail Capital Loan. That is because Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) acknowledged and agreed, when she entered into the Retail Capital Loan Agreement, that Retail Capital relied on all information (financial and other) provided by her or on behalf of Tobo in connection with Retail Capital's decision to make the Retail Capital Loan. That is also because Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) represented that all information (financial and other) provided by her or on behalf of Tobo to Retail Capital in connection with, or pursuant to, the Retail Capital Agreement is true, accurate and complete in all respects.

116.   The false representations set forth above by Ms. Oh (on behalf of Tobo, and at the instruction of Mr. Chae) caused Retail Capital to sustain losses in the amount of not less than $248,588.22, which is inclusive of the difference between the repayment amount under the Retail Capital Loan Agreement and the payments Tobo made towards repaying the Retail Capital Loan, as well as fees that have accrued related thereto. Such losses shall also include attorneys fees and costs that Retail

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CALIFORNIA 92075
(888) 846-8901

1  Capital is forced to incur in the instant proceedings pursuant to Section 10.13 of the
2  Retail Capital Loan Agreement.

3      117. Debtors' misrepresentations constitute false pretenses, false
4  representations, and/or actual fraud in violation of 11 U.S.C. §523(a)(2)(A) and,
5  therefore, Debtors' indebtedness to Retail Capital constitutes a non-dischargeable
6  debt.

7

8                              **VI.    Count II:**

9                      **Violation of 11 U.S.C. §523(a)(6)**

10     118. Retail Capital realleges and incorporates by reference ¶¶ 1–117 of this
11  Complaint as if specifically set forth herein.

12     119. The foregoing misrepresentations and non-disclosures constitute a
13  willful and malicious injury to Retail Capital's property.

14     120. Such conduct violates 11 U.S.C. §523(a)(6) and, therefore, the Debtors'
15  indebtedness to Retail Capital constitutes a nondischargeable debt.

16  /////
17  /////
18  /////
19  /////
20  /////
21  /////
22  /////
23  /////
24  /////
25  /////
26  /////
27  /////
28  /////

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

**Requested Relief**

WHEREFORE, Retail Capital respectfully requests that this Court, upon trial:

1.      Order that Debtors' indebtedness to Retail Capital (or such amount thereof that the Court deems appropriate) constitutes a non-dischargeable debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6);

2.      Grant a non-dischargeable judgment in favor of Retail Capital against Debtors with prejudgment and postjudgment interest as provided by law and pursuant to the terms of the Retail Capital Loan Agreement, as well as reasonable attorney fees, costs, and expenses; and

3.      Grant Retail Capital such other and further relief to which it may be justly entitled.

Dated:  May 11, 2020                           **GLOBAL LEGAL LAW FIRM**

                                               By: _____
                                                    Christopher R. Dryden, Esq.
                                                    Joshua J. Herndon, Esq.
                                                    Attorneys for Retail Capital LLC,
                                                    doing business as Credibly

COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

IN RE:                          )
                                )        CERTIFIED COPY
MONICA SHIUN OH AND             ) Case No: 220-bk-11376-BB
JIMI P. CHAE,                   )
                                ) Chapter 7
          Debtors.             )
_____ )

BANKRUPTCY EXAMINATION OF

MONICA OH AND JIMI CHAE

CONDUCTED VIA REMOTE VIDEOCONFERENCING

SAN DIEGO, CALIFORNIA

APRIL 27, 2020

Reported by:
DARLA KMETY
CSR No. 12956, RPR
No. 20-90626



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860  |  323.938.8750

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              LOS ANGELES DIVISION

4

5

6    IN RE:                    )        **CERTIFIED COPY**
                               )
7    MONICA SHIUN OH AND       ) Case No: 220-bk-11376-BB
     JIMI P. CHAE,             )
8                              ) Chapter 7
              Debtors.         )
9    _____)

10

11

12         BANKRUPTCY EXAMINATION OF

13         MONICA OH AND JIMI CHAE

14    CONDUCTED VIA REMOTE VIDEOCONFERENCING

15         SAN DIEGO, CALIFORNIA

16             APRIL 27, 2020

17

18

19

20

21

22

23
     Reported by:
24   DARLA KMETY
     CSR No. 12956, RPR
25   No. 20-90626

```
 1              A P P E A R A N C E S

 2

 3    Global Legal Law Firm

 4    380 Stevens Avenue, Suite 311

 5    Solana Beach, California 92075

 6    858.256.7435

 7    Mr. Joshua Herndon, Esq.

 8    jherndon@attorneygl.com

 9

10    The Hinds Law Group

11    21257 Hawthorne Boulevard, Second Floor

12    Torrance, California 90503

13    310.316.0500

14    Rachel Sposato, Esq.

15    rsposato@hindslawgroup.com

16

17

18

19

20

21

22

23

24

25
```

```
 1   I N D E X

 2   WITNESSES:  MONICA OH/JIMI CHAE

 3   EXAMINATION BY                        PAGE

 4   MR. HERNDON                           5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    EXHIBITS                                        PAGE

 2    EX 1   Premarked Credibly Loan Preapproval      50

 3    EX 2   Premarked Pacific City Bank Statement    50

 4    EX 3   Document Production                       90
             re:  Credibly 2004, Examination 465
 5
      EX 4   Re:  Credibly 2004, Examination 527      91
 6
      EX 5   Re:  Credibly 2004, Examination 457      100
 7
      EX 6   Re:  Credibly 2004, Examination 461      102
 8
      EX 7   Re:  Credibly 2004, Examination 507      106
 9
      EX 8   Re:  Credibly 2004, Examination 500      117
10
      EX 9   Re:  Credibly 2004, Examination 492      124
11
      EX 10 Re:  Credibly 2004, Examination 475       129
12
      EX 11 Re:  Credibly 2004, Examination 289       132
13
      EX 12 Re:  Credibly 2004, Examination 271       137
14
      EX 13 Re:  Credibly 2004, Examination 206       141
15
      EX 14 Re:  Credibly 2004, Examination 302       148
16
      EX 15 Re:  Credibly 2004, Examination 208       149
17
      EX 16   CONFIDENTIAL, ATTORNEYS' EYES ONLY      153-154
18
      EX 17 Re:  Credibly 2004, Examination 309       156
19

20

21           CONFIDENTIAL ATTORNEYS' EYES ONLY PORTION

22                      PAGES 153-154

23

24

25
```

```
 1              MS. OH:  First name is spelled M-O-N-I-C-A.
 2    Last name is spelled O-H.
 3              MR. HERNDON:  Thank you very much.  Mr. Chae,
 4    would you please do the same?
 5              MR. CHAE:  First name is spelled J-I-M-I.  Last
 6    name is C-H-A-E.
 7              MR. HERNDON:  Thank you very much.
 8              Now, going forward, I will ask a question, and
 9    then you can decide how to answer the question in terms of
10    if one of you has better knowledge than the other.  That I
11    think is probably the best way to go forward with these
12    questions.
13              So we'll go ahead and get started with that.
14    I'm going to refer to Tobo Construction throughout this
15    examination as Tobo.
16              Is that okay with you?
17              MS. OH:  Sure.
18              MR. CHAE:  That's fine.
19
20                      DIRECT EXAMINATION
21    BY MR. HERNDON:
22         Q    Okay.  When was Tobo created?  What year was it
23    created?
24         A    (Mr. Chae):  I don't have the exact year, but I
25    believe it's about 18 to 20 years ago as a corporation.
```

```
1        Q     Okay.  All right.  A California corporation?

2        A     That is correct.

3        Q     Okay.  And what was the scope of Tobo's business

4   right after it was created?  What did Tobo do after it was

5   created?

6        A     It's a construction company.  General

7   contractor.

8        Q     Okay.  All right.  Has that changed in any way

9   from the time that Tobo was created until the present or

10  has it always been a general contractor?

11       A     It's always been a general contractor.

12       Q     Okay.  Okay.  To what extent does Tobo utilize

13  subcontractors in Tobo's business?

14       A     As a general contractor for Tobo, depending on

15  the projects, we hire subcontractors to do specialty trade

16  works.

17            MR. HERNDON:  Okay.  And, Ms. Oh, let me start

18  with you.  What is your position with Tobo?

19            MS. OH:  I am the namesake president.

20            MR. HERNDON:  To clarify, did you say the

21  namesake president?

22            MS. OH:  Yes.  I'm the president for the

23  company.

24            MR. HERNDON:  Okay, Ms. Oh.  How long have you

25  been in that position with Tobo?
```

1              MS. OH:  Since we bought out the company from

2     the previous owner, I want to say over a decade ago, maybe

3     12, 13 years ago.

4              MR. HERNDON:  All right.  Ms. Oh, what are your

5     duties in your position as the president of Tobo?

6              MS. OH:  I sign documents.

7              MR. HERNDON:  Do you do anything else?

8              MS. OH:  Nope.  No.

9              MR. HERNDON:  Do you review the documents before

10    you sign them?

11             MS. OH:  Sometimes I do.

12             MR. HERNDON:  What types of contracts do you

13    sign in your position as president for Tobo?

14             MS. OH:  Loan documents that were taken in my

15    name.  Anything that needs to be notarized.  Primarily

16    financial documents.

17             MR. HERNDON:  Have those been your duties for as

18    long as you've been the president of Tobo?

19             MS. OH:  Yes.

20    BY MR. HERNDON:

21        Q    Okay.  And, Mr. Chae, what is your position with

22    Tobo?

23        A    I'm the corporate secretary.

24        Q    All right.  Mr. Chae, how long have you been in

25    that position?

1       A       From the inception, so about 12 years.

2       Q       From when you and Ms. Oh bought out the prior

3  owner; is that correct?

4       A       That's correct.

5       Q       All right.  Mr. Chae, what are your duties in

6  your position as corporate secretary?

7       A       Um, I manage our staff.  Project manager,

8  superintendents.

9       Q       So you manage Tobo staff which consists of

10  project managers, and what was the other term you

11  mentioned?

12      A       Superintendents.  And the office administrators.

13      Q       All right.  Mr. Chae, do you have any other

14  duties in your position as corporate secretary?

15      A       Those three are primary duties.

16      Q       So primarily management, management of staff?

17      A       That's correct.

18      Q       Okay.  And have those been your duties in that

19  position as corporate secretary for as long as you've been

20  with Tobo?

21      A       Yes.

22      Q       Thank you very much.  Now I will just simply

23  open it up to the both of you for these questions.  Does

24  Tobo collect any payments from any of their customers via

25  credit card?

```
1          A     No.

2          Q     Does Tobo collect any payments from any of their

3    customers via debit card?

4          A     No.

5          Q     Does Tobo collect any payments from any of their

6    customers via any other kind of payment card?

7          A     No.

8          Q     How do Tobo customers make payments to Tobo when

9    they pay Tobo for the services rendered?

10         A     Usually by checks or electronic fund transfer.

11         Q     Okay.  All right.  Are you familiar with a loan

12   that Tobo obtained from Retail Capital in May 2019?

13               MS. OH:  Yes.

14         A     Yes.

15         Q     How were you familiar with that loan?

16               MS. OH:  Are you addressing it to me?

17         Q     No, I'll address it to both of you.  Actually,

18   yeah, if I can have each of you answer that, I would

19   appreciate it.

20               MS. OH:  It was another loan that -- for a line

21   of credit that my husband told me that I needed to sign.

22         Q     Okay.  Ms. Oh, do you recall if Mr. Chae told

23   you why you needed to sign?

24               MS. OH:  He just said it was another line of

25   credit.
```

1      Q    Okay.  All right.  When did Tobo decide to

2    retain that loan from Retail Capital?

3      A    I believe it was April, May of 2019.

4      Q    Why did Tobo decide to obtain that loan for

5    Retail Capital?

6      A    To help with cash flow on Tobo business.

7      Q    Would you please specify what it is you mean by

8    to help with cash flow?

9      A    We -- as a company, there's monthly billings

10   that we process payments when it comes in.  Sometimes it

11   takes longer; sometimes it takes more than 30 days to

12   receive payments from our clients.  So we needed some

13   relief in cash flow to make payments for the business.

14     Q    Okay.  And who at Tobo was responsible for

15   deciding whether to obtain that loan from Retail Capital?

16     A    That would be me.

17     Q    So going back to the prior part of the

18   examination about your duties with Tobo Construction, is

19   it also accurate to say that your duties also include

20   decisions to obtain financing or funding for Tobo?

21     A    Yes.  Yes.

22     Q    Okay.  When Tobo decided to obtain the loan from

23   Retail Capital, was it known what those loan proceeds

24   would be used for?

25     A    Yes.

1    Q    What did Tobo intend to use those loan proceeds

2    for?

3    A    For Tobo's business purposes, making necessary

4    payments.

5    Q    Who at Tobo was responsible for deciding what

6    those loan proceeds would be used for?

7    A    That's me.

8    Q    How was the amount of the Retail Capital loan

9    determined?

10    A    When you say the amount of the loan itself or...

11    Q    I want to wait for you to finish your question.

12    Yeah.  In other words, Tobo obtained a loan of a certain

13    amount from Retail Capital.  How did Tobo determine the

14    amount of that loan?

15    A    I don't know if we initiated the amount, but I

16    believe I asked one of my administrators to look into

17    Retail Capital to see how much line we can get.  And as a

18    result of the application for the line, I think we came to

19    the final amount of the loan.

20    Q    All right.  Who at Tobo was responsible for

21    deciding the final amount of that Retail Capital loan?

22    A    That would be me.

23    Q    When Tobo obtained the loan from Retail Capital,

24    was Tobo also in the process of seeking additional funding

25    from other lenders?

```
 1        A     Not at that time, no.
 2        Q     Okay.  Are you familiar with the State of
 3   California labor commissioner?
 4        A     Yes.
 5        Q     How is it that you're familiar with the State of
 6   California labor commissioner?
 7        A     It's -- we -- our primary business is in public
 8   works, so that's just the normal part of the business
 9   we're involved as an entity.
10        Q     Is it -- I'm going to refer to the California
11   labor commissioner as just the commissioner.  Is it your
12   understanding that the commissioner sends out mailings and
13   notifications to businesses?
14        A     Yes.
15        Q     Is it your understanding that Tobo ever received
16   mailings or notifications from the Commissioner?
17        A     Yes.
18        Q     How are you familiar with Tobo receiving
19   mailings or notifications from the Commissioner?
20        A     It depends, but we receive them to our office or
21   it may go to our subcontractors, to our office
22   administrator or our project managers would bring it to
23   our internal meetings.
24        Q     So just so that I get that correctly, you said
25   that project managers.  Did you also say your internal
```

1    staff?

2         A     That's correct.  Internal staff and project

3    managers.

4         Q     And they will bring those notifications and

5    mailings to what type of meetings?

6         A     Our staff meeting, Tobo staff meeting.

7         Q     How often does Tobo have staff meetings?

8         A     About once a week.

9         Q     And if Tobo has received a mailing or

10   notification from the Commissioner prior to a particular

11   staff meeting, then that notification or mailing will be

12   discussed at the upcoming staff meeting?

13        A     Yes.  That's correct.

14        Q     Okay.  What occurs at a staff meeting if the

15   topic of the meeting is a mailing or a notification from

16   the Commissioner?

17        A     The first thing we try to identify:  Which

18   project it belongs to.  And then secondary:  Is it our

19   subcontractor issue or is it our field crew issue?

20        Q     Is there anything after that that occurs at one

21   of the staff meetings?

22        A     And then, depending on the notice and type of

23   notice we receive, we do our process of providing

24   information through the labor commissioner's office.

25        Q     Who attends the staff meetings?

1         A      Do you need names specifically or positions and

2    title?

3         Q      Both, if you will, please.

4         A      To our staff meeting from our administrative

5    side would be Misa Tang, M-i-s-a T-a-n-g.  Suzie Na,

6    S-u-z-i-e N-a.  Our project managers would be Michael Cha,

7    M-i-c-h-a-e-l C-h-a.  Thomas Yoon, T-h-o-m-a-s Y-o-o-n,

8    Yoon.  Chung Mu, C-h-u-n-g M-u.  We have a few others, but

9    those are the primary managers that regularly attend the

10   meeting.

11        Q      Okay.  What is your understanding of the kinds

12   of mailings and notification that Tobo has received from

13   the commissioner?

14             MS. SPOSATO:  For any time period, Josh?

15   BY MR. HERNDON:

16        Q      Let's say for January 2017 to the present.

17        A      It would depend, but usually it's a document

18   request of a specific project to payroll records, copies

19   usually.  Other inquires -- it starts with inquiries of

20   questions and documents to be produced.

21        Q      Okay.  Would that be a document titled Notice of

22   Investigation?

23        A      Yes.

24        Q      Would it also include a wage assessment in some

25   circumstances?

1          A      Yes.

2          Q      Without referring to any one specific project,

3    if a wage assessment is issued, is that preceded by a

4    notice of investigation?

5          A      Usually in my past 12 years working at Tobo

6    Construction, the process begins with inquiry or

7    questionnaire of a specific project and names of workers.

8    Then we provide documentation, payroll records.  There's

9    always a dispute over exact days and hours worked, and

10   sometimes there will be classification of the trade.  So

11   that kind of sorts itself through.

12              Then the labor commissioner would review our

13   provided documents and make wage assessments whether

14   there -- whether there was insufficient payment made or

15   the hours are different and so forth and so on.  So

16   that's -- unfortunately that seems to be the normal course

17   of the business that in the last 10, 12 years.  We

18   consider it --

19         Q      Okay.

20         A      -- part of the business.

21         Q      Okay.  In order to characterize what you

22   testified to correctly, it sounded like you said that the

23   very first step is Tobo receives an inquiry or

24   questionnaire; is that correct?

25         A      That is correct.

1    Q    Would that inquiry and questionnaire consist of

2    a notice of investigation or would it simply include a

3    notice of investigation under certain circumstances or are

4    you talking about one in the same?

5         A    It may begin with inquiry or it may begin with

6    investigation.  Sometimes it begins with inquiry, and it

7    may turn into investigation.

8         Q    Thank you very much.  And then I believe that

9    you testified that the next step in the process of -- the

10   next step of the process is Tobo will provide

11   documentation such as payroll records to the labor

12   commissioner; is that correct?

13        A    That is correct.

14        Q    Is there a standard amount of time from the

15   point where Tobo receives an inquiry or receives a notice

16   of investigation that Tobo has to turn over the

17   documentation such as payroll records?

18        A    I believe it's usually 60 days, although via

19   communications that can be extended.

20        Q    Did you say 15 as in one five or 50 as in five

21   zero?

22        A    I meant six zero as in 60 days.

23        Q    Thank you very much.  So 60 days from when Tobo

24   receives an inquiry or a notice of investigation to when

25   Tobo turns over the documentation including payroll

1    records?

2         A    That is correct.

3         Q    And then you said that after the documentation

4    is turned over to the labor commissioner, the labor

5    commissioner reviews, I guess, the record that it's

6    received from the person raising the issue and then the

7    documentation that Tobo provides in response to that.  Is

8    that accurate?

9         A    That's correct.

10        Q    So after a certain amount of time where the

11   labor commission reviews that information and that

12   documentation, one possible outcome is that the labor

13   commission will issue a wage assessment; is that correct?

14        A    Yes.

15        Q    In your experience, is there a standard amount

16   of time where the assessment will issue -- if an

17   assessment issues, it will be 30 days after Tobo submits

18   its documents, 60 days?  90 days?  In your experience is

19   there a standard amount of time?

20        A    No.  There's -- there's never been a standard

21   amount of time.  It depends on each case.

22        Q    Okay.

23        A    Yeah, it's case by case.

24        Q    In your experience can you recall the shortest

25   amount of time where a wage assessment issued after Tobo

1   provided documentation to the labor commissioner?

2        A    Shortest amount may be another 60 days, six

3   zero, after all the documents are submitted by Tobo.

4        Q    And that's the shortest amount of time; is that

5   correct?

6        A    That I can recall.  Yes.

7        Q    Okay.  Very good.  Can you recall the longest

8   amount of time that passed between Tobo providing the

9   labor commissioner with the requested documentation and

10  the labor commissioner issuing a wage assessment

11  thereafter?

12       A    I think there's been --

13            MS. SPOSATO:  Are we still working from

14  January 2017 to present?

15            MR. HERNDON:  Yes.

16            MS. SPOSATO:  Okay.

17            THE WITNESS:  I think there's been instances

18  where it took over more than one year.

19  BY MR. HERNDON:

20       Q    Okay.  So let me backtrack just a little bit.

21  After Tobo provides the responsive documentation, the

22  labor commissioner begins a review, correct?

23       A    Yes.

24       Q    And one possible outcome is that the labor

25  commissioner may issue a wage assessment, correct?

1      A    Yes.

2      Q    Okay.  What are the other possible outcomes of

3  the labor commissioner doing its review after Tobo

4  provides the responsive documentation?

5      A    They may dismiss the case based upon the

6  documents produced either by Tobo or several

7  subcontractors related to the complaint of the laborer.

8      Q    Okay.  If the labor commissioner decides to

9  dismiss the case, is Tobo given notification of that

10  outcome?

11      A    Yes.

12      Q    In your experience, have you noticed any

13  difference in the amount of time that the labor

14  commissioner notifies Tobo that it has decided to dismiss

15  a case compared to when the labor commissioner has issued

16  a wage assessment?  In other words, would it be 60 days on

17  the short side when the labor commissioner has informed

18  Tobo that it's dismissed a case and a year or longer when

19  the labor commissioner's notified Tobo that it is

20  dismissing a case or are the times a little bit different?

21      A    The times are different.  It's hard to say

22  whether it's a minimum 60 days to a maximum one year.

23  It's unique and different to individual cases.

24      Q    Okay.  In that case, let me go back to the other

25  scenario that we covered where the outcome is an issuance

1    of a wage assessment.  The very first step is that Tobo

2    receives an inquiry or a questionnaire that may include a

3    notice of investigation, correct?

4         A    Yes.

5         Q    Thereafter, Tobo will have -- and correct me if

6    I'm mistaken -- Tobo will have a minimum of 60 days to

7    provide responsive documents?

8         A    Usually 60 days, although we can make requests

9    for additional time.

10        Q    Okay.  Okay.  And once Tobo provides responsive

11   documentation to the labor commissioner, under certain

12   circumstances where the labor commissioner may issue a

13   wage assessment, on the short side of things that wage

14   assessment would be issued 60 days after Tobo submits the

15   documents to the labor commissioner; is that accurate?

16        A    Yes.

17        Q    But there have been instances where more than a

18   year has passed from the time that Tobo has provided the

19   labor commissioner with responsive documents and the labor

20   commissioner has issued a wage assessment; is that

21   correct?

22        A    Yes.

23        Q    Okay.  So is it fair to say by the time a wage

24   assessment issues that the investigation so -- strike that

25   from the record.

1              When a wage assessment is issued, it is issued

2    in a case, correct?  There's a case number?

3        A    Yes.

4        Q    Okay.  I'm sorry to be a little confusing.  Is

5    it fair to say that by the time a wage assessment is

6    issued in a particular case that an investigation in that

7    case has been ongoing for at least 120 days before the

8    issuance of the wage order?

9        A    That's a possibility, depending on the case.

10       Q    But there would be -- there would be a period of

11   investigation prior to the issuance of the wage

12   assessment, correct?

13       A    Yes.

14       Q    And Tobo would be given notification of the

15   beginning of that investigation period, whether it's

16   through an inquiry or a questionnaire or a notice of

17   investigation.  Is that -- is that always the case?

18       A    Usually that's the case.  We -- we've had cases

19   where our subcontractor received notice but we were not

20   notified.  And as a general contractor, we're responsible

21   for the subcontractors' labor violations as well.  But

22   there's been incidents where we didn't receive

23   notification but our subcontractor did.  Eventually we did

24   receive the case information from the labor commissioner's

25   office.

1      Q     I beg your pardon?  What was the last bit you

2   referred to?  On my end I heard it as the pace

3   information, like p-a-c-e.  Is that --

4      A     No, I meant case, c-a-s-e.

5      Q     Oh, I'm sorry.

6      A     Case number.

7      Q     In the circumstance that you just testified to

8   where the subcontractor has been given notice but Tobo has

9   not been given notice, is that a circumstance where it was

10  the subcontractor's conduct that was the subject of the

11  investigation?

12     A     Yes.

13     Q     In a circumstance where a subcontractor's

14  conduct is the subject of an investigation, is the labor

15  commissioner not required to give the general contractor

16  notification of that investigation?

17     A     During -- I believe during the inquiry or the

18  early phase of the questionnaire, the general contractor

19  may or may not receive the same notification.  So I don't

20  know if that's their standard policy or not.  That's the

21  labor commissioner's process and action.  I'm just stating

22  that there's been cases where we did not receive any

23  inquiries or questionnaire, but our subcontractors did.

24     Q     Has Tobo -- has Tobo -- has the conduct of Tobo

25  been the subject of a wage assessment?

```
 1          A    Yes.

 2          Q    Can you think of an instance where Tobo's

 3    conduct was the subject of a wage assessment and where

 4    Tobo was not given notification of the inquiry, the

 5    questionnaire, or a notice of investigation?

 6          A    No.

 7          Q    So correct me if I'm wrong; let me go back to

 8    your prior testimony.  If Tobo receives a mailing or

 9    notification from the labor commissioner, then Tobo will

10    have a staff meeting where that mailing and that

11    notification is discussed; is that correct?

12          A    Yes.

13          Q    Okay.  And at the staff meeting, is a course of

14    action for dealing with that mailing or notification, is

15    that also determined at the staff meeting?

16          A    Yes.

17          MR. HERNDON:  Okay.  Ms. Oh, do you ever have

18    any duties with respect to reviewing notifications or

19    mailings from the labor commissioner?

20          MS. OH:  No.

21    BY MR. HERNDON:

22          Q    Mr. Chae, do you have any duties reviewing or

23    determining how to respond to mailings or notifications

24    from the labor commissioner?

25          A    Yes.
```

```
 1        Q     Do you review notifications and mailings from
 2   the labor commissioner?
 3        A     Yes.
 4        Q     Is it your standard practice to review all
 5   mailings or notifications received from the labor
 6   commissioner?
 7        A     Yes.
 8        Q     Is it your standard practice to play a role in
 9   deciding how to respond to mailings or notifications from
10   the labor commissioner?
11        A     Yes.
12        Q     Has it been part of your duties to review
13   mailings and notifications from the labor commissioner
14   during the entire time that you've been the corporate
15   secretary for Tobo Construction?
16        A     Yes.
17        Q     Has it also been one of your duties to decide
18   how to respond to mailings and notifications from the
19   labor commissioner the entire time you've been the
20   corporate secretary for Tobo?
21        A     Yes.
22        Q     Mr. Chae, do you and Ms. Oh ever discuss the
23   subject matter of any notifications or mailings from the
24   labor commissioner that Tobo receives?
25        MS. OH:  No.
```

1          A      No.

2          Q      So is it safe to say that when a mailing or a

3    notification is received by Tobo, that the personnel of

4    Tobo that are familiar with those mailings and

5    notifications include Misa -- and forgive me; I did not

6    write her last name down legibly -- but the woman who

7    manages your admin operation; is that accurate?

8          A      Yes.

9          Q      Is it also accurate to say that Suzie Na has

10   notice when Tobo Construction receives a mailing or

11   notification from the labor commissioner?

12         A      Yes.

13         Q      Is it fair to say that Michael Cha also has

14   notification when Tobo receives a mailing or notification

15   from the labor commissioner?

16         A      Yes.

17         Q      And is it also accurate to say that Thomas Yoon

18   receives notification when the labor commissioner sends a

19   mailing or notification to Tobo?

20         A      Yes.

21         Q      And is it also accurate to say that -- is it

22   Chung Mu, the last name, participates in the staff

23   meetings?

24         A      Yes.  Y-U.

25         Q      Is it also accurate to say that he's notified

```
 1    whenever Tobo receives a notification from the -- or
 2    mailing from the labor commissioner?
 3         A    Yes.
 4         Q    What is his position with Tobo?
 5         A    He's the superintendent.
 6         Q    What is Mr. Tom Yoon's position?
 7         A    He's a project manager.
 8         Q    Mr. Cha is also a project manager?
 9         A    Yes.
10         Q    And what is Suzie Na's position with Tobo?
11         A    She's -- she handles accounting and
12    administration.
13         Q    Is there anybody else, any other Tobo personnel,
14    who is notified when Tobo receives a mailing or
15    notification from the labor commissioner?
16         A    Well, the -- we had secretaries who open mail,
17    but they don't participate in any of the meetings.  Those
18    -- the previously-provided names are the primary workers
19    or staff.
20         Q    Okay.  All right.  The staff meetings that
21    you've testified take place at which mailings and
22    notifications received from the labor commissioner that
23    those staff meetings take place, were those staff meetings
24    taking place at the time that Tobo obtained the loan from
25    Retail Capital?
```

1       A    The staff meetings that we hold is not

2   necessarily only for labor-related items.  We hold staff

3   meetings regarding projects and company things such as

4   scheduling and paperwork and administrative requirements

5   and so forth.  So I don't recall whether we discussed

6   labor issues back in April or May, June of 2019.

7           These are weekly meetings, so there's a lot of

8   discussion that is going on and it's regularly repeated.

9   So I can't recall whether we talked about that April, May,

10  June of 2019.

11      Q    Let me ask you a little bit of a different

12  question.  In your recollection when Tobo has received

13  mailings or notifications from the labor commission, how

14  long has it been Tobo's practice to discuss those mailings

15  and notifications at a staff meeting?

16      A    We discuss right away.

17      Q    Let me be a little more specific.  Has that been

18  a practice of Tobo for as long as you've been employed by

19  Tobo?

20      A    Yes.

21      Q    Can you think of any instance where Tobo

22  received a mailing or a notification from the labor

23  commissioner where that was not discussed at one of the

24  staff meetings?

25      A    No.

1        Q      So going back to your prior testimony about how

2    once Tobo receives an inquiry or a questionnaire or a

3    notice of investigation from the labor commissioner, that

4    Tobo is given an opportunity to make a document production

5    of records including payroll records.  Going back to

6    January 2017, who at Tobo has been involved with

7    determining the documents to be produced to the labor

8    commissioner?

9        A      Primarily that would be me with Misa and Suzie.

10       Q      Since January 2017, who at Tobo is involved in

11   the process of obtaining the documents to produce to the

12   labor commissioner?

13       A      The same.  Primarily me with Suzie and Misa.

14       Q      Let me go back to the topic of when Tobo has

15   received wage assessments from the labor commissioner.

16   Can you give me your best estimate of how many wage

17   assessments Tobo has received prior to obtaining the loan

18   that it received from Retail Capital in May 2019?

19           MS. SPOSATO:  For what time period, Josh?

20           MR. HERNDON:  Let's start with Jan -- between

21   January 2017 and when Tobo obtained the loan from Retail

22   Capital.

23           THE WITNESS:  I don't recall.  I know we had

24   some.  Whether it was one or five, I don't accurately

25   recall.

1    of investigation related to that wage assessment before it

2    obtained the loan from Retail Capital?

3         A    I'm not sure.

4         Q    Okay.

5         A    I --

6         Q    Let me switch gears a little bit.  At one time

7    did Tobo have a bank account at Pacific City Bank ending

8    in 0876?

9         A    Yes.

10        Q    Okay.  How is it that you're familiar with that?

11        A    That's our business account.

12        Q    And that's the account for which your counsel

13   provided some statements for this morning's examination,

14   correct?

15        A    Yes.

16        Q    Okay.  And that account is a business checking

17   account; is that correct?

18        A    Yes.

19        Q    Okay.  Do you recall when that account was

20   opened?

21        A    I don't recall, but it's been a while; I believe

22   more than 5 years.

23        Q    Is that account still open?

24        A    I think it's inactive and possibly closed; I'm

25   not a hundred percent sure.

1        Q      Going back to when Tobo obtained the loan from

2   Retail Capital, is that the only business checking account

3   that Tobo had at that time?

4        A      No.  We had -- I think we had another account

5   from a different bank.

6        Q      Another business checking account?

7        A      Yes.

8        Q      So talking about the Pacific Bank account

9   specifically, do you know what kinds of expenses were paid

10  out of that account?

11       A      I think pretty much everything out of that

12  account.  Yeah.

13       Q      So what would be some examples of expenses that

14  were paid out of that account?

15       A      Project costs, our overhead costs, our utility

16  fees.

17       Q      So what would be some examples of project costs?

18       A      Payments to subcontractors.  Any fees or costs

19  that's regarded -- related specific to projects.

20       Q      And as far as overhead goes, are you talking

21  about, for instance, payroll?

22       A      Yes.

23       Q      Okay.  Were certain kinds of expenses paid out

24  of that account by check, specifically?

25       A      Yes.

1   the exhibits that I'd like to refer to during the

2   examination.  It's not going to be one of the documents

3   that we premarked and sent to you late last week.  I'm

4   going to pull it up on my computer screen and I'm going to

5   go ahead and share it.  And then I'm going to make a clear

6   enough record to where it's clear which document that I'm

7   referring to and keep up with the exhibit numbers myself

8   and recite those into the record.  Would that be okay?

9           COURT REPORTER:  That's fine.  Thank you.

10          MR. HERNDON:  All right.  I'll circulate those

11  afterwards.

12          COURT REPORTER:  Thank you.

13          MR. HERNDON:  All right.  The very first item

14  that I'm going to go ahead and refer to as an exhibit, it

15  will be Exhibit 1.  Let me share it on my screen.  Can

16  everybody see that?  So on my end the browser that I have

17  open for this video conference is the little circle

18  spinning.  Maybe go off the record so that I'm not keeping

19  everybody waiting while I'm trying to resolve this on my

20  end.

21          (Off the record)

22          MR. HERNDON:  Back on the record.  Okay.  See if

23  I can share this again now.  Okay.  Can everybody see the

24  document on the screen that has the orange -- the big

25  orange kind of square in the middle?

```
1              MS. SPOSATO:  Yes.

2              MR. CHAE:  Yes.

3              MR. HERNDON:  Okay.

4              MS. OH:  Yes.

5              MS. SPOSATO:  The Credibly loan preapproval; is

6    that the correct document?

7              MR. HERNDON:  Yes, ma'am.  Yes, it is.

8              MS. SPOSATO:  Okay.

9              MR. HERNDON:  All right.  Ms. Oh, Mr. Chae, have

10   you ever seen this document before?

11             MS. OH:  I have not seen this document before.

12             MR. CHAE:  I have seen this document.

13             MR. HERNDON:  So, Ms. oh, you have not seen this

14   document before?

15             MS. OH:  No.  I've never seen this document

16   before.

17   BY MR. HERNDON:

18        Q    Okay.  I'm just going to scroll through very

19   slowly so that we can review -- just review it.  Mr. Chae,

20   you said you have seen this document before?

21        A    Yes, I have.

22        Q    Mr. Chae, do you remember when you first saw

23   this document?

24        A    I think April, May of 2019.

25        Q    Okay.  So I'm looking at page -- at the bottom
```

```
 1    it's identified as Page B, and it includes loan details

 2    such as the amount of the loan:  $325,000.  Is that your

 3    recollection of the amount of the loan?

 4         A    Yes.

 5         Q    And it refers to the disbursement amount of

 6    $316,875.  Is that your recollection of the correct

 7    disbursement amount of this loan?

 8         A    Yes.

 9         Q    It refers to the total repayment amount of

10    $380,250.  Is that your recollection of the correct total

11    repayment amount?

12         A    Yes.

13         Q    Okay.  And then a little bit further down, the

14    daily repayment amount, business days only, of $2,160.51.

15    Is that your recollection of the correct daily payment

16    amount?

17         A    Yes.

18         Q    So basically under the terms of this agreement,

19    Tobo would pay $2,160.51 each business day for 177 days

20    until the total repayment amount was paid in full.  Is

21    that your understanding?

22         A    Yes.

23         Q    Okay.  I'm scrolling down to Page 1 of this

24    document.  In the bottom right-hand corner it includes

25    this item right here where I'm making the circle.  Do you
```

```
 1   recognize what those are?
 2       A    I believe that's my initial.  It looks like my
 3   initials.
 4       Q    Okay.  Let me pull back a little bit.  Was there
 5   any language on this page that you did not understand
 6   before you initialed it?  Well, let me --
 7            MS. SPOSATO:  Josh, just to --
 8            MR. HERNDON:  Please, go ahead.
 9            MS. SPOSATO:  Sorry.  Just to keep the record
10   clear, when you say information on this page, can you just
11   state on the record a bit more about what page you're
12   referring to?
13            MR. HERNDON:  Yes.
14   BY MR. HERNDON:
15       Q    And let me -- let me -- let me go back even
16   further than that.  Still referring to Page 1 of this
17   document, Mr. Chae, is it your recollection that you
18   initialed this page?
19       A    It's hard to see on the screen, but it looks
20   like my initial.  Can you zoom in?
21       Q    Yes, sir.  Let me -- let me represent to you, in
22   case it makes it easier, I'll represent to you that this
23   document appears to have been DocuSigned or was
24   electronically signed.  Does that refresh your
25   recollection that the document was signed and initialed?
```

```
 1        A    That's correct.  It was done electronically.

 2        Q    Very good.  Okay.  Do you recall initially this

 3   Page 1 of this document?

 4        A    I believe so.  It may have been.  Do you

 5   remember if you --

 6             MS. OH:  I honestly -- the signature looks more

 7   like mine, but I --

 8             MR. HERNDON:  Okay.

 9             MS. OH:  -- don't recollect ever seeing this.

10   BY MR. HERNDON:

11        Q    Okay.  So to try to unpack that a little bit, is

12   it fair to say that, Mr. Chae, you believe that you may

13   have initialed this page?

14        A    I may have.  I don't remember a hundred percent.

15        Q    Do you recall reviewing this page, Page 1?

16        A    Yes.

17        Q    Do you recall not understanding any part of the

18   subject matter of this page before it was initialed?

19        A    No.

20        Q    Okay.  Let me move down to Page 2, and if this

21   is either too big or too small, feel free to let me know

22   and I'll adjust it accordingly.  I'm scrolling down to

23   Page 2, and at the bottom of Page 2 there's language that

24   refers to Pacific City Bank, correct?

25        A    Yes.
```

1      Q     And that reference to Pacific City Bank refers

2   to the account number that we just covered earlier in the

3   examination that ends in 0876, correct?

4      A     Yes.

5      Q     Okay.  So we're at the bottom Page 2.  Mr. Chae,

6   do you recall initialing this page?

7      A     Yes.

8      Q     Okay.  Was there any language on this Page 2

9   that you did not understand before you initialed it?

10     A     No.

11     Q     Okay.  I'm going to continue scrolling down to

12  Page 3 of this document.  Okay.  So it says Page 3 right

13  here.  And, Mr. Chae, do you recall initialing this?

14     A     I believe we did it electronically.  I don't

15  honestly remember exactly if I did or not, but I remember

16  looking and reviewing the documents.

17     Q     Is it your recollection that to initial this

18  page it would have literally required someone to click a

19  button on a mouse?

20     A     Yes.

21     Q     Do you recall whether it was you that clicked

22  the button and affixed the initials to this Page 3?

23     A     That's the part I don't recall, whether it was

24  me or my wife.

25     Q     Do you recall reviewing this page of the

1    agreement?

2        A    Yes.

3        Q    Is there any part of the language on this Page 3

4    that you did not understand?

5        A    No.

6        Q    Let me continue, going down to Page 4.

7    Mr. Chae, do you recall reviewing this Page 4 of this

8    agreement?

9        A    Yes.

10       Q    Was there any language on this page that you did

11   not understand?

12       A    No.

13       Q    Do you recall whether you initialed this Page 4?

14       A    It's the same as before.  I don't remember if I

15   actually initialed.

16       Q    Okay.  I'm going to continue to scroll down to

17   Page 5 of the agreement.  Mr. Chae, do you recall

18   reviewing this page of this agreement?

19       A    Yes.

20       Q    Was there any language on this Page 5 that you

21   did not understand?

22       A    No.

23       Q    Do you recall initialing this Page 5 to the

24   agreement?

25       A    It's the same as before.  I don't remember if I

1    specifically initialed it digitally.

2         Q    Okay.  Let me go down to Page 6.  Mr. Chae, do

3    you recall reviewing this Page 6 to this agreement?

4         A    Yes.

5         Q    Was there any language on this Page 6 that you

6    did not understand?

7         A    There's a lot of information on this page.  I --

8    I don't recall whether I had any part of the words that I

9    did not understand at the time when I reviewed the

10   document.  But generally I read through it.

11        Q    Okay.  Do you recall whether you initialed this

12   Page 6?

13        A    Same as before:  I don't remember whether I

14   digitally initialed this page.

15        Q    Okay.

16             MS. OH:  Mr. Herndon, can I ask something?

17             MR. HERNDON:  Yes, ma'am.

18             MS. OH:  Is this the actual Credibly agreement,

19   loan agreement?

20             MR. HERNDON:  Yes.  Yes, ma'am.

21             MS. OH:  Okay.  Then I think, even though I

22   didn't recognize that first page, the normal course of

23   what happens next is that Suzie or my husband will send me

24   something to sign.  And because the lines were -- you

25   know, that was my -- the thing that I did, I must have

1              MR. HERNDON:  Did you ever discuss any of the

2    subject matter of the agreement with Mr. Chae?

3              MS. OH:  I have never.

4              MR. HERNDON:  Did it -- at some point did

5    Mr. Chae simply tell you to initial and sign this

6    agreement?

7              MS. OH:  Everything that he said was it's

8    another line of credit for Tobo and that I just need to

9    sign it.

10             MR. HERNDON:  He -- he literally told you that

11   you needed to sign it?

12             MS. OH:  Well, that's what he tells me to do;

13   there's another document that you need to sign or another

14   line of credit that I need to sign.  That was just the

15   course --

16   BY MR. HERNDON:

17        Q    Okay.  Okay.  All right.  Well, let me go ahead

18   and continue on then.  I'm going to Page 7 of the

19   agreement.  Mr. Chae, do you recall reading this page of

20   the agreement?

21        A    Yes.

22        Q    Okay.  Was there any information or language on

23   this page that you did not understand?

24        A    I mean, generally I understood most of them at

25   the time.

1          MR. HERNDON:  Okay.  Ms. Oh, do you recall

2    initialing this page?

3          MS. OH:  I don't recall, but I probably did.

4    BY MR. HERNDON:

5          Q     All right.  Let me continue down to Page 8.

6    Mr. Oh, do you -- I beg your pardon.  I beg your pardon.

7    Mr. Chae, do you remember reviewing this page of this

8    agreement?

9          A     Yes.

10         Q     Do you recall whether there was any language on

11   this page that you did not understand?

12         A     I generally understood the content of the page.

13         MR. HERNDON:  Ms. Oh, do you recall initialing

14   this page of the agreement?

15         MS. OH:  Again, I don't recall, but I probably

16   did, seeing that's my signature.

17   BY MR. HERNDON:

18         Q     Okay.  I'm going to continue to scroll down on

19   to Page 9 of the agreement.  Mr. Oh, did you -- Mr. Chae,

20   did you review Page 9 of the agreement?

21         A     Yes.

22         Q     Do you recall whether there was any language on

23   Page 9 that you did not understand?

24         A     No.  Generally I understood most of the content.

25         MR. HERNDON:  Okay.  And, Ms. Oh, do you recall

1    initialing this page, Page 9?

2         MS. OH:  Again, I don't recall, but that appears

3    to be my initials.

4    BY MR. HERNDON:

5         Q    Okay.  All right.  And let me just continue on

6    to Page 10.  Okay.  There's no place to initial at the

7    bottom, but there are two places a little higher up to

8    affix signatures.  Mr. Chae, do you recall reading this

9    page of the agreement, Page 10?

10        A    Yes.

11        Q    Do you recall whether there was any part of the

12   language on this page that you did not understand?

13        A    No.  I generally understood the content.

14             MR. HERNDON:  Okay.  All right.  Do you see how

15   there is a part of this Page 10 of the agreement on the

16   left-hand side that refers to Guarantor No. 1?

17             MS. OH:  Yes.

18             MR. HERNDON:  Ms. Oh, does that refresh your

19   recollection as to whether or not this is your signature

20   on the agreement?

21             MS. OH:  Yes.

22             MR. HERNDON:  Okay.  And then to the right, do

23   you see how there is a field that is titled Borrower No.

24   1?

25             MS. OH:  Yes.

1           MR. HERNDON:  And does this refresh your

2   recollection as to whether that is your signature as well?

3           MS. OH:  Yes.

4           MR. HERNDON:  Okay.  I'm going to scroll down to

5   the next page which is Page 11.  It's titled Prepayment

6   Addendum.  Okay.  And at the bottom, do you see a

7   reference to borrower business legal name, and it says

8   Tobo Construction?

9           MS. OH:  Yes.

10          MR. HERNDON:  And is that your signature right

11  underneath it, Ms. Oh?

12          MS. OH:  It appears so, yes.

13          MR. HERNDON:  And then beneath that, do you see

14  that there's a reference to guarantor signature and that

15  there's a signature underneath that?

16          MS. OH:  Yes.

17          MR. HERNDON:  And is that -- is that -- do you

18  recognize that as your signature?

19          MS. OH:  It appears so, yes.

20          MR. HERNDON:  Okay.  I'm going to scroll on to

21  the next page which is titled permission to release

22  information.  Do you see how at the bottom of this

23  page that reference is merchant signature?

24          MS. OH:  Yes.

25

1           MR. HERNDON:  And do you recognize the signature

2    above that to be your signature?

3           MS. OH:  Yes.

4           MR. HERNDON:  Okay.  Madam Court Reporter, this

5    document that we've just finished covering in our

6    examination is going to be marked Exhibit 1.  I will send

7    it to you after the examination so that it can be part of

8    the transcript.

9           COURT REPORTER:  That's fine.

10          MR. HERNDON:  Okay.

11          (Whereupon, Exhibit No. 1 was marked for

12           identification.)

13          MR. HERNDON:  I'm going to mark as Exhibit 2

14   documents consisting of statements from a bank account.

15   It's the account ending in 0876.

16          COURT REPORTER:  Okay.  That's fine.  Thank you.

17          (Whereupon, Exhibit No. 2 was marked for.

18          Identification.)

19          MR. HERNDON:  The very first page that we're

20   going to cover, there's actually a protocol -- numbering

21   protocol at the bottom that the examinees came up with.

22   We're going to start with the document marked Document

23   Production re:  Credibly 2004, Examination 001.

24          MS. SPOSATO:  Josh, for Exhibit 2 how many pages

25   is it going to be in total?

```
1        A    No.

2             MS. OH:  No.

3             MR. HERNDON:  Let me have you scroll down to

4   where the date of this deposit -- 5-16-19.  The

5   description is:  Wire-in Retail Capital, LLC.  Do you see

6   that?

7             MS. OH:  Yes.

8             MR. CHAE:  Yes.

9             MR. HERNDON:  Okay.  And do you understand that

10  to be Tobo's receipt of the loan proceeds from Retail

11  Capital?

12            MS. OH:  Yes.

13            MR. CHAE:  Yes.

14            MR. HERNDON:  Okay.  Let me go down a little bit

15  further.  The date of this deposit is 5-20-19.  The

16  description is Celtic Bank, Tobo Construction, Inc., and

17  the amount is $48,750.  Do you see that?

18            MS. OH:  Yes.

19            MR. CHAE:  Yes.

20            MR. HERNDON:  What is the subject of that

21  deposit?

22            MS. OH:  I do not know.

23            MR. CHAE:  I'm not sure.

24            MR. HERNDON:  Okay.  Let's go to the next line

25  down.  The date is 5-21-19.  The description is:  Return
```

1    description refers to a series of X's that ends with the

2    numbers 3383, and the amount is $23,000.  Do you see that?

3              MS. OH:  Yes.

4              MR. HERNDON:  Are you familiar with the subject

5    of that withdrawal?

6              MS. OH:  I do not know.

7              MR. HERNDON:  Does Tobo have an account that

8    ends in 3383?

9              MS. OH:  I do not know.

10              MR. HERNDON:  Do you have an account that ends

11    in 3383?

12              MS. OH:  I do not.

13    BY MR. HERNDON:

14         Q    Mr. Chae, do you have an account that ends in

15    3383?

16         A    We may.  I don't know of the account

17    specifically at this time.

18         Q    Because if you scroll down this page, there's a

19    number of withdrawals that all have similar descriptions

20    where it says transfer to deposit account ACCT, and then

21    it ends in 3383.  Do you see those?

22              MS. OH:  Yes.

23              MR. CHAE:  Yes.

24    BY MR. HERNDON:

25         Q    Does that refresh your recollection of what

```
 1   those transfers may -- the subject of those transfers may

 2   be?

 3        A    I do not at this point.

 4             MS. OH:  I do not know.

 5             MR. HERNDON:  Okay.  Please go down to a

 6   withdrawal that has a date of 5-13-19.  The description

 7   is -- it refers to a number of X's and then the number is

 8   4960 and the amount is $200,000.  Do you see that?

 9             MS. OH:  Yes.

10             MR. CHAE:  Yes.

11             MR. HERNDON:  Are you familiar with the subject

12   of that withdrawal?

13             MS. OH:  I do not know.

14             MR. CHAE:  No, not at this time.

15             MR. HERNDON:  If you go down a little further on

16   the same page, there's a similar description.  It's dated

17   5-17-19 and it's also in the amount of $200,000.  It's the

18   second line item at the bottom.  Do you see that?

19             MS. OH:  Yes.

20             MR. CHAE:  Yes.

21             MR. HERNDON:  Does that refresh your

22   recollection as to what the subject of these withdrawals

23   were?

24             MS. OH:  I do not know.

25             MR. CHAE:  No.
```

1            MR. HERNDON:  Does Tobo have another account

2    that ends in 4960?

3            MS. OH:  I do not know that.

4            MR. CHAE:  We may.  I don't remember, recall at

5    this point which account that may be.

6            MR. HERNDON:  All right.  I'm going to move on

7    to the next page of this exhibit which is -- on the very

8    bottom it refers to Document 003.

9            MS. OH:  Okay.

10   BY MR. HERNDON:

11        Q    If you go down, there is a withdrawal date of

12   5-28-19.  The description is:  OnDeck Capital, Tobo

13   Construction, Inc., and the amount is $1,983.33.  Do you

14   see that?

15        A    What date did you say?  5-20?

16        Q    5-28-19.

17        A    This one, yes.

18        Q    Okay.  You see the one that I'm referring to?

19        A    Yes.

20            MS. OH:  Yes.

21   BY MR. HERNDON:

22        Q    What is the subject of that withdrawal?

23        A    It's a payment to one of our lenders.

24        Q    Do you know -- do you recall who the lender is?

25        A    I think it's OnDeck Capital.

```
 1        Q     So did Tobo receive either a loan or some sort
 2   of the other funding from OnDeck?
 3        A     Yes.
 4              MS. OH:  Yes.
 5   BY MR. HERNDON:
 6        Q     And the payment of 1,983.33 is a repayment of
 7   that amount?
 8        A     Yes, it's a portion of that amount.
 9        Q     What was the nature of the funding?  Was it
10   literally a loan or was it like a cash advance for the
11   purchase of future receivables?
12        A     It was a loan.
13        Q     Okay.  Do you recall when Tobo obtained that
14   loan from OnDeck?
15              MS. OH:  I don't recall.
16              MR. CHAE:  I don't recall at this moment.
17              MR. HERNDON:  Do you recall whether Tobo
18   obtained that loan before it obtained the loan from Retail
19   Capital?
20              MS. OH:  I have no recollection.
21              MR. CHAE:  I don't remember when it was.
22   BY MR. HERNDON:
23        Q     So is it possible that Tobo could have obtained
24   that loan from OnDeck after it obtained -- after Tobo
25   obtained the loan from Retail Capital?
```

1       A    It could have been before; it could have been

2  after.  I'm sure we have documents that shows dates.  I

3  just don't remember the exact date at this time.

4       Q    Okay.  Do you recall the amount of the loan that

5  Tobo obtained from OnDeck?

6            MS. OH:  Not offhand.

7            MR. CHAE:  No.

8            MR. HERNDON:  I'm going to scroll down to the

9  next page of this exhibit which is -- at the very bottom

10 it says 004.  So this page refers to a number of checks,

11 different check numbers, different amounts.  Is it fair to

12 say that a number of the check amounts on this page end in

13 round numbers such as $5,000, $20,000, $40,000?  Is that

14 fair?

15           MS. OH:  Yes, I see that.

16           MR. CHAE:  Yes.

17           MR. HERNDON:  Why are some of these checks

18 written in those round amounts?

19           MS. OH:  I have no idea.

20           MR. CHAE:  I don't know.  It's whatever amount

21 that was required to pay that was agreed upon, I suppose.

22           MR. HERNDON:  Do you recall -- I'm going to

23 strike that.

24           Let me have you take a look -- it's in the

25 right-hand column.  It's dated 5-20-19.  It's Check No.

1    the line of credit that Tobo had at Pacific City Bank?

2            MS. OH:  I don't know.

3            MR. CHAE:  Possibly, I think.  I'm not a hundred

4    percent certain.

5            MR. HERNDON:  Let me have you go down a little

6    further on this page to the withdrawal section.  If you

7    look, there are two more withdrawals with descriptions

8    that refer to a series of X's, and this number is 3383.

9    The fact that there are withdrawals attributable to that

10   description or with that description in June 2019 as well

11   as May 2019, does that refresh your recollection of the

12   subject of these withdrawals?

13           MS. OH:  I do not know.

14           MR. CHAE:  No.

15           MR. HERNDON:  Let me have you take a look at the

16   withdrawal dated 6-3-19.  The description has a reference

17   to Tesla 8, and the amount is $2,519.58.  Do you see that?

18           MS. OH:  Yes.

19           MR. CHAE:  Yes.

20   BY MR. HERNDON:

21       Q    Do you know what that withdrawal is attributable

22   to?

23       A    That's for an automobile that Tobo leased.  Yes.

24       Q    Okay.

25       A    It's a company car.

```
1    011.  Refers to a statement date July 31st, 2019.

2              MS. OH:  Yes.

3              MR. CHAE:  Okay.

4              MR. HERNDON:  If you look, there is a deposit

5    that's dated July 11, 2019.  It has a description that

6    refers to a series of X's as well as the four digits 3383,

7    and the amount is $2500.  Do you see that?

8              MS. OH:  Yes.

9              MR. CHAE:  Yes.

10             MR. HERNDON:  Are you familiar with the subject

11   of that deposit?

12             MS. OH:  I do not know.

13             MR. CHAE:  No.

14   BY MR. HERNDON:

15        Q    On July 11, 2019 there's a deposit that has a

16   description of regular deposit, and the amount is

17   $423,525.33.  Do you see that?

18        A    Yes.

19        Q    Are you familiar with the subject of that

20   deposit?

21             MS. OH:  I do not know.

22             MR. CHAE:  I don't either, but it looks like a

23   progress payment from one of the projects.

24             MR. HERNDON:  Okay.  Let me have you take a look

25   at a deposit on 5-15-2019.  The description is:  Wire-in
```

1   Kalamata Capital Group, LLC, and the amount is $242,201.

2   Do you see that?

3              MS. OH:  Yes.

4              MR. CHAE:  Yes.

5              MR. HERNDON:  What is the subject of that

6   deposit?

7              MS. OH:  This was another loan.

8              MR. HERNDON:  Is that deposit attributable to a

9   loan?

10             MS. OH:  Yes.

11             MR. CHAE:  Yes.

12             MR. HERNDON:  Let me specify; I apologize.  Is

13  it a loan compared to, say, a purchase of future

14  receivables?

15             MS. OH:  Loans.

16             MR. CHAE:  It's a loan.

17  BY MR. HERNDON:

18     Q     Okay.  Who at Tobo decided to obtain that loan?

19     A     I did.

20     Q     Okay.  Why did Tobo decide to obtain that loan?

21             MS. SPOSATO:  Josh, I'm going to object.  What

22  is the relevance of getting into a separate loan?

23             MR. HERNDON:  Because there is language in

24  Retail Capital loan agreement that includes restrictions

25  on the borrower's ability to obtain funding from other

71

```
 1    third parties.  It's Section 21 of the loan agreement.
 2              MS. SPOSATO:  Okay.
 3              MR. HERNDON:  Madam Court Reporter, there's a
 4    question that you can read back.  Let me go ahead and ask
 5    it again in case you don't have it.
 6    BY MR. HERNDON:
 7         Q    Why did Tobo decide to obtain that loan?
 8         A    To help with cash flow.
 9         Q    Does that mean to literally bring more cash into
10    Tobo Construction or does that have a different meaning in
11    your mind?
12         A    No, that's exactly what it means, to help us
13    with cash flow.
14         Q    When did Tobo decide to obtain that loan?
15         A    Maybe in June?  June of '19.  June, July of '19.
16         Q    Are you familiar with the repayment terms of
17    that loan?
18              MS. OH:  Which loan?
19              MR. HERNDON:  I beg your pardon.  The loan that
20    appears to have been made by Kalamata Capital Group, LLC.
21              MS. OH:  I do not.
22              MR. CHAE:  No, I do not recall the specifics of
23    that, but I think it was -- there was a set amount,
24    regular amount -- regular payment basis.
25
```

```
 1   BY MR. HERNDON:
 2        Q    Okay.  Let me have you take a look at the next
 3   line item in the deposit.  It has a date of 7-25-19, and
 4   the description is:  Wire-in EBF Partners, LLC, and the
 5   amount is $88,260.  Do you see that?
 6        A    Yes.
 7        Q    What is the subject of that deposit?
 8        A    It's another loan for cash flow.
 9        Q    So on Page 011, the very next deposit down is a
10   deposit dated July 30, 2019 that refers to UCLA once
11   again, and the amount is $626,129.58.  Do you see that?
12             MS. OH:  Yes.
13             MR. CHAE:  Yes.
14   BY MR. HERNDON:
15        Q    Do you believe that that deposit is attributable
16   to the same UCLA-related project that also resulted in
17   deposits that we've covered in June 2019 and May 2019?
18        A    Yes.
19        Q    Okay.  Doing some really crude math in my head,
20   looking at the deposits other than the wire in Kalamata's
21   deposit and the wire in EBF Partner's deposit, it appears
22   as though the remaining deposits that are -- have a
23   description of advanced from loan end in regular deposits
24   and then the deposit attributable to the UCLA disbursement
25   is a little more than a million dollars.  Would you agree
```

1    with that?

2        A    Yes.

3        Q    Under that circumstance, did Tobo believe there

4    was a need to obtain additional loans from third parties?

5        A    Yes, but this is a statement on I believe July.

6    So this is -- when we made the decision for additional

7    working cash flow, it was in June.  There was --

8        Q    Okay.

9        A    -- uncertainty when the receivables would be

10    coming in.

11        Q    I just want to make sure I heard your testimony

12    correctly.  Did you say that you made the decision to

13    obtain the loan from Kalamata and the loan from EBF

14    Partners in June 2019 because of uncertainty about

15    receivables?

16        A    Yes.

17        Q    Can you describe a little more specifically what

18    you consider that uncertainty to be in June 2019?

19        A    Whether the progress payment will come in 30

20    days or 60 days or 90 days.  It was uncertain in June.  I

21    believe back then, we obtained additional funding to help

22    us with cash flow to keep the business running.

23        Q    Okay.  If you go to the next page of this

24    exhibit which is marked 012, at the very bottom of that

25    page there's a withdrawal that has a date of 7-16-19, and

1    it refers to Kalamata Capital.   The amount is $2,393.   Do

2    you see that?

3                MS. OH:   Yes.

4                MR. CHAE:   Yes.

5    BY MR. HERNDON:

6        Q    Does that refresh your recollection of the

7    repayment terms of the Kalamata loan that was deposited

8    into this account, this very same month?

9        A    Yes.

10       Q    So what is your understanding of the repayment

11   terms with respect to that loan from Kalamata Capital?

12       A    Based on the statement, it looks like $2,393 to

13   Kalamata.

14       Q    I'm going to scroll forward to the next page of

15   this exhibit which is marked 013, and on that page there's

16   a withdrawal dated July 17, '19.   Description:   Kalamata

17   Capital.   The amount is $2,393.   Do you see that?

18       A    Yes.

19       Q    Was the payment -- strike that.

20            Was the loan from Kalamata to be repaid a

21   certain amount per day through an ACH debit?

22       A    Yes.

23       Q    Okay.   If you look at the document marked 013

24   and then the next page the document marked 014, there are

25   numerous different dates for these withdrawals.   There are

1    3383.  The amount is $15,216.02.  Do you see that?

2         A    Yes.

3         Q    Yes.  Are you familiar with the subject of that

4    deposit into this account?

5              MS. OH:  I don't know.

6              MR. CHAE:  No.

7              MR. HERNDON:  If you go to the page in this --

8    it's in the same statement, but it's marked 019 at the

9    bottom.  And you go to August 8, 2019, there's a

10   deposit -- or, I beg your pardon -- a withdrawal that

11   refers to EBF Partners, LLC, and the amount of the

12   withdrawal is $1,087.50.  Do you see that?

13             MS. OH:  Uh-huh.

14             MR. CHAE:  Yes.

15             MS. OH:  Yes.

16             MR. HERNDON:  The next one down -- the next

17   withdrawal down refers to Retail Capital, and the amount

18   is $2,160.51.  Do you see that?

19             MS. OH:  Yes.

20             MR. CHAE:  Yes.

21             MR. HERNDON:  That was August 9.  Okay.  Then

22   the next withdrawal down refers to Kalamata Capital, and

23   the amount is $2,393.

24             Do you see that?

25             MS. OH:  Yes.

```
1            MR. CHAE:  Yes.
2   BY MR. HERNDON:
3      Q    So is it fair to say that as of August 8, 2019,
4   that Tobo was making repayments on three separate loans
5   from three separate lenders?
6      A    Yes.
7      Q    Okay.  I'm going to scroll down in this very
8   same exhibit to the page that's marked 025.  It looks like
9   a statement dated September 30, 2019.
10     A    Okay.
11     Q    And the deposit -- the deposits refer to a
12  deposit dated September 9, 2019, in the amount of
13  $170,838.19.  Do you see that?
14           MS. OH:  Yes.
15           MR. CHAE:  Yes.
16  BY MR. HERNDON:
17     Q    Okay.  Do you believe that that deposit is a
18  progress payment related to a UCLA-related project of
19  Tobo's?
20     A    Yes.
21     Q    Do you believe that the same is true of the
22  deposit dated September 23, 2019, in the amount of
23  $240,069.53?
24     A    Yes.
25     Q    If you look at the other two deposits on this
```

```
 1    page dated September 10 and September 13, each with the

 2    description regular deposit, are you familiar with the

 3    subject of those deposits?

 4        A    No.

 5             MS. OH:  No.

 6             MR. HERNDON:  Is it fair to say that the dollar

 7    amount of the deposits on this statement is lower than the

 8    amount of the deposits on the preceding statements from

 9    May, June, July and August?

10             MS. OH:  Appears so.

11             MR. CHAE:  Yes.

12    BY MR. HERNDON:

13        Q    Do you know why that is?

14        A    Like I said, it depends on the progress made.

15        Q    If you scroll down in the very same statement to

16    the page marked 027, there are a number of withdrawals

17    that all have the same description "stop payment charge,"

18    and the amount is $30.  Do you see those?

19        A    Yes.

20        Q    Do you know what those stop payment charges are

21    attributable to?

22        A    No, not specifically.

23        Q    I'm going to have you take a look at the

24    withdrawals on this page 027 that are dated September 13,

25    2019 or later.  Look at those withdrawals, as well as the
```

```
 1  withdrawals going on to the next page, 028.  Do you see

 2  any withdrawals that refer to Kalamata?

 3       A    No.

 4       Q    Is it fair to say that on or about September 13,

 5  2019 that Tobo decided to stop repaying the loan it

 6  obtained from Kalamata Capital?

 7       A    That's what it looks like.

 8       Q    Do you recall whether that's the case?

 9            MS. OH:  I don't know.

10            MR. CHAE:  I believe so, yes.

11  BY MR. HERNDON:

12       Q    Do you recall why that would be the case?

13       A    I believe the cash flow wasn't there.  Some of

14  our progress payment didn't come in.  The funds we were

15  expecting didn't come into our account.  We just kind of

16  ran out of working capital.

17       Q    On or about September 13, 2019 did Tobo also

18  stop making repayments on the Retail Capital loan?

19            MS. OH:  I don't know.

20            MR. CHAE:  I don't recall the exact date.

21  BY MR. HERNDON:

22       Q    Do you recall at a certain point Tobo stopped

23  making repayments on the loan from Retail Capital?

24       A    I believe it was in September.

25       Q    Okay.
```

```
 1        A     Of 2019.

 2        Q     Is it for the same reason that Tobo stopped

 3   marking repayments on the Kalamata Capital loan?

 4        A     Yes.

 5        Q     If you scroll down to the remaining withdrawals

 6   on Page 027 for the period of time September 13, 2019 to

 7   September 27, 2019, you'll see a number of withdrawals

 8   that all refer to a number of X's and then the four digits

 9   3383.  Do you see those?

10        A     Yes.

11        Q     Are you familiar with the subject of all of

12   those withdrawals that all reference that very same four-

13   digit account number 3383 in that period of time?

14        A     No.

15              MS. OH:  I do not know.

16   BY MR. HERNDON:

17        Q     If you go down to September 23, 2019, there's a

18   out-going wire transfer of $200,000.  Do you see that?

19              MS. OH:  Yes.

20              MR. CHAE:  Yes.

21   BY MR. HERNDON:

22        Q     Do you know why that money was transferred out

23   of this account on that date?

24              MS. OH:  I do not know.

25              MR. CHAE:  I don't recall specifically why at
```

1    this time.

2    BY MR. HERNDON:

3         Q    Do you recall where it was transferred to?

4              MS. OH:  I do not know.

5              MR. CHAE:  No, I do not know at this point.  I

6    have to look at our accounting records.

7    BY MR. HERNDON:

8         Q    Do you recall when the decision of made to

9    transfer that money.  I beg your pardon.  Strike that.

10             Do you recall when the decision of made to make

11   that wire transfer?

12             MS. OH:  I do not know.

13             MR. CHAE:  I do not recall the exact date, but

14   it was in September 2019.

15   BY MR. HERNDON:

16        Q    So I believe your prior testimony was that you

17   stopped repay -- I beg your pardon.  Tobo stopped repaying

18   on the Kalamata Capital loan and the Retail Capital loan

19   because the cash flow was not there; is that correct?

20        A    Yes.

21        Q    Is that entirely because Tobo simply was not

22   receiving payments on projects that it expected to receive

23   payments for?

24        A    Yes.

25        Q    When did Tobo begin to realize that those

1    payments were not coming in?

2        A    I would think August, September of 2019.

3        Q    If you go back to the page that's marked 025,

4    there's a deposit that has a date September 23, 2019, in

5    the amount of $240,069.53, correct?

6        A    Yes.

7        Q    And you believe that that's a progress payment

8    related to a UCLA-related project of Tobo's, correct?

9        A    That is correct.

10       Q    Wouldn't that deposit on September 23, 2019

11   indicate that Tobo was receiving at least a certain

12   portion of cash flow that it had been receiving related to

13   a project that it had also received payments for in May,

14   June, July, and August 2019?

15       A    Yes, but there's other projects that we have.

16   It's not just UCLA projects.  I believe we had over four

17   to five projects running concurrently with the UCLA

18   project.

19       Q    Do you recall which projects those were?

20       A    I believe we sent the information by document,

21   but off my memory, El Camino Student Services Project,

22   Ventura County Fire Station Project, City of Signal Hill

23   library project.  I believe there was another one for

24   Torrance, City of Torrance project.

25       Q    Okay.  All right.  So in September 2019 Tobo

1  just simply stopped receiving payments for work related to

2  those projects?

3       A     Yes, some of the projects.

4       Q     Do you know why Tobo stopped receiving payments

5  relating to those projects?

6       A     I don't recall exactly to each individual

7  project why.

8       Q     Was that related to wage assessments issued by

9  the labor commissioner with respect to those projects?

10      A     No.  No, that was part of it, but that's not the

11 primary reason.  There was different -- different reasons

12 for different projects.

13      Q     And your testimony is you don't know what the

14 reasons are, aside from the wage assessments issued by the

15 labor commissioner?

16      A     There's -- there's numerous reasons, I suppose.

17 But for me to kind of recall each project right now, I

18 can't recall with a hundred percent accuracy.

19      Q     Did Tobo ever take any action with respect to

20 trying to receive payment for those accounts?

21      A     Yes.  We -- there's ongoing process of project

22 team working with the owners, negotiating final amounts to

23 agree upon extra work amounts, and that's just kind of an

24 ongoing process.  But that never materialized on time for

25 us to do our progress billing.

```
 1   lunch at this point?

 2          MR. HERNDON:  If that would be more convenient,

 3   yes, I'm agreeable to that.

 4          MS. SPOSATO:  Yes.  If we're done with this

 5   exhibit, then I think this might be a good time to break

 6   for lunch.

 7          MR. HERNDON:  Agreed.  How much time would be --

 8   would you like?

 9          MS. SPOSATO:  How about 45 minutes?

10          MR. HERNDON:  Yes.  Okay.  So about 1:40?

11          MS. SPOSATO:  I would come back for that.

12          MR. HERNDON:  Okay.  Very good.  Great.  Thank

13   you.  Off the record.

14          (Noon recess.)

15          MR. HERNDON:  Back on the record.

16   BY MR. HERNDON:

17      Q    Mr. Chae, if you don't mind, I want to start by

18   asking you a few questions to make sure I understand some

19   of your earlier testimony.  Prior to the issuance of a

20   wage assessment related only to Tobo's conduct, Tobo

21   received notice of an inquiry questionnaire or a notice of

22   an investigation, correct?

23      A    Yes.

24      Q    Okay.  Now, that inquiry questionnaire or notice

25   of investigation is the first notification that Tobo
```

```
 1    receives of a labor commission case, correct?

 2         A    Yes.

 3         Q    Okay.  Now, if Tobo receives any such inquiry

 4    questionnaire or notice of investigation, you review all

 5    of those notices and questionnaires, correct?

 6         A    Yes.

 7         Q    And all such notices and questionnaires received

 8    by Tobo are addressed at Tobo's weekly staff meetings by

 9    members of Tobo's management team including yourself,

10    correct?

11         A    Yes.

12         Q    Tobo then has 60 days or more to gather and

13    produce documents in response to the inquiry questionnaire

14    or notice of investigation, correct?

15         A    Yes.

16         Q    Based on what you've seen since January 2017,

17    the labor commissioner then takes as little as 60 days and

18    can take up to a year or more before issuing a wage

19    assessment; is that correct?

20         A    Yes.

21         Q    Okay.  And based on what you've seen since

22    January 2017, a wage assessment is issued at least 120

23    days after Tobo receives notice of an inquiry, a

24    questionnaire, or a notice of investigation, correct?

25         A    Yes.
```

1        Q      And then you review all such wage assessments,

2    correct?

3        A      Yes.

4        Q      And then all such wage assessments are addressed

5    at Tobo's weekly staff meetings by members of Tobo's

6    management team, including yourself, correct?

7        A      Yes.

8               MR. HERNDON:  Okay.  All right.  I'm going to go

9    ahead and refer to the next exhibit which, Madam Court

10   Reporter, I show as Exhibit 3, correct?

11              COURT REPORTER:  That's correct.

12              (Whereupon, Exhibit No. 3 was marked for

13               identification.)

14   BY MR. HERNDON:

15       Q      Okay.  The document in question is marked at the

16   bottom:  Document Production re:  Credibly 2004,

17   Examination 465.  Scroll up.  And it's a letter on the

18   letterhead of the State of California Department of

19   Industrial Relations dated May 29, 2019.  Do you see that?

20       A      Yes.

21       Q      Okay.  If you scroll down, there's a reference

22   to DLSE, Case No. 40-54384-757.  Do you see that?

23       A      Yes.

24       Q      Okay.  I'm going to scroll down a little bit.

25   Have you ever seen this document before?

```
 1         A     Yes.

 2               MS. OH:  No.

 3   BY MR. HERNDON:

 4         Q     Do you recall when you first saw this document?

 5         A     I believe May or June of 2019.

 6         Q     I'm going to read from the very first paragraph

 7   of this letter.

 8               Quote:  This letter is to inform you that I now

 9   represent the Division of Labor Standards Enforcement,

10   hereinafter DLSE, with regard to the civil wage and

11   penalty assessment the CWPA issued on March 26, 2019 in

12   the above-captioned matter, closed quote.

13               Do you see that?

14         A     Yes.

15         Q     So did Tobo receive a wage assessment for DLSE

16   Case No. 40-54384-757 that was issued on March 26, 2019?

17         A     I believe so, yes.

18               MR. HERNDON:  Madam Court Reporter, I'm going to

19   go ahead to refer to a different document that I'm going

20   to mark as Exhibit 4.

21               (Whereupon, Exhibit No. 4 was marked for

22                identification.)

23   BY MR. HERNDON:

24         Q     At the bottom of this document it's marked,

25   Document Production re:  Credibly 2004, Examination 527.
```

```
1    That will be Exhibit 4.

2             Do you see that document?

3       A    Yes.

4       Q    Okay.  At the top of it would you agree with me

5    that it is titled Labor Violations; DLSE?

6       A    Yes.

7       Q    Okay.  Have you ever seen this document before?

8       A    Yes.

9            MS. OH:  No.

10   BY MR. HERNDON:

11      Q    Do you know who prepared this document?

12      A    I believe that was prepared by either Misa or

13   Suzie just giving me a summary page of the DLSE cases.

14      Q    Do you know when this document was prepared?

15           MS. OH:  No.

16           MR. CHAE:  Not exactly.  But I believe no, I

17   don't recall exactly when it was prepared.

18   BY MR. HERNDON:

19      Q    Can you give me your best estimate of when it

20   was prepared, if you can give such an estimate?

21      A    I think I saw this either November, December of

22   last year.

23      Q    Okay.  And did you just testify that this

24   document was prepared to give you a summary with respect

25   to the -- I don't want to put words in your mouth.  Let me
```

```
 1   just ask you the question again.

 2           Why was this document prepared?

 3       A    It was just a summarize labor inquiry

 4   investigation penalty assessment, just a summary of

 5   everything basically.

 6       Q    Do you know what information and documentation

 7   was used to prepare this document.

 8               MS. OH:  No.

 9               MR. CHAE:  Looks like a spreadsheet.

10               MR. HERNDON:  That's correct.  Let me go ahead

11   and clarify.  The information that is filled out in this

12   spreadsheet, do you know which documentation was used to

13   prepare the spreadsheet?

14               MS. OH:  No.

15               MR. CHAE:  I think it's based on the title shown

16   on the document which is by case number, DLSE case number.

17   BY MR. HERNDON:

18       Q    Do you believe that Tobo maintains files of

19   documents that were relied upon to create this

20   spreadsheet?

21       A    Yes.  I believe this spreadsheet was made from

22   information based on DLSE case files.

23       Q    Okay.  Do you have any reason to question the

24   accuracy of any of the information in this spreadsheet?

25       A    I -- looking at it, I don't know to the accuracy
```

1    bottom two rows, do you see how for this column that the

2    boxes are highlighted and it says, Mega Air-Tobo?

3         A    Yes.

4         Q    Do you know why in those two boxes it says Mega

5    Air-Tobo as opposed to the other rows above it where it

6    only says Tobo?

7         A    I don't know.  That's the way it's written, but

8    I don't know why.

9         Q    Okay.  Let me have you go to, on the same

10   spreadsheet, the third row down.  Do you see where there's

11   a reference to DLSE Case No. 40-54384-757?

12        A    Yes.

13        Q    That's the same case number that we -- that we

14   just looked at in the prior Exhibit 3 on that letter,

15   correct?

16        A    Yes.

17        Q    Okay.  Are you familiar with the subject matter

18   of that subject case, No. 40-54384-757?

19             MS. OH:  No.

20             MR. CHAE:  I think -- I believe it's regarding

21   the Horizon View project, but off the top of my head I

22   don't know the specifics of what that was.

23   BY MR. HERNDON:

24        Q    Okay.  All right.  So if you go to the fifth

25   column over on the third row of the spreadsheet, do you

1    last one, but do you know whether Tobo had paid that

2    amount?

3             MS. OH:  I don't know.

4             MR. CHAE:  No.

5             MR. HERNDON:  Do you know whether Tobo was

6    required to pay that amount?

7             MS. OH:  Don't know.

8             MR. CHAE:  From what I recall, the amount was

9    assessed, but there was a communication going back and

10   forth between our attorney representing that specific case

11   with the LSC, but at the time of that date we were not

12   informed that we had to make the payment at that time.

13   BY MR. HERNDON:

14        Q    If there's an assessment that is made in a --

15   and the subject of the wage assessment -- strike that.

16             If there's a wage assessment and only Tobo's

17   alleged conduct is at issue in that wage assessment,

18   ultimately is Tobo on the hook for the amount of the

19   assessment?

20        A    Yes, that's possible, but there's always the

21   process of the assessment investigation.  There's appeal

22   process.  There's different things.  So our labor

23   attorneys handle the case, and we follow their

24   recommendation.

25        Q    Do you recall if anything in particular was

```
 1   recommended with respect to this specific wage assessment?
 2        A    I do not recall at this time.
 3             MS. OH:  I do not know.
 4   BY MR. HERNDON:
 5        Q    You don't know whether a request for review was
 6   filed or submitted?
 7        A    I don't recall.
 8        Q    Would you say that this assessment, this
 9   particular wage assessment, had any kind of adverse effect
10   on Tobo's business?
11        A    I -- I wouldn't know what to say to that.
12   This -- this is normal part of business as far as I was
13   concerned at that time.  We go through this regularly.  So
14   I didn't consider it as a big threat to the operations of
15   the company.
16        Q    Although one possible outcome with this
17   particular wage assessment is that Tobo could be required
18   to pay the $1,337,883.93 that's referenced in the amount
19   column on the spreadsheet though, correct?
20        A    Yes.  But there's been cases in prior years
21   where entire case got dismissed or reduced by 95 percent
22   too.  So our standard -- my standard protocol at the time
23   is we supplied information, have our legal attorneys get
24   involved, and then we take their direction but we continue
25   on business.
```

```
 1   BY MR. HERNDON:

 2        Q    Okay.  Based on the reference to WBF, WBR?

 3        A    That's correct.

 4        Q    Okay.  If you go up -- for this particular case,

 5   if you go over to the very final column on the right

 6   titled Status, do you see where it references

 7   investigation?

 8        A    Yes.

 9        Q    Do you have an understanding of what that

10   reference to investigation means with respect to this

11   specific case?

12        A    My understanding is that there's investigation.

13        Q    Do you understand that to be an ongoing

14   investigation?

15        A    Yes.

16             MR. HERNDON:  Okay.  Madam Court Reporter, I'm

17   about to refer to what I show as Exhibit 5.

18             COURT REPORTER:  That's fine.  Thank you.

19             (Whereupon, Exhibit No. 5 was marked for

20              identification.)

21   BY MR. HERNDON:

22        Q    Okay.  And it's a document production re:

23   Credibly 2004, Examination 457.  And it is a document on

24   pleading paper that's captioned DLSE's Exhibit List.  Do

25   you see this, the document?
```

100

1         A       Yes.

2         Q       Are you familiar with this document?

3                 MS. OH:  No, I'm not.

4                 MS. SPOSATO:  Josh, can we have -- can we give

5    my client a minute to look at it?  Are you going to do 457

6    through 460?

7                 MR. HERNDON:  Let me ask you this.  First of

8    all, yes, your clients are welcome to look at it.  Are

9    your clients looking at these documents separately from

10   looking at them on my computer screen or are they reading

11   it off --

12                MR. CHAE:  No, we're looking at the screen only.

13   BY MR. HERNDON:

14        Q       Okay.  I just want to -- then in that case, let

15   me know what I can do to make it easier for you to review

16   it, and take as much time as you need to take a look at

17   it.

18        A       This is fine with me.

19        Q       Okay.

20        A       Yes, I'm familiar with this document.

21        Q       Okay.  What is your familiarity with this

22   document?

23        A       It's a letter with exhibit attachment or list

24   for one of our projects, looks like, with wage assessment.

25        Q       Okay.  Let me go ahead -- let me have you stay

```
 1    on this same document marked 457.  There's Item No. 1 and

 2    the description is civil wage and penalty assessment,

 3    dated October 5, 2018 in DLSE Case No. 40-54317-132.  Do

 4    you see that?

 5         A    Yes.

 6         Q    Okay.  Did Tobo receive a civil wage and penalty

 7    assessment dated October 5, 2018, in DLSE Case No.

 8    40-54317-132?

 9         A    Yes, Tobo did.

10         Q    Do you know if Tobo ever received a notice of

11    investigation with respect to this case before the wage

12    assessment in this case was issued?

13         A    I'm sure we did.  I just don't recall when those

14    things were.

15         Q    Do you know whether Tobo ever submitted a

16    request for a review with respect to the wage assessment

17    in this case?

18         A    I'm sure we did.

19              MR. HERNDON:  Okay.  Madam Court Reporter,

20    Exhibit 5 is only going to consist of the page marked

21    Page 457.

22              COURT REPORTER:  Okay.

23              MR. HERNDON:  Okay.  I'm going to now mark as

24    Exhibit 6 the next document in sequence.

25              (Whereupon, Exhibit No. 6 was marked for
```

102

```
 1              identification.)

 2  BY MR. HERNDON:

 3      Q     At the very bottom of the document it's marked

 4  Document Production re:  Credibly 2004, Examination 461.

 5  And it's a document that is titled:  Order Dismissing

 6  Request For Review.  Do you see that document?

 7      A     Yes.

 8      Q     Did Tobo withdraw its request for review in this

 9  particular case?

10      A     I think our -- I think our attorneys did who

11  handled the legal matter on the case.

12      Q     Would you have had to authorize them to do that

13  in order for them to do so?

14      A     I believe so.

15      Q     Do you know what happened when Tobo withdrew its

16  request for review with respect to the assessment in this

17  case?

18      A     No.

19          MR. HERNDON:  Madam Court Reporter, did you hear

20  the witness's answer?

21          THE WITNESS:  I said no.

22  Thank you.  That's what he said.

23  BY MR. HERNDON:

24      Q     Okay.  If a requesting party withdraws a request

25  for review with respect to a wage assessment, does the
```

103

1   requesting party have any further recourse with respect to

2   contesting the wage assessment at that point?

3            MS. SPOSATO:  Object to the extent that calls

4   for a legal opinion, but they can still answer.

5            MR. HERNDON:  Thank you.

6            THE WITNESS:  I don't know.  That's a legal

7   question and an answer, so I do not know.

8   BY MR. HERNDON:

9        Q    Do you know the amount of the assessment in this

10  particular case?

11       A    No.  I would have to look at the case number,

12  but I'm sure it's in there somewhere.  I cannot recall at

13  this time the exact amount.

14       Q    Okay.  Do you know whether Tobo has paid the

15  assessment in this case?

16       A    I believe we have not, that Tobo has not.

17       Q    Do you know whether Mr. Tobo will have to pay

18  the assessment in this case?

19       A    I'm not sure.  That's something our attorneys

20  are looking into.

21       Q    Although one possible outcome is that Tobo could

22  be on the hook for the amount of the assessment, correct?

23       A    Yes.

24            MR. HERNDON:  Okay.  Madam Court Reporter,

25  Exhibit 6 will only consist of Document 461.

```
 1              COURT REPORTER:  Document 461.  I've got it.
 2    BY MR. HERNDON:
 3         Q    Okay.  I'm going to turn to the next document in
 4    the examination.  Okay.  This will be Exhibit 7.  It is a
 5    document marked at the bottom, Document Production re:
 6    Credibly 2004, Examination 507.  It is a document titled
 7    Notice of Investigation.  Do you see that?
 8         A    Yes.
 9         Q    Before I proceed with this Exhibit 7, let me ask
10    you very quick, Mr. Chae:  We were just talking about the
11    wage assessment in DLSE Case No. 40-54317-132, correct?
12         A    Okay.
13         Q    And it was your testimony that Tobo received a
14    civil wage and penalty assessment dated October 5, 2018 in
15    that DLSE case, correct?
16         A    Yes.
17         Q    You would have reviewed that wage assessment in
18    that case, correct?
19         A    Yes.
20         Q    Okay.  Okay.  Let me direct your attention to
21    Exhibit 7 which is the document marked at the bottom 507,
22    the document marked Notice of Investigation.  Do you see
23    that?
24         A    Yes.
25
```

```
 1              (Whereupon, Exhibit No. 7 was marked for

 2              identification.)

 3    BY MR. HERNDON:

 4        Q    Can you see how the document is dated May 16,

 5    2019?

 6        A    Yes.

 7        Q    And it refers to Case No. 40-65066-132, correct?

 8        A    Yes.

 9        Q    Have you ever seen this document?

10        A    Yes.

11              MS. OH:  I have not.

12              MR. HERNDON:  Okay.  Just referring to Case No.

13    40-65066-132 which is literally the case number referenced

14    on this document, do you know if this notice of

15    investigation was the first notification Tobo received

16    with respect to this specific case?

17              MS. OH:  I do not know.

18              MR. CHAE:  I believe so.  Maybe there was a --

19    yeah.

20    BY MR. HERNDON:

21        Q    Okay.  Were you about to say that maybe there

22    was another questionnaire or another inquiry that may have

23    been earlier than this notice of investigation?

24        A    Yeah, but that's my assumption because that's

25    just a normal protocol from DLSE, so.
```

1       Q    What -- let me unpack that a little bit.  What

2  were you referring to as the normal protocol from the

3  DLSE?

4       A    I think I previously answered that also, but

5  there will be an inquiry or question for document request

6  by DLSE, and we would provide that.  That may lead into

7  investigation or it may bring closure to the inquiries.

8  Then once the investigation occurs, then per the document

9  requirements are produced and then it follows the next

10  step which is an assessment.

11          So based on this document where it says notice

12  of investigation, I'm just presuming there was a -- some

13  kind of communication inquiring documents.  It's an

14  assumption.

15       Q    Okay.  But you're saying it's possible that a

16  request for documents may have preceded this notice of

17  investigation in this case?

18       A    Yes.

19       Q    Although that's entirely an assumption on your

20  part?

21       A    That's correct.

22       Q    Okay.  All right.  Let me go ahead and move

23  forward to the next page that is marked 508.  That will

24  also be part of Exhibit 7, and it's a document titled

25  Notice of Apprenticeship Compliance.  Do you see that?

1         A     Yes.

2         Q     Based on the information on this document, do

3    you know which of Tobo's projects this notice pertains to?

4         A     If you could zoom in under the title Notice of

5    Apprenticeship Compliance a little bit --

6         Q     Does that help?

7         A     Yeah.  Looks like -- yeah.  Looks like a UCLA

8    project.

9         Q     Okay.  So if you read this document marked 508,

10   it says in part, The Division of Labor Standards

11   Enforcement, DLSE, has received a complaint alleging that

12   you are not in compliance with Labor Code Section 1777.5.

13         Do you see that?

14        A     Yes.

15        Q     And then it refers to a few specific line items

16   where there are boxes checked.  This document is dated

17   May 16, 2019, correct?

18        A     Yes.

19        Q     Was Tobo aware of the alleged violations that

20   are set forth on this document prior to May 16, 2019?

21        A     I believe so.  Yes.

22        Q     Do you know how far or how much earlier than

23   May 16, 2019 Tobo was aware of the violations in this

24   document?

25        A     I cannot recall exactly when that was.

```
 1        A     Yes.
 2        Q     Do you know what that reference to SSC is a
 3   reference to?
 4        A     SSC stands for Student Services Center project.
 5        Q     Is that a project at a college or university?
 6        A     That's a community college in El Camino.
 7        Q     El Camino Community College?
 8        A     Yes.
 9        Q     Can you move over one more column to the right
10   where the column says laborers.  Do you know what the
11   reference to numerous is a reference to?
12        A     No.
13        Q     If you move over one more column to the right,
14   do you see the reference to the amount of $2,998,536.05?
15        A     Yes.
16        Q     Do you know what that's a reference to?
17        A     No.
18        Q     If you move over one more column to the right,
19   do you see the reference to "plus penalties"?
20        A     Yes.
21        Q     Do you know what that is a reference to?
22        A     No.
23        Q     Do you believe that the information for this
24   Case 40-60881-132, the information on this spreadsheet for
25   that case was obtained from a file that Tobo maintains
```

1    with respect to that case?

2         A    I believe so.

3         Q    Do you know whether a wage assessment was issued

4    in that particular case, 40-60881-132?

5         A    No.

6         Q    So your answer is that you don't know whether a

7    wage assessment was issued?

8         A    No.

9         Q    Okay.  Is it possible that the amount

10   $2,998,536.05 may be a reference to a wage assessment

11   issued in that case?

12        A    It's a possibility.

13        Q    Can you think of any other reason that that

14   amount would be on this spreadsheet other than it

15   resulting from a wage assessment?

16        A    No.

17        Q    If a wage assessment had issued in that case,

18   you would have reviewed that wage assessment, correct?

19        A    Yes, with our attorney at the time.

20        Q    Do you know whether a notice or a questionnaire

21   or a notice of investigation was received by Tobo with

22   respect to this specific case?

23        A    I'm certain we received notices.

24        Q    And you would have reviewed those notices,

25   correct?

1      A     Yes.

2      Q     Do you have any recollection of when Tobo would

3  have received notices related to this particular case?

4      A     No.

5      Q     Let me see if I can try to refresh your

6  recollection.  Do you know whether Tobo received notices

7  with respect to Case No. 40-60881-132, the one we've been

8  discussing, prior to when it obtained the loan from Retail

9  Capital in May 2019?

10     A     I do not recall specifically what notice and

11 which date.  I'm just assuming -- presuming that we did

12 receive certain notices.

13     Q     Do you know whether Tobo was ever asked to

14 provide any information or documentation in connection

15 with this specific case?

16     A     To whom?

17     Q     To anybody.

18     A     Can you rephrase the question or repeat the

19 question.

20     Q     Sure.  Was Tobo ever asked to provide any

21 information or documentation in connection with Case No.

22 40-60881-132?

23     A     Yes.

24     Q     Do you recall who asked Tobo to provide

25 documentation or information in connection with that case?

1    would that have an adverse effect on Tobo's business?

2         A    Not necessarily, because there's the ongoing

3    appeal process.  That's not the end of the case as far as

4    I'm concerned.

5         Q    Well, let me --

6         A    So the answer is no.

7         Q    Let me be a little more clear then.  If Tobo had

8    no recourse with respect to Case No. 40-54384-757 other

9    than to pay that amount and if Tobo paid that amount,

10   would that have an adverse effect on Tobo's business?

11            MS. SPOSATO:  I'm going to object to the extent

12   that it calls for speculation, but they can still answer.

13            THE WITNESS:  It will have an impact on the

14   business.  To what severity, I would have to speculate.

15   BY MR. HERNDON:

16        Q    During the time frame from May 2019 through

17   September 2019, would Tobo have been able to pay a wage

18   assessment in the amount of $1,337,883.90?

19        A    If we had to pay it, I believe so.  Yes.

20        Q    From what funds would Tobo have paid that

21   amount?

22        A    Well, we would work out the accounts payable

23   according to what we had to pay.  I'm speculating.  So if

24   we had to make that payment, did we have ability to make

25   that payment?  Yes, we did.

1    to DLSE, what I'm saying is yes because we could look at

2    the cash flow and determine the priority of what needed to

3    be paid.  So I'm hoping that answers your question.

4        Q    Yeah.  I mean, what I'm trying to get to is if

5    ultimately Tobo had to make a wage assessment in that

6    amount, it would have a negative effect on Tobo's

7    finances.  Is that --

8        A    It would have -- yes, it would have an impact on

9    our bottom line, for the lack of better word, but we --

10   Tobo Construction had contracts over 70, $80 million.  So,

11   you know, an entity as Tobo Construction, would that have

12   a severe adverse effect?  I don't know.  I think -- it has

13   an impact, but I don't know if it's a severe adverse

14   impact.

15       Q    I believe it was your testimony before that Tobo

16   stopped paying on the loan that it received from Retail

17   Capital because of cash flow problems that Tobo was

18   experiencing in September of 2019, correct?

19       A    That's correct.

20       Q    If Tobo had to pay a wage assessment in the

21   amount of $1,337,883.90, wouldn't that -- in

22   September 2019, wouldn't that exacerbate Tobo's cash flow

23   problems at that time?

24       A    Yes.  That's correct.

25       Q    Okay.  Let me go back to the document marked 527

```
1    one more time.  Go down to the second row where it says

2    DLSE Case No. 40-57020-218.  Do you see that?

3         A    Yes.

4         Q    If you go over to the fifth column over where it

5    refers to the project as FS27, do you have an

6    understanding of what that refers to?

7         A    Yes.

8         Q    What is your understanding of what that refers

9    to?

10        A    FS27 is an acronym used for our Fire Station 27

11   project.

12        Q    Thank you.  Okay.

13             MR. HERNDON:  Madam Court Reporter, I'm going to

14   go to the document that I'm going to mark as Exhibit 9.

15             COURT REPORTER:  Okay.

16             MR. HERNDON:  It's a document at the bottom that

17   is marked Document Production re:  Credibly 2004,

18   Examination 492.

19             (Whereupon, Exhibit No. 9 was marked for

20              identification.)

21   BY MR. HERNDON:

22        Q    It is a document titled Civil Wage Penalty

23   Assessment.  Do you see that?

24        A    Yes.

25        Q    Okay.  And it has a date of October 24 -- I beg
```

1    your pardon -- October 24, 2019, correct?

2          A    Yes.

3          Q    Okay.  And have you seen this document before?

4          A    Yes.

5               MS. OH:  No.

6    BY MR. HERNDON:

7          Q    When do you believe that you first saw this

8    document?

9          A    I believe early November 2019.

10          Q    And if I understand your prior testimony

11    correctly, before Tobo received this civil wage and

12    penalty assessment, Tobo would have received a

13    questionnaire, an inquiry or a notice of investigation

14    regarding this Case No. 40-57020-218, correct?

15          A    That's correct.

16          Q    Okay.  And you would have reviewed that

17    notification or questionnaire or notice of investigation,

18    correct?

19          A    Yes.

20          Q    And it would have been discussed at Tobo's

21    weekly meetings by members of Tobo's management team?

22          A    Yes.

23          Q    Let me ask you this:  Based on the date of this

24    civil wage and penalty assessment dated October 24, 2019,

25    do you recall when Tobo received a notification

1    questionnaire or notice of investigation regarding this

2    case number?

3         A    I don't recall a specific date when that was

4    made.

5         Q    Do you know whether Tobo received notification

6    questionnaire or a notice of investigation before it

7    obtained the loan from Retail Capital?

8         A    I don't recall.

9         Q    Do you recall whether Tobo was ever contacted by

10   anybody in connection with this -- with this case?

11        A    I'm assuming yes, but I don't recall the exact

12   date or when certain inquiries were made.  I don't recall.

13        Q    Let me -- let me see if I can just clarify that.

14   Even if you don't recall when it occurred, do you recall

15   Tobo being contacted in connection with this case?

16        A    I believe so, yes.

17        Q    Okay.  But you're not sure of when Tobo was

18   contacted in connection with this case?

19        A    That's correct; I'm not sure when.

20        Q    Okay.  And if I asked you this before, I

21   apologize.  But when Tobo received that notification or

22   questionnaire, notice of investigation, you would have --

23   you would reviewed it; is that correct?

24        A    That's correct.

25        Q    Okay.  If you scroll down on this document

1    marked 492, do you see how the reference to the Division

2    has determined that the total amount of wages due is

3    $511,477.64?

4         A    Yes.

5         Q    If you go to the next line down, do you see that

6    there's a reference to:  The Division has determined that

7    the total amount of penalties assessed under Labor Code

8    Sections 1775 and 1813 is $395,675?

9         A    Yes.

10         Q    Okay.  And the next row down is, the Division

11    has determined that the amount of penalties assessed under

12    Labor Code Section 1777.7 is $56,680?

13         A    Yes.

14         Q    Are you aware of the current status of this

15    case?

16         A    I don't recall.

17         Q    Do you know whether Tobo submitted a request

18    for -- a request to review in connection with this case?

19         A    I believe we did.  I don't remember exact dates.

20         Q    Do you know whether Tobo paid the assessment

21    that it reflected on this document, No. 492?

22         A    I don't recall if Tobo made payments -- any or

23    part of the payments on this document.

24         Q    If Tobo had made any such payments, do you

25    believe that you would have known about it?

```
 1        A    Yes.

 2             MR. HERNDON:  Okay.  Going back to the document

 3   marked -- I beg your pardon, Madam Court Reporter.  Let me

 4   see if I can clean that up a little bit.

 5             Madam court reporter, Exhibit 9 will consist

 6   only of the document that we just covered, 492.

 7             COURT REPORTER:  Yes.  Okay.  Yes.

 8   BY MR. HERNDON:

 9        Q    Okay.  Going back to the spreadsheet on Document

10   527 for a minute.  I'm going to refer to the second row

11   down for Case No. 40-54388-132.

12        A    Okay.

13        Q    If you move over to the fifth column over, do

14   you see the reference to the RALO again?

15        A    Yes.

16        Q    Will you please remind me what you believe the

17   reference to RALO is a reference to?

18        A    It's an acronym for Ramona and Lone Hill

19   project.

20        Q    Thank you very much.

21             MR. HERNDON:  Madam court reporter, Exhibit 10

22   will consist of this document which is marked, Document

23   Production re:  Credibly 2004, Examination 475.

24             COURT REPORTER:  I got it.  Thank you.

25             MR. HERNDON:  And it's a document that's titled
```

128

```
 1    Civil Wage and Penalty Assessment.

 2                (Whereupon, Exhibit No. 10 was marked for

 3                 identification.)

 4    BY MR. HERNDON:

 5         Q    You've seen this document before, correct?

 6         A    Yes.

 7              MS. OH:  I haven't.

 8    BY MR. HERNDON:

 9         Q    Do you recall when you first saw this document?

10         A    I believe a week or two after November, as the

11    date shown on the letter.

12         Q    Looking at this document, Mr. Chae -- let's zoom

13    in.  Do you see how there's a reference to Tobo

14    Construction, Inc., a California corporation as the prime

15    contractor?

16         A    Yes.

17         Q    And do you see how beneath that there's a

18    reference to subcontractor?

19         A    Yes.

20         Q    And you can see how that box is blank?

21         A    Yes.

22         Q    Do you understand that to mean that only Tobo is

23    the subject of this particular civil wage and penalty

24    assessment?

25         A    Yes.
```

1        Q    Okay.  Before receiving this civil wage and

2   penalty assessment, do you recall whether Tobo received a

3   notification questionnaire or notice of investigation

4   related to this?

5        A    Yes, I recall, but I don't recall the specific

6   dates and time line when we did receive such requests.

7        Q    Thank you.  You do recall receiving it?

8        A    Yes.

9        Q    Do you recall -- do you recall reviewing it?

10       A    Yes.

11       Q    Do you recall when you reviewed it?

12       A    I don't recall the time line when I reviewed it.

13  But ...

14       Q    Do you recall whether you reviewed it before or

15  after -- strike that.

16            Do you recall whether you reviewed it before

17  Tobo obtained the loan from Retail Capital?

18       A    I don't recall exactly when I reviewed this

19  document or any communication prior to this document.

20       Q    Okay.

21       A    I presuming I did.

22       Q    Okay.  If we scroll down a little bit, do you

23  see the reference, the language, the Division has

24  determined that the total amount of wages due is

25  $800,858.90?

```
 1        A    Yes.

 2        Q    And the next line down states, the Division has

 3   determined that the total amount of penalties assessed

 4   under Labor Code Section 1775 and 1813 is $537,025.  Do

 5   you see that?

 6        A    Yes.

 7        Q    Do you know whether Tobo paid any part of that

 8   assessment, wage assessment?

 9        A    We have not paid any of that amount.

10        Q    Do you know the current status of this specific

11   case?

12        A    No.  Our labor attorney was handling this case

13   as well.

14        Q    Let me just clarify this real quick; I think I

15   might have asked you this earlier.  If we just focus on

16   this document marked 475, if we focus on the amount of the

17   wage assessment on this document, I believe you testified

18   earlier that one outcome is that Tobo would be liable for

19   the amount of this wage assessment, correct?

20        A    Yes.

21             MR. HERNDON:  Okay.  Madam Court Reporter,

22   Exhibit 10 will only consist of the document marked 475.

23             COURT REPORTER:  Got it.

24   BY MR. HERNDON:

25        Q    Okay.  Going back to the document marked 527 for
```

```
 1    a minute, the second to the last row on this document

 2    refers to a Case No. 40-66318-716?

 3         A    Yes.

 4         Q    Do you know what the reference to Mega Air-Tobo

 5    as the company, what that refers to?

 6         A    I can -- I'm looking at the project acronym.

 7         Q    Yes.

 8         A    I believe it says SHL?  If you can zoom in a

 9    little bit on that section.

10         Q    Yes, sir.

11         A    If it is SHL, that's referring to Signal Hill

12    Library project.

13              MR. HERNDON:  Okay.  Madam Court Reporter, the

14    next exhibit that I have is Exhibit 11.

15              COURT REPORTER:  Okay.

16              MR. HERNDON:  That will include the document

17    marked at the bottom, Document Production re:  Credibly

18    2004, Examination 289.

19              COURT REPORTER:  Got it.

20              (Whereupon, Exhibit No. 11 was marked for

21                identification.)

22    BY MR. HERNDON:

23         Q    Okay.  Mr. Chae, have you ever seen this

24    document before?

25         A    Yes.
```

```
1        Q    Dated October 31st, 2019.  Do you see where it

2   lists Tobo Construction, Inc., a corporation as the prime

3   contractor?

4        A    Yes.

5        Q    And do you see where immediately underneath it

6   refers to Mega Air Company, Inc., a corporation, as the

7   subcontractor?

8        A    Yes.

9        Q    With respect to this specific case, do you

10  recall what Mega Air Co, Inc.'s involvement in the case

11  is?

12       A    I believe this is based on labor compliance by

13  DLSE inquiry investigation into our subcontractor at the

14  time on this project, mega Air.  That they assess certain

15  penalties and violations.

16       Q    Is it your understanding that those penalties

17  and violations were as a result of Mega Air Company's

18  actions or inactions?

19       A    That's correct.

20       Q    So is it your understanding that with respect to

21  this civil wage and penalty assessment, Tobo Construction

22  is a subject of the civil wage and penalty assessment

23  because the actions or inactions of one of its

24  subcontractors is at issue?

25       A    Yes.  That's correct.
```

```
 1        Q     Okay.  Sir, where you have a circumstance like
 2   that where a civil wage and penalty assessment is based on
 3   actions or inactions of a subcontractor, a prime
 4   contractor can nevertheless still be on the hook for
 5   having to pay the amount, correct?
 6        A     That is correct.
 7        Q     With respect to this specific case,
 8   40-66318-716, do you recall whether Tobo received an
 9   inquiry questionnaire or some investigation?
10        A     I'm certain we did.  I don't recall the date or
11   time when we did.
12        Q     But you're certain that you did?
13        A     Yes.
14        Q     Okay.  Can you give me your best estimate of
15   whether Tobo received that inquiry questionnaire, notice
16   of investigation before Tobo obtained its loan from Retail
17   Capital?
18        A     I would be guessing.  It could be -- I would be
19   guessing.
20        Q     Okay.  Do you recall reviewing that assessment
21   or that inquiry, that questionnaire, that notice of
22   investigation?
23        A     Yes.
24        Q     Do you know what the current status is in this
25   particular case?
```

```
 1    discussed where it's referred to as Mega Air-Tobo?

 2        A    Yes.

 3        Q    Okay.  Immediately to the right of that, do you

 4    see the reference to WBR as the project?

 5        A    Yes.

 6        Q    Do you have an understanding of what that

 7    reference to WBR is a reference to?

 8        A    It's a -- WBR is for a UCLA project.  It's an

 9    acronym for a UCLA project.

10             MR. HERNDON:  Madam Court Reporter, Exhibit 12

11    will include the document marked Document Production re:

12    Credibly 2004, Examination 271.

13             COURT REPORTER:  Okay.  Thank you.

14             (Whereupon, Exhibit No. 12 was marked for

15              identification.)

16    BY MR. HERNDON:

17        Q    Mr. Chae, have you seen this document before?

18        A    Yes.

19        Q    All right.  Do you recall when you first saw

20    this document?

21        A    I believe November last year.  2019.

22        Q    And do you recall whether Tobo received

23    notification, an inquiry, questionnaire, notice of

24    investigation related to this case?

25        A    Can you repeat that question.
```

137

1        Q    Yeah.  I can probably clean it up a little bit.

2    With respect to this specific case, do you recall whether

3    Tobo received an inquiry questionnaire or notice of

4    investigation?

5        A    Yes, we have received such documents.

6        Q    Okay.  Do you recall reviewing that document?

7        A    Yes.

8        Q    Do you recall when Tobo received the document?

9        A    I don't recall specific dates, but it was -- it

10   was in 2019 and possibly 2018 also.  I don't recall

11   exactly when we received them.

12       Q    Do you recall whether Tobo received the document

13   before it obtained the loan from Retail Capital?

14       A    I'm certain we did before, but I don't recall

15   the specific date.

16            MR. HERNDON:  Madam Court Reporter, could you

17   please read that back?

18            COURT REPORTER:  The answer was, I'm certain we

19   did before, but I don't recall the specific date.

20   BY MR. HERNDON:

21       Q    Okay.  If we look down on this document marked

22   271, do you see where there's a reference to:  The

23   Division has determined that the total amount of wages due

24   is $36,139.26?

25       A    Yes.

```
1        Q     And the next line down, the Division has

2    determined that the total amount of penalties assessed

3    under Labor Code Sections 1775 and 1813 is $15,480?

4        A     Yes.

5        Q     And the next line down is:  The Division has

6    determined that the amount of penalty assessed under Labor

7    Code Section 1777.7 is $23,920?

8        A     Yes.

9        Q     Do you know the current status of this case?

10       A     No.

11       Q     Do you know whether Tobo's paid any of the

12   amounts on this Document 271?

13       A     Tobo has not paid any of this amount.

14       Q     Is one possible outcome of this case that Tobo

15   may have to pay the amounts on this document?

16       A     That is one of the possibilities, yes.

17       Q     If Tobo had to pay the amounts on this document,

18   would it have an adverse effect on Tobo's business?

19       A     No, it would not.

20       Q     No, it would not?

21       A     No.

22       Q     Even if they made that payment in

23   September 2019?

24       A     No.

25       Q     Isn't September 2019 when Retail-- when Tobo had
```

1    to stop making payments on Retail Capital's loan because

2    of reduced cash flow?

3         A    That's correct.

4         Q    If Tobo had to pay the amounts of this document

5    in September of 2019, wouldn't that have exacerbated the

6    cash flow problems that Tobo was experiencing in

7    September 2019?

8         A    We would have taken this into consideration of

9    our cash flow and perhaps adjusted accordingly.

10        Q    Does that mean that at the same time Tobo

11   stopped making payments on Retail Capital's loan that Tobo

12   in some manner would have come up with a way of paying the

13   assessments on this document?

14        A    If it was absolutely necessary, I'm presuming

15   that we would have made adjustments in September of 2019.

16        Q    In your mind, would it have been more necessary

17   to pay the assessments on this document than it was to

18   continue making payments on the loan that Tobo took out

19   with Retail Capital?

20        A    I -- I don't know.

21        Q    In September 2019, Tobo stopped making payments

22   on three separate loans that Retail -- that Tobo had taken

23   out from three separate lenders; isn't that correct?

24        A    That's correct.

25        Q    If Tobo had a means to come up with additional

```
 1   capital to continue paying those loans, wouldn't Tobo have

 2   come up with that additional cash flow?

 3       A    That's correct.

 4            MR. HERNDON:  Okay.  Madam Court Reporter,

 5   Exhibit 12 will consist of the document marked 271.

 6            COURT REPORTER:  Yes.

 7            MR. HERNDON:  Okay.  Madam Court Reporter, the

 8   next exhibit, Exhibit 13, will be the document marked --

 9   it's on the left-hand column:  Document Production re:

10   Credibly 2004, Examination 206.  Okay.

11            COURT REPORTER:  I got it.

12            (Whereupon, Exhibit No. 13 was marked for

13             identification.)

14   BY MR. HERNDON:

15       Q    Are you familiar with this document?

16       A    Yes.

17       Q    Okay.

18            MS. OH:  No.

19   BY MR. HERNDON:

20       Q    What is your understanding of this document?

21       A    It's a spreadsheet of DLSE case number.

22       Q    Do you know who created this document?

23       A    No, but I'm presuming it's either Misa or Suzie.

24       Q    Would that purely be your presumption?

25       A    Yes.
```

1      Q     Okay.  Do you recall asking anybody any of --
2  strike that.

3           Do you recall asking any of Tobo's personnel to
4  prepare this specific document?

5      A     I may have.

6      Q     Do you know when this document was created?

7      A     I don't know.

8      Q     Do you know why this document was created?

9      A     No, I don't know.

10     Q     With respect to this specific document, if you
11  go over to the fourth column where there is a reference to
12  company, do you know why each of the rows has a reference
13  to Tobo?

14     A     I do not.

15     Q     If you go down to the second to the last row,
16  you'll see a reference to the project SSC.  Do you know
17  what that's a reference to?

18     A     That's the same reference as noted before:
19  Student Services Center.

20     Q     At El Camino College -- Community College?

21     A     That's correct.

22     Q     If you move over one line or one column to the
23  right, there's a reference to, quote, 200131, per Emily,
24  CWPA $5,776,436.05.  Do you see that?

25     A     Yes.

```
 1        Q     Do you know what the reference to 200131 is a
 2   reference to?
 3        A     Can you zoom in on that a little bit?
 4        Q     Yes, sir.
 5        A     The first six numbers is indicating year, month
 6   and date.  Per Emily is, I believe, our attorney who
 7   handles our labor issues.  I'm not sure what CWPA stands
 8   for, but I imagine that's for the Labor Compliance or
 9   DLSE.
10        Q     Okay.  So going back to the Numbers 200131, your
11   testimony is that that refers to January 31st, 2020; is
12   that correct?
13        A     That's correct.
14        Q     Do you know what that is a reference to?  Let me
15   be more specific.  I apologize; it was a bad question.
16              To the extent that that is a reference to
17   January 31st, 2020, do you know if that is a reference to
18   a -- the date of a wage assessment?
19        A     I don't recall if that's a wage assessment.
20   What I can gather is on that date, there was some
21   communication from our attorney regarding Student Services
22   project in the amount noted.
23        Q     A communication regarding the amount of
24   $5,776,436.05?
25        A     That's correct.
```

1        Q    Do you recall the context of that communication?

2        A    I do not.

3             MS. SPOSATO:    I'm going object to the extent

4    that that's asking for attorney/client communication.    I'm

5    going to object and instruct my clients not to answer.

6    BY MR. HERNDON:

7        Q    With respect to this particular case, do you

8    know whether a wage assessment in the amount of

9    $5,776,436.05 was assessed?

10       A    As best as I can recall, no.

11       Q    If this case is included on this spreadsheet

12   which refers to labor violations in its title, can you

13   think of a reason why the $5,776,436.05 figure would be on

14   this document, if not because it is a wage assessment?

15       A    I don't know why that amount is there, because

16   the line right above that is the same project as SC.

17       Q    Okay.

18       A    And that shows different numbers.    So I'm -- I'm

19   seeing what it is.    I don't know what that is in relation

20   to.

21       Q    Okay.    Do you know whether Tobo received an

22   inquiry, questionnaire or notice of investigation with

23   respect to that specific case?

24       A    Yes, we have.

25       Q    And did you review that document?

```
1        A    Yes, I have.

2        Q    Do you recall when you reviewed that document?

3        A    I don't recall exact date, but --

4        Q    Fair enough.  Would you please give me your best

5   estimate of when you believe you may have reviewed that

6   document?

7        A    I think my best estimate is 2018 -- sometime in

8   2018.  Whether it was summer, fall, I'm not really sure.

9        Q    And your testimony is, to be clear, you're not

10  sure whether a wage assessment issued in this case in the

11  amount of $5,776,436.05; is that correct?

12       A    That's correct.  I'm not sure what that amount

13  is specifically in regards to.

14       Q    If a wage assessment in this case, this specific

15  case, in the amount of $5,776,436.05 was assessed, one

16  possible outcome is Tobo would have to pay that

17  assessment, correct.

18       A    Yes, that's one of the possible outcomes.

19       Q    If Tobo had to pay an assessment in the

20  $5,776,436.05, would that have an adverse effect on Tobo's

21  finances?

22       A    You're asking me to speculate.  So if I was to

23  speculate that Tobo had to make 5 million plus in one-time

24  payment, yes, it probably would have an adverse effect to

25  Tobo Construction as a business.
```

```
 1              MS. OH:  This is pertaining to the loan that we

 2    took out with Kalamata, correct?

 3              MR. HERNDON:  Respectfully, that is -- that's

 4    actually what I'm trying to find out from you and your

 5    husband.  Do you believe that the subject of this

 6    complaint is that loan?

 7              MS. OH:  I believe so.

 8              MR. CHAE:  Yes.

 9              MR. HERNDON:  On July 15, 2019, did Tobo and

10    Kalamata Capital Group enter into --

11              MS. OH:  I'm sorry.  You were breaking up, and

12    there's a lot of static.  Can you repeat that?

13              MR. HERNDON:  Yes, ma'am.  I'm sorry.  On or

14    about July 15, 2019, did Kalamata and Tobo enter into an

15    agreement?

16              MR. CHAE:  Yes.

17              MR. HERNDON:  And under that agreement did

18    Kalamata agree to Tobo's future receivables have an

19    agreed-upon value of $335,000?

20              MS. SPOSATO:  Josh, I'm going to ask how this is

21    relevant again to Credibly's issues that are presented in

22    its request for the 2004 examination.

23              MR. HERNDON:  Because under Section 21 of the

24    loan agreement with Retail Capital, there are limitations

25    on the borrower's ability to obtain funding from other
```

                                                              150

```
 1        Q     Okay.

 2        A     For construction projects.  That's the future

 3   receivables stated on the document, I believe.

 4        Q     Future receivables related to Tobo's public work

 5   projects?

 6        A     That's correct.

 7        Q     Okay.  So Paragraph 4 on Page 2008 refers to an

 8   agreement that was entered into on or about July 15, 2019.

 9   When did Tobo first consider obtaining this loan?

10        A     I believe May, June of 2019.

11        Q     Do you believe that Tobo may have considered

12   obtaining this loan from Kalamata Capital before it

13   obtained the loan from Retail Capital?

14        A     I'm -- I don't recall exact timeline of when --

15   to which entity we thought about it.

16             MS. OH:  I do not know.

17             MR. HERNDON:  Okay.  Madam Court Reporter,

18   Exhibit 15 will only consist of the document marked 208.

19             COURT REPORTER:  Yes, I have that.

20

21

22

23        (The following portion of the transcript is

24           CONFIDENTIAL, ATTORNEYS' EYES ONLY.)

25
```

```
1                          * * *

2

3

4

5

6          DECLARATION OF PENALTY OF PERJURY

7

8

9      I, _____, do hereby declare under

10  penalty of perjury that I have read the foregoing

11  transcript; that I have made any corrections as

12  appear noted, in ink, initialed by me, or attached

13  hereto; that my testimony as contained herein, as

14  corrected, is true and correct.

15          EXECUTED this _____ day of _____,

16  20_____, at _____,_____.
                              (City)                    (State)
17

18

19          _____
                    MONICA OH AND JIMI CHAE

20

21

22

23

24

25
```

1   STATE OF CALIFORNIA
    COUNTY OF SAN DIEGO
2

3          I, Darla Kmety, a Certified Shorthand Reporter,

4   hereby certify that the witness in the foregoing

5   deposition was by me duly sworn to tell the truth in the

6   within-entitled cause via remote videoconference as

7   stipulated by both counsel;

8

9          That said examination was taken down in

10  shorthand by me, a disinterested person, at the time and

11  place (via remote teleconference) therein stated, and that

12  the testimony of the said witnesses was thereafter reduced

13  to typewriting, by computer, under my direction and

14  supervision;

15

16         I further certify that I am not of counsel or

17  attorney for either or any of the parties to the said

18  deposition, nor in any way interested in the events of

19  this cause, and that I am not related to any of the

20  parties hereto.

21

22         This Day 4th of May, 2020, at San Diego,

23  California.

24  _____

25         Darla Kmety, CSR No. 12956

# EXHIBIT 2

# CREDIBLY

## LOAN PRE-APPROVAL

# Congratulations, you've been pre-approved for a small business loan!

### Dear Tobo Construction Inc

To finalize your loan, we'll just need a few simple things (which we've listed below).

Make sure to review all your documents carefully – you know the old saying: "Correct paperwork leads to quick funding."

Well, if that's not a saying, it should be.

We're happy that you chose Credibly to help grow your business.

### PRE-APPROVED LOAN AMOUNT

# $325,000.00

### Your Referral Source:

Name: Business Capital LLC / Delta capital

Phone: 212-931-0702

Email: mgrez@credibly.com, deals@businesscapitalllc.com, greg@businesscapitalllc.com, lschneider@b...

This pre-approval is based on a preliminary review of credit information and is not a guarantee of credit or a commitment to lend. A completed loan contract and documentation described herein must be provided for underwriting review before a loan decision can be made. Any misrepresentation in the prequalification request, the loan application or an adverse change in the applicant's financial position may void this pre-approval letter. Pre-approvals are subject to change or cancellation if a requested loan no longer meets applicable regulatory requirements.

We must receive your signed contract, plus all requested Closing Documents and steps to complete (as listed on page D of this packet) within 30 days of the date of the Business Loan and Security Agreement (_____05/10/2019_____), or we will consider your application to be withdrawn.

## NOW FINALIZE & RECEIVE YOUR LOAN

**Step 1**   Review Your Loan Details

**Step 2**   Sign Your Loan Agreement & Prepayment Addendum

**Step 3**   Submit Your Documents

| EXHIBIT 1 |
|---|
| Monica Oh/Jimi Chae |
| 4/27/2020 |
| Darla Kmety - CSR#12956 |

 **LOAN PRE-APPROVAL**

## **Step 1** Review Your Loan Details

Every business can benefit from a financial boost, and yours is on the verge of receiving one! Please take your time to go over your loan details and complete your closing documents.

| YOUR LOAN DETAILS | |
|---|---|
| Amount: | $325,000.00 |
| Term (months): | 8 Months |
| Loan Origination Fee: | $8,125.00 |
| Disbursement Amount: | $316,875.00 |

| YOUR REPAYMENT DETAILS | |
|---|---|
| Total Repayment: | $380,250.00 |
| Rate: | $1.17 |
| Daily Payment:<br>(Business Days Only) | $2,160.51 |
| Number of Daily Payments: | 177 |

**LOAN PRE-APPROVAL**

# Step 2 Sign Your Loan Agreement and Prepayment Addendum

- Initial each page of the Business Loan and Security Agreement that begins on page 1 of this packet
    - All owners* MUST sign on behalf of the Business and also individually as Personal Guarantors on page 10
    - All owners* MUST sign the Prepayment Addendum on page 11



# Step 3 Submit Your Documents

- See Page D of this packet for a complete list of Closing Documents
    - Additional bank statements may be required based on loan size**



*Owners that represent at least 50% of the business ownership (greater ownership representation may be required by Lender)

**If applicable, required bank statements will be listed on page D (loans of $50,000 - $74,999 require 6 months of bank statements, loans $75,000 and higher require 9-12 months of bank statements)

CREDIBLY

**LOAN PRE-APPROVAL**

# Have you completed these Closing Documents?

-Bank Statements: november 2018 to january 2019. month to date for May 2019

-Business Lease/ Business Mortgage: most recent mortgage statement or proof of free/clear ownership.

-Drivers License

-Most Recent Tax Return: If selected offer is $100,000 or greater, Credibly will require most recent tax return & financial statements. Variations greater than 30% (positive or negative) between gross annual sales, as indicated on the most recent tax returns and the 12 months of bank deposits provided, will result in additional documentation being requested.

-Voided Check

-Lien/Judgement: Pmt Plan or Satisfaction Letter: Satisfaction letter or payment plan with 3 most recent months proof of payment on federal tax lien filed on 12/11/2017 for $146,168

-Documentation on UCC lien filing: ███████████████ filed on 9/17/2018 from ███████████ - please confirm name of lender

-Multiple Entity Addendum: Multiple Entity Addendum may be required for ███████████████ entity that owns the business premises.

---

## HOW TO SUBMIT THESE DOCUMENTS

**You have options, please remember to include your company's name on all documents.**



Email
docs@credibly.com



Fax
(888)735-4420



Upload
Coming Soon

---

If you have any questions, please don't hesitate to contact your Referral Source (on Page A).
We look forward to this opportunity to help your business continue to grow.

888.664.1444                     www.credibly.com
Agreement #: 362004                Page: D                Working Capital Program

DocuSign Envelope ID: 6B092F93-C4DC-49BD-B020-6FF48684312D

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:**

In connection with opening an account, we will ask for and retain your name, address, date of birth, and other information that will allow us to identify and verify you. We may also ask to see your driver's license or other identifying documents. If required by Federal law, we may report this information to government agencies to help fight the funding of terrorism and money laundering activities.

**This Business Loan and Security Agreement ("Agreement") dated** _____05/10/2019_____ **is between the business borrower listed below ("Borrower") and (i) if Borrower is formed or its principal place of business is located in California, Retail Capital LLC and (ii) for any other Borrower, Credibly of Arizona LLC (as applicable, "Lender").**

| | |
|---|---|
| Business Legal Name: | Tobo Construction Inc |
| State of Incorporation / Organization: | CA |
| D/B/A: | Tobo Construction |
| Main Phone: | 4243781131 |
| Main Fax: | |
| Type of Entity: | Corporation |
| Mailing Address: | 2500 Pacific Coast Highway        Torrance        CA  90505 |
| Date Business Started (mm/dd/yy): | 08/06/1998 |
| Name of Primary Authorized Signor: | Monica Oh |
| Position or Title: | Owner |
| Email for Signor: | chaemonica@hotmail.com |
| Business Website: | http://www.toboco.net/ |
| Main Business Location: | 2500 Pacific Coast Highway        Torrance        CA  90505 |
| Principal Loan Amount: | 325,000.00 |
| Disbursement Amount: | $316,875.00 |
| Loan Origination: | $8,125.00 |
| Repayment Amount: | 380,250.00 |
| Repayment Plan: | Daily Repayment $ 2,160.51 _____ each business day (Monday through Friday) Repayment Plan will continue until the Repayment Amount has been satisfied and in accordance with Section 5 below. |

(WORKING CAPITAL PROGRAM)

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

Loans are made by Retail Capital LLC or one of its affiliates depending on the Borrower's jurisdiction, as specified in the Business Loan and Security Agreement (the "Lender"). Retail Capital LLC, doing business as Credibly, processes all loan applications and manages the accounts on an ongoing basis on behalf of the Lender. Your account statement will reflect ACH debit entries from your account by Lender's Designee (as defined in the Business Loan and Security Agreement): "Retail Capital LLC," which is doing business as Credibly.

## DISBURSEMENT OF LOAN PROCEEDS
By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the Business Loan and Security Agreement.

## AUTOMATIC PAYMENT PLAN
Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the Business Loan and Security Agreement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. You agree that, to the extent prohibited by applicable law, you will not revoke this authorization and instruction without our prior written consent.

## BUSINESS PURPOSE ACCOUNT
By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

## ACCOUNT CHANGES
Borrower agrees to notify Lender promptly in there are any changes to the account and routing numbers of the Designated Checking Account, pursuant to the terms of the Business Loan and Security Agreement.

## MISCELLANEOUS
Lender and its Designee are not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this authorization agreement.  The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

Business Bank Name: _____
("Bank")

Business Bank Address: _____ City: _____ State: _____ Zip: _____

Business Bank Account Routing Number: _____    Business Bank Account Number: _____

*(The Designated Bank Account Information shall herein after be referred to as the "Designated Account").*

Tobo Construction, Inc.

Print Business Account Holder Name: _____

 CREDIBLY

# BUSINESS LOAN AND SECURITY AGREEMENT

## KEY TERMS AND CONDITIONS

**You should read this entire document before signing it. Your Agreement includes the following terms and conditions:**

1.  Loans to Borrowers located in California are made by Retail Capital dba Credibly. Loans to Borrowers in all other jurisdictions are made by Credibly of Arizona LLC. Credibly services all loans and your account statement will reflect ACH debit entries from your account by Lender's Designee (as defined in the Agreement): Retail Capital LLC, doing business as Credibly.

2.  Section 18 gives you and us the right to require any dispute to be resolved through BINDING INDIVIDUAL ARBITRATION rather than in court. Individual arbitration means that neither you nor we can assert claims on behalf of a class or in a representative capacity. You can opt out of this provision without penalty for a limited time after the date of this Agreement.

3.  Section 5.4 requires you to pay certain fees and charges in addition to the Repayment Amount. These fees and charges include, but are not limited to, an Origination Fee, late fees, dishonored payment fees and site visit fees.

4.  Among other things, Section 10.11 allows us to pull your business and owner/guarantor personal credit reports in connection with this loan and to determine your eligibility for other financial products.

5.  Among other things, Sections 10.3, 10.4, 10.5 and 20 restrict what you can do with our collateral for this loan.

6.  Section 21 restricts your ability to seek certain types of additional financing before you have paid off your obligations to us.

7.  Section 22 allows us to contact you in certain ways and to record our telephone calls with you. Other parts of Section 22 are optional.

Borrower agrees that this Agreement establishes a business loan that shall be used **only for commercial or business purposes** in the ordinary course of business and **not for personal, family, or household purposes.** Specifically, Borrower understands that Borrower's agreement not to use this business loan for personal, family or household purposes means that certain duties imposed upon us, and **certain rights conferred upon a consumer, pursuant to certain federal or state laws, do not apply to this business loan and security agreement.**

### 1. PARTIES.

In this Agreement, the words "you" and "your" refer to Borrower. The words "I" and "Signing Principal" refer to the authorized signatory of the Borrower or the Personal Guarantee of this Agreement, as the case may be. The words "we", "us" and "our" refer to Lender and its successors, assigns or Designee, including any "Assignee" as defined in Section 11. A "Designee" is a party whom we authorized to act on our behalf with respect to any of our obligations or rights under this Agreement. "Principal" refers to each one of Borrower's owners, shareholders, partners, members, principals, officers, directors and employees.

### 2. EFFECTIVE DATE; TERM.

Except for Sections 10.11, 15, 18 and 22, which become effective upon your signature, the term of this Agreement (the "Term") begins on the date we accept it at our home office in Arizona by signing it, or by transmitting the Principal Amount to you, whichever is earlier (the "Effective Date"). You understand and agree that we are not required to transmit the Principal Amount to you until:

(a) you have provided us with all documents and fully met all conditions required by this Agreement; and

(b) the security interests we are entitled to receive under this Agreement have been perfected. If there is a delay in your receipt of the Principal Amount for these or any other reasons, you agree that there will be no adverse consequence to us. The Term ends on the Maturity Date set forth above, unless we elect to extend the Term to collect unpaid fees and other charges under Section 5.4 below, in which case the Term shall end when we have collected the Repayment Amount and all other amounts due under this Agreement. In addition, if you pay us the Repayment Amount and all other amounts due under this Agreement prior to the Maturity Date, and you have done everything else you are required to do under this Agreement, the Term will end and you will have no further obligations to us under this Agreement except as otherwise stated below.

### 3. PRINCIPAL AMOUNT; USE OF LOAN PROCEEDS.

You represent to us and agree that the Principal Amount will be used only:

(a) to buy merchandise, inventory or related goods you will rent or sell to your customers,

(b) to buy equipment or other goods for use in your business,

(c) for training or other services needed by your business, and/or

(d) to make improvements to your business location (but not to buy real estate).

REGARDLESS OF ANYTHING ELSE STATED IN THIS AGREEMENT, YOU ACKNOWLEDGE AND AGREE THAT:

(A) YOU WILL USE THE PRINCIPAL AMOUNT (AND THE GOODS OR SERVICES YOU BUY WITH THE PRINCIPAL AMOUNT) SOLELY FOR BUSINESS PURPOSES AND NOT FOR CONSUMER, PERSONAL, FAMILY OR HOUSEHOLD PURPOSES;

(B) YOU WILL NOT USE THE PRINCIPAL AMOUNT TO FUND DIVIDENDS OR DISTRIBUTIONS TO ANY OF YOUR SHAREHOLDERS, PARTNERS, MEMBERS OR ANY OTHER OWNER OF ANY EQUITY INTEREST IN YOUR BUSINESS; AND

(C) THE LOAN DOCUMENTED BY THIS AGREEMENT IS NOT A "CONSUMER TRANSACTION" AS DEFINED IN THE UNIFORM COMMERCIAL CODE ("UCC") or otherwise.

Borrower agrees that Lender has no obligation to determine whether any given use of the Principal Amount of the Business Loan conforms to any business purpose. Borrower agrees that a breach by Borrower of use of the Business Loan Principal Amount for business purposes will not affect Lender's right to enforce Borrower's promise to pay for the credit extended, including related charges, or to use any remedy legally available to Lender even if that remedy would not have been available had this Agreement been established as a consumer credit account. Moreover, given that the requested loan is expressly to be used only for business purposes and not for personal, family or household purposes, Borrower hereby acknowledges it and its Principals lack any rights associated with loans extended for personal, family or household purposes and Borrower and its representatives are forever estopped from asserting such rights. Furthermore, any attempt to assert any rights associated with personal, family or household purposes shall be deemed void and of no effect.

### 4. PROMISE TO PAY.

In exchange for the Lender loaning you the Principal Amount, you unconditionally promise to pay the Repayment Amount in accordance with the Repayment Plan selected, as well as all other amounts this Agreement requires you to pay. You agree to make payments to us in accordance with the Repayment Plan selected above, in the manner stated in Section 5 of this Agreement. As part of your agreement to repay us without conditions, you waive (both as to the original loan and any renewal, extension, refinancing, modification or consolidation of the loan) the following:

(a) protest, demand and presentment;

(b) notice of dishonor, protest or suit;

(c) all other notices or requirements necessary to hold you liable hereunder; and

(d) all rights of exemption under the constitution or laws of any state as to real or personal property.

YOU AGREE THAT YOUR OBLIGATIONS UNDER THIS AGREEMENT ARE ABSOLUTE AND UNCONDITIONAL, MAY NOT BE PREPAID EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, AND SHALL CONTINUE IN FULL FORCE AND EFFECT REGARDLESS OF ANY CIRCUMSTANCE WHATSOEVER, AND THAT SUCH OBLIGATIONS SHALL NOT BE AFFECTED BY ANY COUNTERCLAIM, SET-OFF, RECOUPMENT, OFFSET, DEFENSE OR OTHER ALLEGED RIGHT AGAINST US.

### 5. METHOD OF REPAYMENT.

5.1. Payment through ACH Debits. Except as set forth in Section 5.2, you shall pay us the Repayment Amount in accordance with the Repayment Plan selected (as set forth on page 1) during the Term of this Agreement, by authorizing and allowing Lender or its Assignee or Designee to debit or otherwise withdraw the Repayment Amount from your Designated Account. Borrower hereby authorizes and requests Lender or its Assignee or Designee to withdraw from the Designated Account the Repayment Amount in accordance with the Repayment Plan selected until all amounts due under this Agreement have been paid, as well as any late fees, taxes,

Agreement #: 362004                     www.credibly.com                     Page:                     



BUSINESS LOAN AND SECURITY AGREEMENT

non-sufficient funds charges, reimbursements and other amounts due pursuant to this Agreement. Borrower further:
(a) authorizes Lender or its Assignee or Designee to deliver a copy of this Agreement to Borrower's Bank as evidence of Borrower's authorization, and
(b) agrees that Borrower may change the Designated Account to a different bank account only by following the procedures provided by Lender, and
(c) agrees that, except to the extent prohibited by applicable law, Borrower's authorizations to Lender and any Assignee or Designee hereunder may be revoked only with Lender's prior written consent.

5.2. Business Day and ACH Processing. A "business day" is defined as a weekday on which Lender is open and able to process ACH transactions. IN THE EVENT LENDER IS UNABLE TO PROCESS AN ACH TRANSACTION ON A BUSINESS DAY, FOR ANY REASON, LENDER OR ITS ASSIGNEE OR DESIGNEE WILL DEBIT THE DESIGNATED ACCOUNT FOR AN AMOUNT EQUAL TO THE SUM OF:
(A) THE REPAYMENT AMOUNT IN ACCORDANCE WITH THE REPAYMENT PLAN SELECTED DUE ON THAT BUSINESS DAY, PLUS
(B) ANY SCHEDULED REPAYMENT AMOUNT(S) DUE ON THE PRECEDING BUSINESS DAY WHEN LENDER WAS UNABLE TO PROCESS ACH TRANSACTIONS.

5.3. Authorization to Access and Withdraw from Designated Account. You authorize and instruct Lender or its Assignee or Designee to debit or otherwise withdraw (via the ACH system, electronic checks, wires or otherwise) the Repayment Amount in accordance with the Repayment Plan selected from the Designated Account until the entire Repayment Amount and all other amounts you owe to us under this Agreement have been repaid. You agree that, except to the extent prohibited by applicable law, you will not revoke this authorization and instruction without our prior written consent. You acknowledge and agree that we or our Assignee or Designee may issue pre-notifications to your financial institution with respect to such debits, withdrawals and other transactions. You agree any Assignee or Designee may rely upon our instructions, without any independent verification, in making the transactions described above. You waive any claim for damages you may have against any Assignee or Designee in connection with actions taken based on our instructions, unless such damages were due to our Assignee's or Designee's failure to follow our instructions. You acknowledge and agree that:
(a) our Assignee or Designee will be acting on our behalf with respect to the Designated Account, and
(b) our Assignee or Designee may or may not be our affiliate.
You understand and agree that this Agreement allows us to access the Designated Account. Within two business days of any request by us, you shall provide, us with records and/or other information regarding the Designated Account. You hereby authorize and direct your financial institution to provide us with all such information.

5.4. Fees. In addition to the Repayment Amount, you agree to pay us the following fees and charges:
(a) a one-time, non-refundable Origination Fee in the amount set forth on page 1 of this Agreement;
(b) a fee of $45 for any wire transfer;
(c) a fee of $25 (or such lesser amount as permitted by applicable law) for each returned, rejected or dishonored payment, ACH debit, or wire transfer withdrawal, it being understood that we have the right to receive such fee for each business day on which we or our Assignee or Designee attempted and were unable to debit or otherwise withdraw from your accounts the amount we were entitled to receive as of such date:
(d) the cost of any inspection of collateral and place of business (set forth in Section 10.5), that confirms a violation of this Agreement, not to exceed $500 for each such visit;
(e) if we have not received the scheduled payments as of the last day of each month, a late fee equal to 5% of the sum of all Repayment Amounts due but unpaid as of that close of that period (we may assess this late fee once each month until you have paid all of your obligations to us in full):
(f) charges for providing copies and other documentation you request from us (a list of such charges will be made available upon request or online): and
(g) in the event You breach the terms of Section 21 of this Agreement, You shall immediately pay to the Company an amount equal to 10% of the original Principal Amount. The fee shall not be construed as a waiver and is in addition to and not in lieu of any other rights or remedies provided for hereunder or at law at equity. The fee is not a penalty and instead reflects the increased risk to Company of receiving the Repayment Amount.

Borrower hereby authorizes and requests Lender and/or any Assignee or Designee to withdraw the Origination Fee and the wire transfer fee (if applicable) from the Designated Account on or after the Effective Date. If any fees, charges or other amounts owed under this Agreement are due and unpaid on the Maturity Date, we may elect to extend the Term (without notice to you) and continue to withdraw the Repayment Amount from the Designated Account in accordance with the Repayment Plan selected until all amounts due to us under this Agreement have been paid in full: and

5.5. Designated Account. You represent, warrant and agree that the Designated Account identified on Page 2 of this Agreement ("Authorization for Direct Deposit and Direct Payments"):
(a) is and shall be a business bank account during the Term of this Agreement,
(b) is not and will not be during the Term of this Agreement an account established primarily for personal, family or household purposes or otherwise an "account" as defined in the Electronic Fund Transfer Act and Regulation E promulgated thereunder, and
(c) shall have sufficient funds during the Term of this Agreement for all debits and other withdrawals contemplated by this Agreement to be made on our behalf.
If the Designated Account at any time lacks sufficient funds for any debit or other withdrawal required by this Agreement to be made on our behalf, you agree to immediately transfer sufficient funds to the Designated Account or to pay to us such funds in accordance with Section 7.1 below.

## 6. PREPAYMENT DISCOUNT.
You are eligible for a prepayment discount, as outlined in Prepayment Addendum, a part of this Agreement and incorporated by reference herein.

## 7. ADDITIONAL REPAYMENT TERMS.
7.1. Other Payment Methods. You may make payments to us in addition to Repayment Amount set forth in the Repayment Plan selected to satisfy your obligations under this Agreement. All such payments must be made in immediately available funds and U.S. Dollars paid by check, money order, wire transfer, ACH credit or any pay-by-phone or on-line service that we offer. Any payments sent by mail or overnight courier must be addressed to Credibly at 4026 N. Miller Road, Suite B200, Scottsdale, Arizona 85251. You acknowledge and agree that payments sent to any other address may not be timely processed or credited. Any payments made under this Section shall not affect in any way your obligation to pay the Repayment Amounts. We may accept late, postdated or partial payments without losing any of our rights under this Agreement or otherwise. We have no obligation to hold postdated checks and may process any postdated check on the date we receive it without being liable to you for any damages or other claims you may assert, which you hereby expressly waive. You agree not to mark any partial payment "paid in full," "without recourse," "in full satisfaction" or with any similar language, and you agree that any such notations shall have no force or effect and that we will not lose any of our rights under this Agreement if we accept any such payments.

7.2. Application of Payments. Repayment Amounts will be applied first to any Repayment Amounts in accordance with the Repayment Plan and then in the same manner as a payment other than Repayment Amount. If you make a payment other than a Repayment Amount in accordance with the Payment Plan selected, we generally will apply payments first to any items we have asked you to pay, then to any other fees you owe us, then to other amounts you owe us (such as for amounts we incur in performing your obligations pursuant to Section 12), and then to the balance of the Repayment Amount. However, we reserve the right to apply payments in any order or manner we choose, in our sole discretion.

7.3. Reliance on Terms. The provisions of this Agreement are for the benefit of you, each Signing Principal, us, and any Assignee or Designee. Notwithstanding the fact that an Assignee or Designee is not a signatory-party to this Agreement, the Assignee or Designee may rely upon the terms of this Agreement and raise them as defenses in any action by you or any Signing Principal.

7.4. Indemnification: Limitation of Liability. You shall indemnify and hold each of us, any Assignee or Designee, its and our respective officers, directors, affiliates, employees, agents, representatives, successors and assigns (the "Indemnified Parties") harmless from and against all losses, damages, claims, liabilities, obligations, penalties, suits, actions, controversies, or proceedings of any kind, imposed upon, incurred by, or asserted against any of the Indemnified Parties, in any way arising from, in connection with, relating to, or incident to your breach of this Agreement or any and all actions taken by any Assignee or Designee in reliance upon information or instructions provided to an Assignee or Designee by us, including the payment of all costs and expenses of every kind for the enforcement of our rights and remedies hereunder, including reasonable attorneys' fees, costs of any trial, arbitration, appellate court proceeding, administrative



**CREDIBLY**     BUSINESS LOAN AND SECURITY AGREEMENT

proceeding, or any negotiations or consultations (the "Indemnified Amounts"). Such Indemnified Amounts will bear interest at the rate for prejudgment interest prevailing in your jurisdiction until paid. IN NO EVENT WILL WE OR ANY ASSIGNEE OR DESIGNEE BE LIABLE FOR ANY CLAIMS ASSERTED BY YOU UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH YOU HEREBY EXPRESSLY WAIVE.

## 8. DEFAULT; REMEDIES.

8.1. Events of Default. Each of the following shall constitute an "Event of Default" under this Agreement:

(a) Lender, its Assignee or Designee is unable to debit the Repayment Amount in accordance with the Repayment Plan selected above from the Designated Account (for rejects, non-sufficient funds or otherwise) for five consecutive weekdays on which Lender is open;

(b) you fail to pay any amount you owe us under this Agreement within 30 days after we request in writing that you do so;

(c) you revoke or cancel any authorization for Lender, its Assignee or Designee to debit or otherwise withdraw from or access the Designated Account without our permission (but only to the extent that the prohibition on your revoking or cancelling such authorization contained in this Agreement is not prohibited by applicable law);

(d) you fail to maintain insurance required hereunder;

(e) any warranty, representation or statement made or furnished to us by you or any Signing Principal or on your or any Signing Principal's behalf under this Agreement is or becomes false or misleading in any material respect;

(f) this Agreement ceases to be in full force and effect at any time and for any reason (including failure to create a validly perfected security interest or Lien);

(g) you:

(i) legally dissolve, are adjudicated insolvent or bankrupt or cease to pay your debts as they mature,

(ii) make a general assignment for the benefit of or enter into an arrangement with creditors,

(iii) apply for or consent to the appointment of a receiver, trustee or liquidator of you or a substantial part of your property,

(iv) take action to dissolve or terminate your legal existence, or authorize or file a voluntary petition in bankruptcy or under any similar law, consent to such a petition, or suffer such a petition or proceeding to be instituted against you which remains dismissed for a period of 60 days, or

(v) if a sole proprietor, dies or becomes legally incompetent; if a partnership, the general or managing partner dies; if a limited liability company, any managing member dies;

(h) commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any of your creditors or by any governmental agency against any Collateral (as defined in Section 9), including a garnishment of any of your accounts or deposit accounts;

(i) you fail to perform or comply with any other term, provision, condition, covenant or agreement contained in this Agreement or any other documentation related to this Agreement;

(j) you default under any other agreement with us, any Designee, Assignee or any affiliate of either us or any Assignee, or under any agreement with any third party material to your business or providing for the lease of real or personal property or the repayment of money borrowed;

(k) we reasonably deem ourselves insecure with respect to your performance hereunder or in our rights with respect to the Collateral, including any Prohibited Transactions outlined in Section 21 herein; and

(l) any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of your obligations hereunder.

8.2. Remedies. Upon the occurrence of an Event of Default, we shall have the right, but not the obligation, to declare the unpaid balance of the Repayment Amount and all other amounts you owe us under this Agreement to be immediately due and payable. We shall have and may exercise all the rights and remedies of a secured creditor under the UCC, including, but not limited to, debiting any business account to satisfy the default. We may enter a UCC financing statement against any and all assets maintained by you and/or maintained by any or all business locations you may own in addition to the located listed in the Agreement. We may notify any and all banks and merchant processors used by you (including but not limited to ACH processors and credit card processors) and direct them to remit to us any and all amounts received by such processors or held by such banks to satisfy the full amount of the then-outstanding Repayment Amount and all other amounts due under this Agreement. In addition, we shall have and may exercise any and all other rights and remedies available to us at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of our rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by us to pursue any remedy will not constitute a waiver of our rights to pursue other remedies. No forbearance or delay by us shall be deemed to waive any of our rights or remedies or create a course of dealing between or among the parties hereto. Any election by us to make expenditures or to take action to perform one or more of your obligations under this Agreement, after your failure to perform, shall not affect our right to declare an Event of Default and exercise our remedies.

## 9. GRANT OF SECURITY INTEREST.

Capitalized terms used in this Section without definition which are not defined elsewhere in this Agreement have the meanings defined in the UCC. For valuable consideration and to secure the prompt payment and performance in full of all of your, any Principal's or any of your affiliates' indebtedness, liabilities and obligations to us, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising, whether or not such indebtedness, liabilities and obligations relate to the loan described in this Agreement and whether or not contemplated by the parties hereto at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument and including obligations to perform acts and refrain from taking action as well as obligations to pay money, including all principal, interest, other fees and expenses, you hereby grant to us a security interest in the following properties, assets and rights (the "Collateral"), wherever located, whether now owned or hereafter acquired or arising and howsoever your interest therein may arise or appear (whether by ownership, lease, security interest, claim, or otherwise):

(a) any and all amounts owing to you now or in the future from any merchant processor;

(b) all Accounts;

(c) all Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper);

(d) all Instruments;

(e) all Goods, including, without limitation, Equipment, motor vehicles, Inventory, Farm Products, Accessions, and As Extracted Collateral;

(f) all Documents;

(g) all General Intangibles (including, without limitation, Payment Intangibles and software);

(h) all Deposit Accounts;

(i) all Letter of Credit Rights;

(j) all Investment Property;

(k) all Supporting Obligations;

(l) all trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and all renewals, reissues and extensions thereof (collectively "IP");

(m) any records and data relating to any of the foregoing, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of your right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

(n) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer, whether due to judgment, settlement or other process. You irrevocably authorize us and our Designees at any time and from time to time to file:

(i) in any filing office in any jurisdiction any initial financing statements and amendments thereto that indicate the collateral therein as all of your assets or words of similar effect, regardless of whether such description is greater in scope than the collateral pledged to us hereunder; and such recordations with the USPTO we deem necessary or desirable to evidence the security interest in IP described above.



BUSINESS LOAN AND SECURITY AGREEMENT

**10.    REPRESENTATIONS, WARRANTIES AND COVENANTS.**

You and each Signing Principal represent warrant and covenant the following as of the Effective Date and during the Term of this Agreement:

**10.1. Name, Location, Authority, Etc.**

(a) You are and shall remain duly organized, licensed, validly existing and in good standing under the laws of your state or jurisdiction of organization and are and shall remain duly qualified, licensed and in good standing in each and every other state and jurisdiction in which the failure to do so could have a material adverse effect on your financial condition, business or operations;

(b) your exact legal name(s) and DBA(s) set forth on page 1 are true and correct and you do not and shall not conduct your business under any other name;

(c) you are authorized and permitted, by law, your organizational documents, contracts to which you or any Signing Principal is a party and otherwise, to execute, deliver and perform this Agreement and all related documents;

(d) the aggregate ownership of the Signing Principal(s) is at least fifty percent (50%) ownership of the Borrower's business;

(e) all of your organizational and formation documents and all amendments thereto have been duly filed and are in proper order and any capital stock, membership interests or other ownership interest issued by you and outstanding was and is properly issued and all of your books and records are accurate and up to date and will be so maintained;

(f) you are not subject to any charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a materially adverse effect on your financial condition, business or prospects;

(g) you are and will continue to be in compliance with your organizational and formation documents, all contractual requirements by which you may be bound, and all applicable federal, state and local laws, statutes, regulations, ordinances and rules pertaining to the conduct of your business, including without limitation the regulations of card associations and payment networks;

(h) there is no action, suit, proceeding or investigation pending or, to your knowledge, threatened against or affecting you or any of your assets before or by any court or other governmental authority which, if determined adversely to you, would have a material adverse effect on your financial condition, business or prospects or the value of the Collateral; and

(i) you possess and are in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and/ or lease your properties and to conduct your business.

**10.2. Your Business and Operations.** You shall not:

(a) materially change the nature of your business from the type originally disclosed to us in connection with this Agreement;

(b) sell or otherwise transfer your business without:

(i) our express prior written consent and

(ii) the assumption by transferee of all of your obligations under this Agreement using documentation reasonably satisfactory to us;

(c) change your place of business, your legal name, entity type or state or jurisdiction of organization, unless you have provided us with at least 60 days' prior written notice and you, at your sole cost and expense, provide such documents, agreements and information we request and take such other actions as we deem necessary or desirable to protect our interests hereunder and in the Collateral.

**10.3. Location of the Collateral.** You agree to keep the Collateral (or, to the extent the Collateral consists of intangible property such as Accounts or General Intangibles, the records concerning the Collateral) at the Business Location(s) shown on page 1 or at such other locations as we have agreed to in advance in writing. Upon our request, you will deliver to us in form satisfactory to us a schedule describing the Collateral in such detail as we reasonably request. You shall not remove the Collateral from its existing location(s) without our prior written consent.

**10.4. Repairs and Maintenance.** You shall:

(a) only use Collateral in a prudent, businesslike manner for its originally-intended purpose;

(b) comply promptly with all applicable insurance policies, laws, ordinances, rules, regulations and requirements of all governmental authorities, now or hereafter in effect, applicable to the ownership, production or disposition thereof; and

(c) pay when due all taxes and claims for work done on, or services or material furnished in connection with, the Collateral.

**10.5. Inspection of Collateral and Place of Business.** We or our designated representatives and agents shall have the right during your normal business hours and at any other reasonable time to examine the Collateral where located and the interior and exterior of any of your places of business. During an examination of any of your places of business, we may examine, among other things, whether you:

(a) have a place of business that is separate from any personal residence,

(b) are open for business, and

(c) have sufficient inventory to conduct your business.

When performing an examination, we may photograph the interior and exterior of your places of business, including any signage, and may photograph any Principal. Any photograph will become and remain the sole property of Lender, its Assignee or Designee.

**10.6. Insurance.** You shall maintain insurance in such amounts and against such risks as are consistent with your past practice and shall show proof of such insurance and/or name us as a loss payee and additional insured upon our request. You shall promptly notify us of any loss or damage to the Collateral or any loss or change in insurance coverage.

**10.7. Business Information; Reliance; Compliance.** All information (financial and other) provided by or on your or any Signing Principal's behalf to us in connection with or pursuant to this Agreement is true, accurate and complete in all respects. You and each Signing Principal shall furnish us, and Designee such information as we may request from time to time. You acknowledge and agree that all information (financial and other) provided by or on behalf of you and/or any Signing Principal has been relied upon by us in connection with our decision to loan you the Principal Amount.

**10.8. Solvency.** You do not presently intend to close or cease operating your business, in whole or in part, temporarily or permanently. As of the date of this Agreement, you are solvent and are not contemplating any insolvency or bankruptcy proceeding. During the four months preceding the date of this Agreement, neither you nor any Principal has discussed with or among your management, with counsel, or with any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of your creditors and no such action or proceeding has been filed or is pending. Other than as disclosed to us in a writing attached to this Agreement, no eviction or foreclosure is pending or threatened against you.

**10.9. Confidentiality.** You and each Signing Principal understand and agree that the terms and conditions of the products and services we offer, including this Agreement and any other documentation provided by us ("Confidential Information") are our proprietary and confidential information. Accordingly, unless disclosure is required by applicable law or court order, you and each Signing Principal shall not disclose (and you and each Signing Principal shall cause each Principal not to disclose) Confidential Information to any person other than your attorneys, accountants, financial advisors or employees who need to know such information for the purpose of advising you ("Advisors"), provided that such Advisors use such information solely to advise you and first agree in writing to keep such information confidential.

**10.10.    Publicity.** You and each Signing Principal authorize us to use your, his or her name in a listing of clients and in advertising and marketing materials.

**10.11.    Credit Reports and Information Sharing.** YOU AND EACH SIGNING PRINCIPAL AND GUARANTOR HEREBY AUTHORIZE US, LENDER'S DESIGNEE, AND OUR THEIR AGENTS, REPRESENTATIVES, ANY DESIGNEE, AND ANY CREDIT REPORTING AGENCY OR SPECIALTY CREDIT REPORTING AGENCY ENGAGED BY ANY OF THE FOREGOING, TO

(A)    INVESTIGATE ANY REFERENCES GIVEN OR ANY OTHER STATEMENTS OR DATA OBTAINED FROM OR ABOUT YOU OR SIGNING PRINCIPALS OR GUARANTORS FOR THE PURPOSE OF THIS AGREEMENT, AND

(B)    OBTAIN YOUR AND EACH SIGNING PRINCIPAL AND GUARANTOR'S BUSINESS AND PERSONAL CREDIT BUREAU REPORTS NOW, AND AT ANY TIME FOR SO LONG AS YOU OR ANY SIGNING PRINCIPAL(S) CONTINUE TO HAVE ANY OBLIGATION TO US AS A CONSEQUENCE OF THIS AGREEMENT,

(I)    TO DETERMINE CREDITWORTHINESS,

(II)    VERIFY ANY INFORMATION PROVIDED OR OBTAINED,

(III)    PREVENT AND/OR REPORT FRAUDULENT TRANSACTIONS, AND

(IV)    DETERMINE YOUR ELIGIBILITY FOR A FINANCIAL PRODUCT OFFERED BY US.

We may report our transaction and experiences with you and/or any Signing Principal to any credit reporting agency, specialty credit reporting agency, and our



BUSINESS LOAN AND SECURITY AGREEMENT

affiliates. Our affiliates may only use such information regarding you or a Signing Principal when they are considering whether to offer financial or other products or services requested by you or the Signing Principal, respectively. You and each Signing Principal hereby waive to the maximum extent permitted by law any claim for damages against us and our affiliates, agents, employees and representatives relating to any investigation undertaken by or on our behalf as permitted by this Agreement or disclosure of information as permitted by this Agreement. You also agree that we may release any such information if we believe it is required to comply with any governmental or legal process, whether or not such release is actually required, or when it is necessary or desirable in connection with a transaction or investigating a potential loss. If you or any Signing Principal fails to satisfy the terms of your respective credit obligations hereunder, we may submit a negative credit report to a credit reporting agency that adversely affects the credit score or record of you and/or the Signing Principals.

10.12.    D/B/As, Representatives and Agents. You and each Signing Principal hereby acknowledge and agree that we may use "doing business as" or "d/b/a" names, agents, designees and secured party representatives in connection with various matters relating to the transactions between you and us, including the filing of UCC-1 financing statements and other notices or filings.

10.13.    Collection Costs and Fees. To the extent not prohibited by applicable law, you shall pay to us any and all expenses, including collection costs, attorneys' fees and expenses, expert fees and expenses, and all other expenses which may be incurred by us in the prosecution, defense, settlement and/or other resolution of any claim, demand, action or proceeding arising out of or relating to this Agreement, the Collateral or any of our related rights or interests, regardless of whether you are a party to that action or proceeding or made aware of the claim or demand before it is resolved. Without limiting the generality of the foregoing, the expenses you shall pay to us include counsel fees and expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by us for the purpose of administering, protecting or realizing our security under this Agreement. All amounts described in this Section shall be considered advances to protect our security, and shall be secured by this Agreement.

11.    ASSIGNMENT.

Without our prior written consent, you shall not:
(a) pledge, cancel, revoke or assign this Agreement or your rights hereunder;
(b) allow any lien to exist on any Collateral other than our rights hereunder; or
(c) sell, transfer or assign any Collateral to a third party: provided, however, you may sell Collateral in arms-length transactions in your normal course of business.

Any prohibited assignment shall be void. No consent to an assignment by us shall release you from your obligations hereunder. We may assign, mortgage, pledge or otherwise transfer or delegate this Agreement or any of our rights or obligations hereunder to any party (each, an "Assignee") without notifying you or obtaining your consent. Without limiting the generality of the foregoing, we may grant a security interest in any and all of our rights and interests pursuant to this Agreement, including our rights and interests in and to the Repayment Amounts and the Repayment Amount, and including to parties from whom we may obtain financing (any such Assignee, a "Secured Party"), and you agree that any such Secured Party is entitled, to the extent of the applicable assignment or other agreement between us and such Secured Party, to enforce any and all of our rights, remedies and interests under this Agreement. Any Secured Party shall have all of our rights, but no liability for any of our obligations, under this Agreement, and you agree that you will not assert against any Secured Party any defense, counterclaim, set-off, recoupment, offset or other alleged right that you may have against us. Upon and following receipt of written notification by an Assignee to you, you are authorized and directed to remit any and all amounts then or thereafter payable by you under this Agreement directly to such Assignee. As between you and any such Assignee, any remittance sent to us following such receipt shall not constitute payment unless and until such payment is actually received by such Assignee.

12.    RIGHT TO PERFORM; FURTHER ASSURANCES; POWER OF ATTORNEY.

If you fail to carry any insurance or render any other performance required by this Agreement, we may, at our sole option and without obligation, do so on your behalf and you will reimburse us together with interest from the date of the expense to the date of reimbursement at the rate for prejudgment interest prevailing in your jurisdiction. You hereby appoint us as your true and lawful attorney and agent with full authority to, in your name, execute, file, communicate, record and deliver any documents and take any actions we deem appropriate to protect our interest in this Agreement or any Collateral or the proceeds thereof including, but not limited to, (i) to obtain and adjust insurance; (ii) collect monies due or to become due under or in respect of any of the Collateral or the proceeds thereof; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or (ii) above; (iv) to sign your name on any invoice, bill of lading, assignment or direction to customers or account debtors to make payment directly to us or our Designees, successors or assignees: and (v) to file any claims or take any action or institute any proceeding which we may deem necessary for the collection of any amounts due or otherwise to enforce its rights with respect to the Collateral. This power, being coupled with an interest and with full power of substitution, shall be irrevocable until all your obligations hereunder have been indefeasibly and fully paid and performed. YOU ACKNOWLEDGE THAT THE FEES WE CHARGE TO YOU FOR LATE PAYMENTS, DOCUMENTATION, ORIGINATION, ADMINISTRATION, TAX COMPLIANCE, INSURANCE OR ANY OTHER MATTER ASSOCIATED WITH THIS AGREEMENT MAY REPRESENT PROFIT TO US IN WHOLE OR IN PART AND MAY NOT BE MERELY A REIMBURSEMENT FOR ACTUAL COSTS. You agree to execute and deliver any additional writings and take any other actions we reasonably request to evidence or effect your agreements and obligations under this Agreement.

13.    EXCESS INTEREST SAVINGS CLAUSE.

It is the intention of parties to this Agreement to comply strictly with applicable usury laws and, accordingly, in no event shall we ever be entitled to receive, collect, or apply as interest any interest, fees, charges or other payments equivalent to interest, in excess of the maximum rate of interest which we may lawfully charge under applicable law (the "Maximum Rate"). In the event that we ever receive, collect, or apply as interest any such excess, such amount which, but for this provision, would be excessive interest, shall be applied to the reduction of the principal balance owed under this Agreement: and if the principal balance, and all lawful interest accrued and owed, is paid in full, any remaining excess interest shall be paid to you, or other party lawfully entitled to the excess interest. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the highest rate which we may lawfully charge under applicable law, the parties to this Agreement shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as a reasonable loan charge, rather than as interest. Any provision of this Agreement, or of any other agreement between the parties to this Agreement, that operates to obligate or compel you to pay interest in excess of the Maximum Rate shall be construed to require payment of the Maximum Rate only. The provisions of this Section shall prevail over any other provision of this Agreement or in any other agreement between the parties to this Agreement that is in conflict with the provisions of this Section.

14.    NOTICES.

Any notice or other communication required or desired to be given shall be in writing and shall be sent by certified mail, return receipt requested, by a nationally recognized express courier service (such as FedEx) or personally served, and shall be deemed to be duly given when postmarked by the United States Post Office, when deposited with a nationally recognized express courier service or when personally served. Each such notice to Borrower shall be at the mailing address (or location address for delivery by courier or personal service if the mailing address is a Post Office box) set forth on page 1 and any such notice to Lender shall be at the following address (or to any other address as may be specified by Lender in writing in accordance with this Section):

Credibly
4026 N. Miller Road, Suite B200
Scottsdale, AZ 85251

Notwithstanding the foregoing, any notice, request or demand which you make pursuant to any statutory rights granted to debtors under Article 9 of the UCC shall only be effective upon receipt of a copy of said notice, request or demand by us at the address set forth above with the following caption "Attention: Manager- UCC Notice."

15.    GOVERNING LAW; JURISDICTION.

THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF US, YOU AND EACH SIGNING PRINCIPAL SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ARIZONA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. Without limiting the generality of the foregoing, you, the Signing Principals and we agree that Arizona law shall govern the entire relationship between and among all parties to this Agreement, including without limitation, all issues or claims arising out of, relating to, in connection with, or incident to this Agreement and any transactions it contemplates, whether such claims are based in tort, contract, or arise under statute or in equity, including without limitation the law with respect to applicable statutes





BUSINESS LOAN AND SECURITY AGREEMENT

of limitations, laches, or similar time-based defenses. Subject to each party's right to elect arbitration under Section 18 below, you and the Signing Principals further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court located in Arizona to resolve any suit, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among any of the parties to this Agreement, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.  You and the Signing Principals hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the parties hereto, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.

You and the Signing Principals waive, to the fullest extent permitted by law:
(a) any objection that you or Signing Principals may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above-named courts;
(b) any objection to personal jurisdiction applying in any such court: and
(c) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF ARIZONA.

You and Signing Principals understand and agree that:
(d) we are located in Arizona:
(e) we make all credit and other decisions from our offices in Arizona: and
(f) the loan hereunder is made in Arizona (that is, no binding contract will be formed until we receive and accept your signed agreement in Arizona).

16.    FAX SIGNATURES; COUNTERPARTS.
You and each Signing Principal(s) agree that your faxed, scanned or other electronic signatures will be considered as good as your original signature and admissible in court as conclusive evidence. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

17.    INTERPRETATION; MISCELLANEOUS.
Except as otherwise stated in Section 18, the provisions of this Agreement shall be severable and if any provision shall be invalid, void or unenforceable in whole or in part for any reason, the remaining provisions shall remain in full force and effect. This Agreement shall be binding upon and shall inure to the benefit of the parties to this Agreement and their respective heirs, personal representatives, successors and assigns (subject nevertheless to restrictions provided in Section 11). This Agreement, together with the other agreements and instruments mentioned in this Agreement or executed by you contemporaneously with this Agreement, constitutes the entire agreement of the parties to this Agreement and we shall not be charged with any agreement or representation not contained in a writing executed by us as provided within or attached to this Agreement. Absent manifest error, our records shall be conclusive evidence with respect to the matters governed by this Agreement (including the total amount of the Repayment Amount and other amounts paid to us) but the failure to record any such amount in such records or otherwise shall not limit or affect your obligations or our rights hereunder. Whenever terms such as "include" or "including" are used in this Agreement herein, they shall mean "include" or "including" as the case may be, without limiting the generality of any description or word preceding such term. Whenever terms such as "acceptable to us" or "to our satisfaction" are used or we are granted the contractual right to choose between alternatives or express our opinion, the satisfaction, choices and opinions are to be made in our sole and absolute discretion. The captions or headings to this Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of such document. As used in this Agreement, all masculine pronouns shall include the feminine or neuter, and all singular terms the plural forms thereof, and vice versa. Any exhibits annexed hereto are incorporated therein and made a part thereof as if contained in the body of this Agreement. All references to Sections shall be deemed to refer to Sections of this Agreement, unless otherwise expressly provided, whether or not "hereof," "above," "below" or like words are used. This Agreement has been drafted by our counsel as a convenience to the parties to this Agreement only and shall not, by reason of such action, be construed against us or any other party.

18.    ARBITRATION AGREEMENT.
You or we each may elect to resolve any and all claims and disputes relating in any way to this Agreement or our dealings with one another ("Claims"), except for Claims concerning the validity, scope or enforceability of this Arbitration Agreement, through BINDING INDIVIDUAL ARBITRATION.  This Arbitration Agreement is made with respect to transactions involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), and not by state law. SIGNING PRINCIPALS AGREE THAT SECTION 18 (INCLUDING SECTIONS 18.1- 18.6) SHALL APPLY TO THEM IN THE SAME MANNER AS BORROWER.

18.1. Individual Arbitration. If either of us elects to resolve a dispute by arbitration, this means that neither you nor we will be able to have the dispute settled by a court or jury trial or to participate in a class action or class arbitration. Other rights that you and we would have if you or we went to court will not be available or will be more limited in arbitration, including your and our right to appeal. YOU AND WE BOTH UNDERSTAND AND AGREE THAT BY ALLOWING EACH OTHER TO ELECT TO RESOLVE ANY DISPUTE THROUGH INDIVIDUAL ARBITRATION, WE ARE EACH WAIVING THE RIGHT TO A JURY TRIAL OR A TRIAL BEFORE A JUDGE IN A PUBLIC COURT. IF EITHER YOU OR WE ELECT TO RESOLVE A DISPUTE BY ARBITRATION, THAT DISPUTE SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS. NEITHER YOU NOR WE MAY BRING A CLAIM UNDER THIS PROVISION AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE CAPACITY. THE ARBITRATOR(S) MAY NOT CONSOLIDATE MORE THAN ONE PARTY'S CLAIMS (except Claims by or against you and Principals with respect to a single Agreement or series of Agreements involving the same parties) AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING.

18.2. Arbitration Rules. Arbitration of any dispute under this Arbitration Agreement shall be administered by the American Arbitration Association ("AAA") pursuant to the applicable rules of AAA in effect at the time the arbitration is initiated. You may contact AAA to obtain information about arbitration, arbitration procedures and fees by calling 800-778-7879 or visiting www.adr.org. If AAA is unable or unwilling to administer the arbitration of a dispute, then a dispute may be referred to any other arbitration organization mutually agreed upon in writing by you and us or to an arbitration organization or arbitrator appointed pursuant to section 5 of the FAA. Arbitrations between you and us shall be conducted before a single arbitrator who shall be a retired judge or an attorney with at least 15 years of active practice. The arbitration shall take place in the federal judicial district in which your physical address is located, unless otherwise agreed by you and us in writing. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall be authorized to award any relief that would have been available in court, provided that the arbitrator's authority to resolve claims and make awards is limited to you and us alone except as otherwise specifically stated in this Agreement. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. The decision by the arbitrator shall be final and binding. You and we agree that this Arbitration Agreement extends to any other parties involved in any Claims, including but not limited to your Principals and our employees, affiliated companies and vendors.  In the event of any conflict between this Arbitration Agreement and the AAA arbitration rules or the rules of any other arbitration organization or arbitrator, this Arbitration Agreement shall govern.

18.3. Arbitration Fees and Costs. If we initiate a dispute and either of us elects to arbitrate that dispute, or if you initiate a dispute and elect to arbitrate that dispute at the time you initiate it, we will be responsible for paying all of the arbitration fees.  If you initiate a dispute, but do not elect to arbitrate it, and we elect to arbitrate that dispute, you will be responsible for paying your share of the arbitration fees up to the amount of any filing fees you would have incurred if you had brought a claim in the state or federal court closest to your physical address set forth above, and we will pay the remainder of the fees.

18.4. Exceptions. Notwithstanding any other provision of this Agreement, you or we may seek relief in a small claims court for Claims within the jurisdiction of that court. In addition, you and we agree that this Arbitration Agreement does not stop you or us from exercising any lawful rights to seek provisional remedies or self-help. You and we agree that we each may seek provisional remedies in court or self-help remedies out of court without waiving the right to arbitrate. Notwithstanding any other provision of this Agreement, if the prohibition against consolidated, class and/or representative arbitration in Section 18.1 is determined to be invalid or unenforceable, then this entire Arbitration Agreement shall not apply. If any portion of this Arbitration Agreement other than the prohibition on consolidated, class and representative arbitration is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this Arbitration Agreement.

18.5. Arbitration Agreement is Optional. YOU HAVE THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT, BUT YOU MUST EXERCISE THIS RIGHT PROMPTLY. If you do not wish to be bound by this agreement to arbitrate, you must notify us in writing within sixty (60) days after the Effective Date. You must send your request to: Credibly, 4026 N. Miller Road, Suite B200, Scottsdale, AZ 85251. The request must include your full name, address, account number, and the statement


CREDIBLY                                    BUSINESS LOAN AND SECURITY AGREEMENT

"I reject the Arbitration Agreement contained in my Business Loan and Security Agreement." If you exercise your right to reject arbitration, the other terms of this Agreement shall remain in full force and effect as if you had not rejected arbitration.

18.6. Cure Provision. You and we intend for both of us to have the right to arbitrate disputes on an individual basis as set forth above. In the event that a court finds any reason to invalidate or refuse to enforce this Arbitration Agreement, the party aggrieved by that decision shall have the right to take unilateral action to eliminate the basis for the court's decision, such as by waiving any right or remedy it has under this Agreement or agreeing to additional fee or cost shifting. This cure right may be exercised during briefing of a motion to compel arbitration, during oral argument, or in a renewed motion to compel arbitration. If a renewed motion is filed, you and we agree that the exercise of cure rights hereunder shall constitute new facts permitting such a renewed motion.

## 19.    SURVIVAL.

The Personal Guaranty and the following Sections hereof shall survive the expiration or termination of this Agreement for any reason and/or the relationship between us, any bankruptcy by you or us and any transfer by us of this Agreement or our rights hereunder: 7.1, 7.2, 10.9, 10.10, 10.12, 11, 13, 14, 15, 16, 17, 18 (including Sections 18.1 - 18.6), 19 and 22.

## 20.    TRANSACTIONS INVOLVING COLLATERAL.

You represent, warrant and agree that:

(a) you shall not sell, offer to sell, or otherwise transfer or dispose of any Collateral, except for inventory sold or accounts collected in the ordinary course of your business, unless we otherwise agree in writing;

(b) no one else has any interest in or claim against the Collateral that you have not disclosed to us in writing prior to the Effective Date;

(c) you shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any security interests, liens, claims, charges, restrictions, conditions, options, rights, mortgages, equities, pledges and encumbrances of any kind or nature whatsoever (collectively, "Liens") other than the security interest granted to us hereunder; and

(d) you have, and at all times will have, good, complete and marketable title to all Collateral, free and clear of any and all Liens or any other rights or interests that may be inconsistent with the transactions contemplated with us under this Agreement, or adverse to our interests. You shall, at your sole cost and expense, defend our rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for us, shall not be commingled with any other funds and shall be immediately delivered to us; provided, however that this requirement does not constitute our consent to any such disposition.

## 21.    PROHIBITED TRANSACTIONS.

You shall not enter into any arrangement, agreement or commitment with any person or entity other than us that involves the customers with credit cards, debit cards, charge cards, bank cards and/or other payment cards ("Card Receivables"), whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Card Receivables;  or that requires or contemplates that you will make regular payments more frequently than monthly.  You agree that any financing statements we file to protect our interests in the Collateral and under this Agreement may contain a statement that you are prohibited from transferring Card Receivables or other Collateral to any person or entity other than us, granting any security interest in Card Receivables or other Collateral to any person or entity other than us, or entering into any financing arrangement requiring or contemplating regular payments more frequently than monthly, until you have fulfilled all of your obligations to us.

## 22.    MONITORING, RECORDING, AND SOLICITATION.

(a)    Authorization to Contact You By Phone.  You and each Signing Principal authorize us, and our affiliates, agents and independent contractors, to contact you and each Signing Principal at any telephone number you or any Signing Principal provide to us or from which you or any Signing Principal places a call to us, or any telephone number where we believe we may reach you or any Signing Principal, using any means of communication,  including, but not limited to, calls or text messages to mobile, cellular, wireless or similar devices and calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if you or a Signing Principal incurs charges for receiving such communications.

(b)    Authorization to Contact You By Other Means.  You and each Signing Principal also agree that we and our affiliates, agents and independent contractors may use any other medium, as permitted by law and including, but not limited to, mail, e-mail and facsimile, to contact you and each Signing Principal.

(c)    Rights To Opt-Out Or Make Changes.  You and each Signing Principal are not required to agree to Section 22(a) in order to obtain the loan documented by this Agreement. If you or any Signing Principal wishes to opt out of Section 22(a), or if you or any Signing Principal wants to change how we contact you, including with respect to any telephone number that we might use, please call us at:  888-664-1444 or write to Credibly, 4026 N. Miller Road, Suite B200, Scottsdale, AZ 85251. Notwithstanding the foregoing, any opt-out you make under this Section 22(c) does not limit to our right to contact you by any means permitted by applicable federal or state law, including by telephone, regarding a delinquent account.

(d)    You and each Signing Principal and Guarantor agree that Lender, its affiliates, designees, agents and independent contractors ("Representatives") may listen to or record telephone calls between any Signing Principal or Guarantor and Lender or its Representatives without additional notice.

## 23.    ARBITRATION NOTICE

THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION IN SECTION 18 (INCLUDING SECTIONS 18.1 – 18.6). THE ARBITRATION AGREEMENT AFFECTS YOUR LEGAL RIGHTS.  READ IT CAREFULLY BEFORE SIGNING.

## 24.    PERSONAL GUARANTY

THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS. READ IT CAREFULLY BEFORE SIGNING

I hereby personally and unconditionally guaranty for the benefit of Lender and its successors and assigns the prompt payment to Lender of all amounts owed by the Borrower referenced above ("Borrower") under the above Agreement.  This is a guaranty of payment and performance and not a guaranty of collection.  This is an absolute, unconditional, primary and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full.  I agree that Lender may extend, transfer and amend the Agreement and I agree to be bound by all such changes. I waive all defenses, legal or equitable, otherwise available to me, and I waive all notices to which I might otherwise be entitled by law, including notices of protest, presentment, transfer, demand and default.  I agree Lender may proceed against me separately without first proceeding against Borrower, any collateral or any other Guarantor.  This Guaranty will not be discharged or affected by my death and until then by my heirs and personal representatives.  If more than one Guarantor executes this Guaranty, the Guarantors' liability hereunder shall be joint and several. I hereby authorize Lender, its agents and representatives and any credit reporting agency engaged by Lender, to investigate any references given or any other statements or data obtained from or about me for purposes of this guaranty, the Agreement, and any associated documentation, and pull credit reports at any time now and for so long as Borrower or I may have any obligation to Lender as a consequence of this Guaranty or the Agreement, including for Lender's collection processes and its credit evaluations, including to determine Borrower's or my eligibility to enter into the Agreement or any future agreement  with Lender.

## 25.    COMPLIANCE AGREEMENT

For and in consideration of Lender entering into this Agreement and funding this loan, Borrower agrees, if requested by Lender, its successors and/or assigns, or its Designee, to fully cooperate and adjust for any clerical errors or omissions on any or all loan documentation as deemed necessary or desirable in the reasonable discretion of Lender.  These clerical errors or omissions may include, but are not limited to, loan or repayment details.  The Borrower acknowledges and agrees that this is a material term of the Agreement and covenants not to bring a claim or attempt to avoid its obligations due to any clerical error or omission. If Borrower fails, within 15 days of Lender's request, to execute said documents correcting errors and omissions then Lender may, in its sole discretion, correct the documents and deliver corrected copies to Borrower and may institute any action or proceeding against Borrower relating to the provisions herein.  In that event, Lender shall be entitled to recover from the Borrower its reasonable costs, expenses and attorney's fees.

[Signature Page Follows]

Agreement #: 362004                    www.credibly.com                    Page:                    9

# SIGNATURES

I ACKNOWLEDGE AND AGREE THAT THIS GUARANTY, THE AGREEMENT AND ALL ASSOCIATED DOCUMENTATION SHALL BE INTERPRETED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ARIZONA, APPLIED WITHOUT GIVING EFFECT TO CONFLICT-OF-LAWS PRINCIPLES.

I ACKNOWLEDGE AND AGREE THAT THIS GUARANTY IS GOVERNED BY THE ARBITRATION AGREEMENT SET FORTH ABOVE IN SECTION 18 (INCLUDING SECTIONS 18.1- 18.6). WITH RESPECT TO ANY LEGAL ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF, RELATED TO, IN CONNECTION WITH OR INCIDENT TO THIS GUARANTY, THE AGREEMENT, OR ANY ASSOCIATED DOCUMENTATION, I WAIVE MY RIGHT TO A JURY AND AGREE TO ARBITRATE ANY CLAIMS ON AN INDIVIDUAL BASIS AS SET FORTH IN THE ARBITRATION AGREEMENT ABOVE.

On behalf of the Borrower, I have read this entire Agreement, including the Arbitration Agreement in Section 18 (including Sections 18.1 -18.6), and received a copy for our records. Borrower understands that it has the right to consult with an attorney before signing this Agreement if it chooses to do so. I certify that I am able to read and understand the English language. By signing below, on behalf of Borrower and in my individual capacity as a Signing Principal, I agree to all of the terms of this Agreement, including the Arbitration Agreement and the other Key Terms and Conditions summarized on Page 1, and offer to enter into the transaction it describes.

Electronic Signatures. In the event you have chosen to sign this agreement electronically, you acknowledge and agree that your electronic signature on the agreement (and any related documents) has the same effect as if you signed the agreement by hand in ink. You should print or save a copy of this agreement and any communications in your records as they may not be accessible online at a later date.

| Guarantor #1: | Borrower #1: |
|---|---|
| _(Authorized Signatory of the Guarantor)_ | _(Authorized Signatory of the Borrower)_ |
| Monica Oh | Monica Oh |
| _(Printed Name)_ | _(Printed Name)_ |
| Owner | Owner |
| _(Printed Title)_ | _(Printed Title)_ |
| 5/15/2019 | 5/15/2019 |
| _(Date)_ | _(Date)_ |
| | |
| Guarantor #2: | Borrower #2: |
| _(Authorized Signatory of the Guarantor)_ | _(Authorized Signatory of the Borrower)_ |
| | |
| _(Printed Name)_ | _(Printed Name)_ |
| | |
| _(Printed Title)_ | _(Printed Title)_ |
| | |
| _(Date)_ | _(Date)_ |
| | |
| Guarantor #3: | Borrower #3: |
| _(Authorized Signatory of the Guarantor)_ | _(Authorized Signatory of the Borrower)_ |
| | |
| _(Printed Name)_ | _(Printed Name)_ |
| | |
| _(Printed Title)_ | _(Printed Title)_ |
| | |
| _(Date)_ | _(Date)_ |

# Prepayment Addendum

This Prepayment Addendum to Business Loan and Security Agreement ("Prepayment Addendum") is entered into by and between Lender (or its Designee on behalf of Lender) and the Borrower, each as named in the Business Loan and Security Agreement No. 362004____ (the "Agreement"). This Prepayment Addendum is made a part of and subject to the Agreement. Capitalized terms not defined in this Prepayment Addendum have the meanings set forth in the Agreement.

RECITALS
WHEREAS, Lender and Borrower are parties to the Agreement.

WHEREAS, Borrower desires to have, and Lender desires to provide, the option to prepay the Repayment Amount as set forth in this Prepayment Addendum.

NOW THEREFORE, in consideration of the mutual covenants contained herein and in the Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.  Prepayment. At any time on or before the date Borrower has paid 50% of the Repayment Amount (the "Early Repayment Deadline"), Borrower may prepay in full all of its remaining obligations under the Agreement by paying Lender or its Designee an amount equal to (a) the unpaid interest (the difference between the Repayment Amount and the Principal Amount) portion of the Repayment Amount as allocated by Credibly as of the date of prepayment *less 20%*; plus (b) the unpaid principal portion of the Repayment Amount as allocated by Credibly as of the date of the prepayment; plus (c) any accrued or unpaid payments, fees or charges as of the repayment date; provided, however, that the Borrower must make a written request for the discount in subsection (a) and the Early Repayment Amount must be paid in full in a single payment and from the Designated Account identified on page 2 of the Agreement. THE RIGHT TO PREPAY IN THIS PARAGRAPH WILL NOT APPLY TO ANY OTHER PAYMENTS MADE BY BORROWER OR TO REFINANCED AMOUNTS DEPOSITED INTO THE DESIGNATED ACCOUNT TO PAY OFF THE OUTSTANDING LOAN BALANCE.

2.  Eligibility. Borrower must have made all payments fully and timely and there must not have been an Event of Default to obtain the prepayment discount. If at any time prior to or on the Early Repayment Deadline, Borrower's loan is delinquent or there is an Event of Default, Borrower will no longer be eligible to receive the prepayment discount. Borrower understands that a delinquency and/or default notice shall constitute sufficient notice that Borrower is no longer eligible to receive the discounted payoff, and that no additional notice is required.

3.  Responsibilities of Borrower. Borrower must also continue making regularly scheduled daily payments for five days after making this final payment to avoid a potential Event of Default, as defined in the Agreement. Lender or its Designee will refund any overage amount after the Early Repayment Amount has been submitted.

4.  Incorporation of Terms; Conflicts; Defined Terms. This Prepayment Addendum is subject to all of the terms and conditions set forth in the Agreement. This Prepayment Addendum is supplementary to the Agreement and shall not be construed as to limit or otherwise derogate from any of the rights or remedies of Lender, or any of the liabilities or obligations or undertakings of Borrower under the Agreement, except as expressly set forth herein. In the event of a conflict between the Agreement and this Prepayment Addendum, this Prepayment Addendum shall control. Borrower has read this entire Prepayment Addendum and received a copy for its records. Borrower and its authorized signatory understand that they have the right to consult with an attorney before signing the Prepayment Addendum if they choose to do so. The undersigned signatory represents and warrants that he or she is able to read and understand the English language.

By signing below, on behalf of Borrower and in my individual capacity as a Signing Principal, I agree to all of the terms of this Prepayment Addendum.

Borrower Business Legal Name (print):    **Tobo Construction Inc**

By: _____          By: _____
(authorized signature)                                                  (authorized signature)

Print name:  Monica Oh                                          Print name: _____

Print title:  Owner                                                 Print title: _____

**GUARANTOR SIGNATURE**
By signing below, in my capacity as Guarantor, I agree to all of the terms of this Prepayment Addendum.

By: _____          By: _____
(authorized signature)                                                  (authorized signature)

Print name:  Monica Oh                                          Print name: _____



## PERMISSION TO RELEASE  INFORMATION

Date: **05/14/2019** Analyst Initials: _____
Business Name: _Tobo Construction Inc_
Merchant Contact: _ Monica Oh_

I, _Monica Oh_____, authorize Retail Capital LLC dba Credibly (hereinafter, "Credibly") to obtain trade, landlord, bank and tax records from vendors, suppliers, landlord or mortgager, banks, creditors, payroll, companies, accountants, or taxing authorities. This information will be used for the sole purpose of obtaining funding from Credibly or Credibly of Arizona LLC.

### Permission to Access Merchant Processing

I, _Monica Oh_____, give permission to Credibly to access my merchant processing accounts on-line. If I do not currently have on-line access, I give  Credibly permission to set up access on my behalf. My access information is listed below. I understand that I can change my account access information after underwriting is complete to deny further access in the future.

Current Processor: _____

Merchant Number: _____

Processor Phone #: _____

Processor Website: _____

Username: _____

Password: _____

American Express Username: _____

American Express Password: _____

DocuSigned by:

_____                    05/10/2019
9EC71C068403491...

Merchant  Signature _Monica Oh_                    Date



## Certificate Of Completion

Envelope Id: 6B032FC3C4DC49BDB32067E18684112D
Subject: Funding Contracts for Tobo Construction Inc
Source Envelope:
Document Pages: 16                    Signatures: 5
Certificate Pages: 5                  Initials: 9
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
Ciara Shoebottom
1250 Kirts Blvd Ste 100
Troy, MI  48084-4855
cshoebottom@credibly.com
IP Address: 66.103.237.74

## Record Tracking

Status: Original
     5/14/2019 8:29:51 AM

Holder: Ciara Shoebottom
     cshoebottom@credibly.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Monica Oh<br>chaemonica@hotmail.com<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>—9EC71C068403491... | Sent: 5/14/2019 8:31:20 AM<br>Viewed: 5/15/2019 11:13:44 AM<br>Signed: 5/15/2019 11:26:34 AM |
| | Signature Adoption: Drawn on Device<br>Using IP Address: 184.181.106.77<br>Signed using mobile | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 5/15/2019 11:13:44 AM<br>  ID: 1322e606-22e5-4acd-85e0-e34ff7787f13 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mathias Grez<br>mgrez@credibly.com<br>Credibly<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 5/14/2019 8:31:20 AM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |
| Funding Desk<br>funding@credibly.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 5/14/2019 8:31:20 AM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/14/2019 8:31:20 AM |
| Certified Delivered | Security Checked | 5/15/2019 11:13:44 AM |
| Signing Complete | Security Checked | 5/15/2019 11:26:34 AM |
| Completed | Security Checked | 5/15/2019 11:26:34 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on 3/30/2016 2:01:33 PM
Parties agreed to: Monica Oh

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Credibly (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Credibly:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Credibly of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at isosupport@credibly.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Credibly**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ISOSupport@credibly.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Credibly**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to isosupport@credibly.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Credibly as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Credibly during the course of my relationship with you.

# EXHIBIT 3


**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                          Page     1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

```
*****************************************************************
*   2nd Annual - PCB Scholarship, Pacific City Bank will be     *
*   awarding 15 scholarships to those students who demonstrate  *
*   strong academic performance and leadership. If you are      *
*   interested in applying, please visit www.paccitybank.com for*
*   full details. Certain restrictions apply.                   *
*****************************************************************
```

BUSINESS REGULAR CHECKING                        Account No      ████0876
                                              Statement Date    05/31/2019
                                         Last Statement Date    04/30/2019

85                          Statement Period

Previous Balance            154,702.32    # Of Days-Stmt Period          31
 13 Deposits/Credits      2,357,144.00
133 Checks/Withdrawals    2,232,136.12    Average Balance       157,455.06
Ending Balance              279,710.20
Total Srv Chg Today              0.00     YTD Interest                 0.00

Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 05/02/19 | ADVANCED FROM LOAN | 10,000.00 |
| 05/03/19 | ADVANCED FROM LOAN | 30,000.00 |
| 05/06/19 | ADVANCED FROM LOAN | 40,000.00 |
| 05/08/19 | ADVANCED FROM LOAN | 70,000.00 |
| 05/09/19 | REGULAR DEPOSIT | 539,481.81 |
| 05/15/19 | ADVANCED FROM LOAN | 60,000.00 |
| 05/16/19 | ADVANCED FROM LOAN | 20,000.00 |
| 05/16/19 | Wire In -RETAIL CAPITAL LLC | 316,875.00 |
| 05/20/19 | ADVANCED FROM LOAN | 310,000.00 |
| 05/20/19 | CELTIC BANK      TOBO CONSTRUCTION, INC<br>ACH CREDIT 36354140   36354140 | 48,750.00 |
| 05/21/19 | RETURN CHECK 754962<br>STOP PAYMENT | 254,574.00 |
| 05/22/19 | UC LOS ANGELES   TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 314,612.44 |
| 05/31/19 | UC LOS ANGELES   TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 342,850.75 |

EXHIBIT
2
Monica Oh/Jimi Chae
4/27/2020

Darla Kmety - CSR#12956

**In re Monica Oh and Jimi Chae (2:20-bk-11376)**
**Document Production re: Credibly 2004 Examination 001**



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                     Page    2

                                                   Account    ████0876

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 05/01/19 | INET XFER 05-01  TO XXXXXXX4960 | 27,475.48 |
| 05/01/19 | IPFS866-412-1821 TOBO CONSTRUCTION INC.<br>ACH DEBIT  IPFSPMTCAL 359373 | 10,191.74 |
| 05/01/19 | CAPITAL ONE     OH MONICA<br>ACH DEBIT  ONLINE PMT 912039910134306 | 35,000.00 |
| 05/01/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 1,466.00 |
| 05/02/19 | SO CAL GAS      301601474121232157<br>ACH DEBIT  PAID SCGC  0239049456 | 229.60 |
| 05/03/19 | INET XFER 05-03  TO XXXXXXX3383 | 23,000.00 |
| 05/03/19 | LEASE DIRECT      Tobo Construction Inc.<br>ACH DEBIT  WEB PAY   63119619 | 681.33 |
| 05/03/19 | TD AUTO FINANCE  SUZIE H NA<br>ACH DEBIT  WEB PAY   0001102065723 | 813.82 |
| 05/03/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT CKF023924106POS | 5,000.00 |
| 05/06/19 | INET XFER 05-06  TO XXXXXXX3383 | 7,200.00 |
| 05/06/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC<br>ACH DEBIT  Policy Pmt AD20648228 | 281.75 |
| 05/07/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 385568613 | 500.98 |
| 05/08/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 17,545.43 |
| 05/10/19 | CAPITAL ONE     OH MONICA<br>ACH DEBIT  ONLINE PMT 912939910461409 | 20,000.00 |
| 05/10/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 1,831.16 |
| 05/13/19 | INET XFER 05-13  TO XXXXXXX4960 | 200,000.00 |
| 05/14/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 3,624.11 |
| 05/15/19 | INET XFER 05-15  TO XXXXXXX3383 | 8,600.00 |
| 05/15/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 408900165 | 454.73 |
| 05/15/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT CKF023924106POS | 5,000.00 |
| 05/15/19 | CAPITAL ONE     OH MONICA<br>ACH DEBIT  ONLINE PMT 913439910150667 | 21,487.46 |
| 05/16/19 | Wire In Fee | 10.00 |
| 05/16/19 | GF              TOBO CONSTRUCTION<br>ACH DEBIT  Genesis Fi 1713811166 | 786.17 |
| 05/16/19 | WELLS FARGO BANK TOBO CONSTRUCTION<br>ACH DEBIT  LOANLEASE  000000004939118 | 6,257.23 |
| 05/17/19 | INET XFER 05-17  TO XXXXXXX3383 | 25,000.00 |
| 05/17/19 | INET XFER 05-17  TO XXXXXXX4960 | 200,000.00 |
| 05/20/19 | INET XFER 05-20  TO XXXXXXX3383 | 10,000.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    3

                                              Account        ████0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 05/20/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/20/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT CKF023924106POS | 34,153.80 |
| 05/21/19 | STOP PAYMENT CHARGE | 30.00 |
| 05/21/19 | INET XFER 05-21  TO XXXXXXX3383 | 20,000.00 |
| 05/21/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/22/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/23/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 404223091 | 141.04 |
| 05/23/19 | WFEF MDF        Tobo Construction Inc.<br>ACH DEBIT  WEB PAY     603-0182554-000 | 485.06 |
| 05/23/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/24/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/24/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 555.53 |
| 05/28/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  36523708   36523708 | 1,983.33 |
| 05/28/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/28/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 4,122.83 |
| 05/29/19 | INET XFER 05-29  TO XXXXXXX4960 | 25,859.67 |
| 05/29/19 | INET XFER 05-29  TO XXXXXXX3383 | 27,000.00 |
| 05/29/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/30/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/30/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 1,500.35 |
| 05/31/19 | INET XFER 05-31  TO XXXXXXX3383 | 17,000.00 |
| 05/31/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 05/31/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 915039910274120 | 15,000.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    4

                                                Account        ▇▇▇0876

_____

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|---------|--------|------|---------|--------|------|
| 754893 | 1,193.40 | 05/02/19 | 754959 | 11,918.40 | 05/10/19 |
| 754903 | 8,610.00 | 05/01/19* | 754960 | 30,000.00 | 05/10/19 |
| 754904 | 20,000.00 | 05/10/19 | 754961 | 40,000.00 | 05/10/19 |
| 754913 | 20,000.00 | 05/10/19* | 754962 | 254,574.00 | 05/20/19 |
| 754914 | 20,000.00 | 05/01/19 | 754963 | 5,000.00 | 05/14/19 |
| 754917 | 10,000.00 | 05/13/19* | 754964 | 9,372.66 | 05/20/19 |
| 754920 | 10,401.23 | 05/02/19* | 754966 | 120,462.00 | 05/23/19* |
| 754921 | 18,795.75 | 05/08/19 | 754967 | 301.00 | 05/23/19 |
| 754923 | 500.00 | 05/03/19* | 754969 | 58,911.76 | 05/21/19* |
| 754924 | 2,282.96 | 05/07/19 | 754971 | 500.00 | 05/16/19* |
| 754925 | 7,411.58 | 05/08/19 | 754972 | 5,000.00 | 05/17/19 |
| 754926 | 4,953.37 | 05/08/19 | 754973 | 1,000.00 | 05/20/19 |
| 754927 | 1,079.13 | 05/07/19 | 754974 | 4,523.00 | 05/20/19 |
| 754928 | 131.40 | 05/07/19 | 754975 | 1,000.00 | 05/17/19 |
| 754929 | 13,905.75 | 05/16/19 | 754976 | 819.63 | 05/20/19 |
| 754930 | 4,030.00 | 05/06/19 | 754977 | 800.00 | 05/16/19 |
| 754931 | 800.00 | 05/06/19 | 754978 | 1,200.00 | 05/21/19 |
| 754932 | 22,800.00 | 05/14/19 | 754979 | 2,139.78 | 05/17/19 |
| 754933 | 13,361.85 | 05/06/19 | 754980 | 1,478.37 | 05/16/19 |
| 754934 | 20,000.00 | 05/01/19 | 754981 | 275.10 | 05/16/19 |
| 754935 | 20,000.00 | 05/13/19 | 754982 | 1,739.08 | 05/17/19 |
| 754936 | 3,000.00 | 05/02/19 | 754983 | 3,750.00 | 05/20/19 |
| 754937 | 3,797.00 | 05/01/19 | 754984 | 35,000.00 | 05/15/19 |
| 754939 | 120.00 | 05/28/19* | 754985 | 16,000.00 | 05/20/19 |
| 754940 | 100.00 | 05/09/19 | 754986 | 31,342.82 | 05/21/19 |
| 754941 | 14,283.74 | 05/01/19 | 754987 | 26,077.50 | 05/20/19 |
| 754942 | 1,300.00 | 05/08/19 | 754988 | 20,000.00 | 05/24/19 |
| 754943 | 5,066.85 | 05/08/19 | 754989 | 8,000.00 | 05/30/19 |
| 754944 | 2,519.58 | 05/08/19 | 754990 | 42,022.22 | 05/22/19 |
| 754946 | 5,000.00 | 05/02/19* | 754991 | 8,642.41 | 05/29/19 |
| 754947 | 16,020.00 | 05/14/19 | 754993 | 3,601.04 | 05/29/19* |
| 754948 | 3,000.00 | 05/06/19 | 754994 | 9,440.30 | 05/24/19 |
| 754949 | 2,620.40 | 05/06/19 | 755000 | 15,000.00 | 05/28/19* |
| 754950 | 8,000.00 | 05/06/19 | 755001 | 5,000.00 | 05/29/19 |
| 754951 | 250.00 | 05/10/19 | 755002 | 5,000.00 | 05/28/19 |
| 754952 | 2,000.00 | 05/20/19 | 755003 | 30,000.00 | 05/28/19 |
| 754953 | 3,672.00 | 05/08/19 | 755004 | 1,400.00 | 05/30/19 |
| 754954 | 40,000.00 | 05/31/19 | 755005 | 39,125.87 | 05/30/19 |
| 754955 | 50,000.00 | 05/10/19 | 755008 | 30,000.00 | 05/31/19* |
| 754956 | 50,000.00 | 05/20/19 | 755014 | 21,000.00 | 05/31/19* |
| 754957 | 50,000.00 | 05/10/19 | 755015 | 10,000.00 | 05/31/19 |
| 754958 | 30,000.00 | 05/20/19 | 755021 | 10,000.00 | 05/31/19* |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    5

                                                    Account        ▇0876

---

Checks

*  Indicates Break In Sequence

---

Daily Balance Summary

| Date | Amount | Date | Amount |
|------------|----------------|------------|----------------|
| 05/01/2019 | 13,878.36 | 05/16/2019 | 329,764.28 |
| 05/02/2019 | 4,054.13 | 05/17/2019 | 94,885.42 |
| 05/03/2019 | 4,058.98 | 05/20/2019 | 9,204.32 |
| 05/06/2019 | 4,764.98 | 05/21/2019 | 150,133.23 |
| 05/07/2019 | 770.51 | 05/22/2019 | 420,562.94 |
| 05/08/2019 | 9,505.95 | 05/23/2019 | 297,013.33 |
| 05/09/2019 | 548,887.76 | 05/24/2019 | 264,856.99 |
| 05/10/2019 | 304,888.20 | 05/28/2019 | 206,470.32 |
| 05/13/2019 | 74,888.20 | 05/29/2019 | 134,206.69 |
| 05/14/2019 | 27,444.09 | 05/30/2019 | 82,019.96 |
| 05/15/2019 | 16,901.90 | 05/31/2019 | 279,710.20 |

---



PACIFIC CITY BANK

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                          Page      1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

---

BUSINESS REGULAR CHECKING                    Account No       ███0876
                                          Statement Date   06/28/2019
                                     Last Statement Date   05/31/2019

  86                         Statement Period

Previous Balance            279,710.20   # Of Days-Stmt Period        28
 5 Deposits/Credits       1,435,722.16
142 Checks/Withdrawals    1,545,515.80   Average Balance       226,234.34
Ending Balance              169,916.56
Total Srv Chg Today              0.00    YTD Interest               0.00

---

Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 06/05/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC | 208,433.35 |
|          | ACH CREDIT UCLA DISBM 143914001 | |
| 06/10/19 | REGULAR DEPOSIT | 383,361.87 |
| 06/12/19 | REGULAR DEPOSIT | 567,621.07 |
| 06/25/19 | ADVANCED FROM LOAN | 10,000.00 |
| 06/27/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC | 266,305.87 |
|          | ACH CREDIT UCLA DISBM 143914001 | |

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 06/03/19 | INET XFER 06-03  TO XXXXXXX3383 | 14,000.00 |
| 06/03/19 | TD AUTO FINANCE  SUZIE H NA | 813.82 |
|          | ACH DEBIT  WEB PAY  0001102065723 | |
| 06/03/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC | 1,983.33 |
|          | ACH DEBIT  36688278   36688278 | |
| 06/03/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
|          | ACH DEBIT  PREAUTHPMT RETAIL | |
| 06/03/19 | TESLA 8          TOBO CONSTRUCTION INC | 2,519.58 |
|          | ACH DEBIT  WEB PYMNT  79815757 | |
| 06/04/19 | INET XFER 06-04  TO XXXXXXX3383 | 20,100.00 |
| 06/04/19 | LEASE DIRECT     Tobo Construction Inc. | 650.12 |
|          | ACH DEBIT  WEB PAY   63539908 | |
| 06/04/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
|          | ACH DEBIT  PREAUTHPMT RETAIL | |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page     2

                                              Account        ▬0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 06/04/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 915439910774224 | 10,000.00 |
| 06/05/19 | INET XFER 06-05  TO XXXXXXX3383 | 4,000.00 |
| 06/05/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC<br>ACH DEBIT  Policy Pmt AD20648228 | 281.75 |
| 06/05/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/06/19 | INET XFER 06-06  TO XXXXXXX3383 | 2,000.00 |
| 06/06/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 385568613 | 534.84 |
| 06/06/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/07/19 | INET XFER 06-07  TO XXXXXXX3383 | 11,000.00 |
| 06/07/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/10/19 | INET XFER 06-10  TO XXXXXXX3383 | 10,000.00 |
| 06/10/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  36874375    36874375 | 1,983.33 |
| 06/10/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/10/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 915839910498925 | 15,000.00 |
| 06/11/19 | INET XFER 06-11  TO XXXXXXX3383 | 500.00 |
| 06/11/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/12/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/13/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/13/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 916339910432975 | 21,271.64 |
| 06/13/19 | BEACON ROOFING S tobo construction inc<br>ACH DEBIT  BT0612     000000083138120 | 27,282.60 |
| 06/14/19 | INET XFER 06-14  TO XXXXXXX3383 | 24,000.00 |
| 06/14/19 | HOME DEPOT       TOBO CONSTRUCTION INC.<br>ACH DEBIT  ONLINE PMT 162986619423896 | 1,332.19 |
| 06/14/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/14/19 | HOME DEPOT COMM  TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT 162986617455014 | 6,016.60 |
| 06/17/19 | INET XFER 06-17  TO XXXXXXX3383 | 9,000.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                      Page      3

Account            ■■■0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 06/17/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 408900165 | 293.72 |
| 06/17/19 | GF            TOBO CONSTRUCTION<br>ACH DEBIT  Genesis Fi 1713811166 | 786.17 |
| 06/17/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  37045538    37045538 | 1,983.33 |
| 06/17/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/17/19 | WELLS FARGO BANK TOBO CONSTRUCTION<br>ACH DEBIT  LOANLEASE  000000005025529 | 6,257.23 |
| 06/18/19 | INET XFER 06-18  TO XXXXXXX3383 | 3,500.00 |
| 06/18/19 | SO CAL GAS       30160147412902847<br>ACH DEBIT  PAID SCGC  1466046186 | 37.47 |
| 06/18/19 | WFEF MDF         Tobo Construction Inc.<br>ACH DEBIT  WEB PAY   603-0182554-000 | 485.06 |
| 06/18/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/18/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT CKF023924106POS | 6,213.87 |
| 06/19/19 | INET XFER 06-19  TO XXXXXXX3383 | 13,000.00 |
| 06/19/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/20/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/20/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 917039910311122 | 5,000.00 |
| 06/21/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/21/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 778.28 |
| 06/24/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  37216871    37216871 | 1,983.33 |
| 06/24/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/25/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/26/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/26/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 5,036.67 |
| 06/27/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 06/27/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 573.09 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    4

Account        ▇0876

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 06/28/19 | INET XFER 06-28 TO XXXXXXX3383 | 15,000.00 |
| 06/28/19 | INET XFER 06-28 TO XXXXXXX4960 | 26,645.20 |
| 06/28/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
| | ACH DEBIT  PREAUTHPMT RETAIL | |

## Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 754970 | 10,000.00 | 06/03/19 | 755042 | 209.48 | 06/19/19 |
| 754996 | 4,007.56 | 06/10/19* | 755043 | 5,000.00 | 06/10/19 |
| 754997 | 380.80 | 06/03/19 | 755044 | 1,757.94 | 06/10/19 |
| 754998 | 20,000.00 | 06/06/19 | 755045 | 25,000.00 | 06/06/19 |
| 754999 | 20,000.00 | 06/06/19 | 755046 | 20,000.00 | 06/11/19 |
| 755006 | 3,750.00 | 06/04/19* | 755047 | 20,000.00 | 06/13/19 |
| 755007 | 500.00 | 06/06/19 | 755048 | 14,776.63 | 06/11/19 |
| 755009 | 13,113.19 | 06/07/19* | 755049 | 18,676.08 | 06/14/19 |
| 755013 | 25,000.00 | 06/04/19* | 755050 | 23,760.00 | 06/10/19 |
| 755016 | 4,128.00 | 06/03/19* | 755051 | 5,600.00 | 06/11/19 |
| 755017 | 4,408.20 | 06/07/19 | 755052 | 30,000.00 | 06/10/19 |
| 755019 | 7,134.90 | 06/10/19* | 755053 | 12,000.00 | 06/10/19 |
| 755020 | 2,145.00 | 06/04/19 | 755054 | 5,000.00 | 06/18/19 |
| 755022 | 10,645.76 | 06/06/19* | 755055 | 7,000.00 | 06/27/19 |
| 755023 | 2,000.00 | 06/06/19 | 755056 | 7,500.00 | 06/27/19 |
| 755024 | 9,491.45 | 06/07/19 | 755057 | 56,842.87 | 06/13/19 |
| 755025 | 57,726.75 | 06/10/19 | 755058 | 8,580.84 | 06/17/19 |
| 755026 | 10,000.00 | 06/06/19 | 755059 | 6,386.72 | 06/17/19 |
| 755027 | 12,164.91 | 06/07/19 | 755060 | 120,000.00 | 06/13/19 |
| 755028 | 9,506.95 | 06/07/19 | 755061 | 17,875.00 | 06/13/19 |
| 755029 | 2,625.55 | 06/03/19 | 755062 | 10,000.00 | 06/12/19 |
| 755030 | 3,672.00 | 06/10/19 | 755063 | 120,000.00 | 06/13/19 |
| 755031 | 2,884.96 | 06/12/19 | 755064 | 25,000.00 | 06/13/19 |
| 755032 | 3,797.00 | 06/03/19 | 755065 | 80,000.00 | 06/17/19 |
| 755033 | 74.34 | 06/10/19 | 755066 | 1,560.00 | 06/20/19 |
| 755034 | 10,350.00 | 06/04/19 | 755067 | 7,831.32 | 06/17/19 |
| 755035 | 120.00 | 06/10/19 | 755068 | 4,104.00 | 06/24/19 |
| 755036 | 100.00 | 06/14/19 | 755072 | 12,000.00 | 06/17/19* |
| 755037 | 14,283.74 | 06/03/19 | 755073 | 50,354.84 | 06/19/19 |
| 755038 | 1,300.00 | 06/05/19 | 755074 | 57,000.00 | 06/14/19 |
| 755039 | 5,066.85 | 06/05/19 | 755075 | 1,000.00 | 06/17/19 |
| 755041 | 451.31 | 06/19/19* | 755076 | 4,420.35 | 06/20/19 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                  Page     5

                                             Account      ■0876

---

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755077 | 1,000.00 | 06/19/19 | 755088 | 3,750.00 | 06/17/19 |
| 755078 | 500.00 | 06/18/19 | 755089 | 4,500.00 | 06/21/19 |
| 755079 | 800.00 | 06/17/19 | 755091 | 20,000.00 | 06/21/19* |
| 755080 | 1,200.00 | 06/24/19 | 755092 | 25,000.00 | 06/18/19 |
| 755081 | 2,491.13 | 06/18/19 | 755093 | 800.00 | 06/21/19 |
| 755082 | 949.15 | 06/19/19 | 755095 | 18,790.09 | 06/20/19* |
| 755084 | 1,259.00 | 06/17/19* | 755098 | 573.00 | 06/25/19* |
| 755085 | 234.72 | 06/20/19 | 755101 | 3,200.00 | 06/26/19* |
| 755086 | 30,000.00 | 06/17/19 | 755105 | 350.00 | 06/27/19* |
| 755087 | 30,000.00 | 06/17/19 | 755108 | 35,000.00 | 06/28/19* |

*   Indicates Break In Sequence

---

Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 06/03/2019 | 223,017.87 | 06/17/2019 | 186,496.32 |
| 06/04/2019 | 148,862.24 | 06/18/2019 | 141,108.28 |
| 06/05/2019 | 344,486.48 | 06/19/2019 | 72,982.99 |
| 06/06/2019 | 251,645.37 | 06/20/2019 | 40,817.32 |
| 06/07/2019 | 189,800.16 | 06/21/2019 | 12,578.53 |
| 06/10/2019 | 398,764.70 | 06/24/2019 | 3,130.69 |
| 06/11/2019 | 355,727.56 | 06/25/2019 | 10,397.18 |
| 06/12/2019 | 908,303.16 | 06/26/2019 | 0.00 |
| 06/13/2019 | 497,870.54 | 06/27/2019 | 248,722.27 |
| 06/14/2019 | 388,585.16 | 06/28/2019 | 169,916.56 |

---



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                    Page    1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

---

BUSINESS REGULAR CHECKING                     Account No        ▆0876
                                             Statement Date    07/31/2019
                                        Last Statement Date    06/28/2019

  72                    Statement Period

Previous Balance          169,916.56   # Of Days-Stmt Period          33
  7 Deposits/Credits    1,402,115.91
151 Checks/Withdrawals  1,099,470.93   Average Balance       161,598.92
Ending Balance            472,561.54
Total Srv Chg Today            0.00    YTD Interest                0.00

---

Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 07/08/19 | ADVANCED FROM LOAN | 15,000.00 |
| 07/09/19 | REGULAR DEPOSIT | 4,500.00 |
| 07/11/19 | INET XFER 07-11   FROM XXXXXXX3383 | 2,500.00 |
| 07/11/19 | REGULAR DEPOSIT | 423,525.33 |
| 07/15/19 | Wire In -KALAMATA CAPITAL GROUP, LLC | 242,201.00 |
| 07/25/19 | Wire In -EBF PARTNERS, LLC | 88,260.00 |
| 07/30/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC | 626,129.58 |
|          | ACH CREDIT UCLA DISBM 143914001 | |

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 07/01/19 | INET XFER 07-01   TO XXXXXXX3383 | 10,927.88 |
| 07/01/19 | TD AUTO FINANCE   SUZIE H NA | 813.82 |
|          | ACH DEBIT   WEB PAY    0001102065723 | |
| 07/01/19 | ON DECK CAPITAL   TOBO CONSTRUCTION, INC | 1,983.33 |
|          | ACH DEBIT   37388736    37388736 | |
| 07/01/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
|          | ACH DEBIT   PREAUTHPMT RETAIL | |
| 07/01/19 | TESLA 8           TOBO CONSTRUCTION INC | 2,519.58 |
|          | ACH DEBIT   WEB PYMNT   81930974 | |
| 07/02/19 | INET XFER 07-02   TO XXXXXXX3383 | 1,785.45 |
| 07/02/19 | LEASE DIRECT      Tobo Construction Inc. | 650.12 |
|          | ACH DEBIT   WEB PAY    63913277 | |
| 07/02/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
|          | ACH DEBIT   PREAUTHPMT RETAIL | |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                       Page    2

Account        ▮0876

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 07/03/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/05/19 | INET XFER 07-05  TO XXXXXXX3383 | 15,500.00 |
| 07/05/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC<br>ACH DEBIT  Policy Pmt AD20648228 | 281.75 |
| 07/05/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/08/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  37567227   37567227 | 1,983.33 |
| 07/08/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/09/19 | WOOSTER PRODUCTS TOBO CONST<br>ACH DEBIT  CORP COLL  1905004 | 1,222.92 |
| 07/09/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/10/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/11/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/11/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 2,475.71 |
| 07/12/19 | INET XFER 07-12  TO XXXXXXX3383 | 19,000.00 |
| 07/12/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/15/19 | Wire In Fee | 10.00 |
| 07/15/19 | INET XFER 07-15  TO XXXXXXX3383 | 7,000.00 |
| 07/15/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 385568613 | 822.83 |
| 07/15/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  37739936   37739936 | 1,983.33 |
| 07/15/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/15/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT CKF023924106POS | 3,000.00 |
| 07/16/19 | INET XFER 07-16  TO XXXXXXX3383 | 6,000.00 |
| 07/16/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 408900165 | 419.87 |
| 07/16/19 | GF            TOBO CONSTRUCTION<br>ACH DEBIT  Genesis Fi 1713811166 | 786.17 |
| 07/16/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 07/16/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page     3

Account          ■■■0876

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 07/17/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/17/19 | HOME DEPOT      TOBO CONSTRUCTION INC.<br>ACH DEBIT   ONLINE PMT 163015742964932 | 2,186.86 |
| 07/17/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/17/19 | HOME DEPOT COMM  TOBO CONSTRUCTION INC<br>ACH DEBIT   ONLINE PMT 133015744704124 | 4,099.55 |
| 07/17/19 | WELLS FARGO BANK TOBO CONSTRUCTION<br>ACH DEBIT   LOANLEASE   000000005149535 | 6,257.23 |
| 07/18/19 | INET XFER 07-18  TO XXXXXXX3383 | 500.00 |
| 07/18/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/18/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/18/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT   ONLINE PMT 919839910315999 | 5,000.00 |
| 07/19/19 | INET XFER 07-19  TO XXXXXXX3383 | 900.00 |
| 07/19/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT   ONLINE PMT 919939910320943 | 2,000.00 |
| 07/19/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/19/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/19/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT   ONLINE PMT CKF023924106POS | 5,000.00 |
| 07/22/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT   37911335   37911335 | 1,983.33 |
| 07/22/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/22/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/22/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 1,415.06 |
| 07/23/19 | INET XFER 07-23  TO XXXXXXX3383 | 7,800.00 |
| 07/23/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/23/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/24/19 | INET XFER 07-24  TO XXXXXXX3383 | 3,300.00 |
| 07/24/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT   ONLINE PMT 920439910345704 | 1,000.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    4

                                                 Account    ▅0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 07/24/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/24/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/25/19 | Wire In Fee | 10.00 |
| 07/25/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/25/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/26/19 | INET XFER 07-26  TO XXXXXXX3383 | 22,000.00 |
| 07/26/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003153661 | 1,087.50 |
| 07/26/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/26/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/29/19 | INET XFER 07-29  TO XXXXXXX3383 | 10,450.00 |
| 07/29/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003159533 | 1,087.50 |
| 07/29/19 | ON DECK CAPITAL   TOBO CONSTRUCTION, INC<br>ACH DEBIT   38082508   38082508 | 1,983.33 |
| 07/29/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/29/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/29/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT   ONLINE PMT CKF023924106POS | 4,000.00 |
| 07/30/19 | INET XFER 07-30  TO XXXXXXX4960 | 26,221.33 |
| 07/30/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003165352 | 1,087.50 |
| 07/30/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 07/30/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 07/31/19 | INET XFER 07-31  TO XXXXXXX3383 | 5,000.00 |
| 07/31/19 | WFEF MDF        Tobo Construction Inc.<br>ACH DEBIT   WEB PAY   603-0182554-000 | 427.06 |
| 07/31/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003171164 | 1,087.50 |
| 07/31/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page      5

                                            Account        ■■■0876

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 07/31/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |
| 07/31/19 | IPFS866-412-1821 TOBO CONSTRUCTION INC. ACH DEBIT   IPFSPMTCAL 388862 | 8,146.87 |
| 07/31/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC ACH DEBIT   ONLINE PMT CKF023924106POS | 9,974.39 |

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755012 | 30,000.00 | 07/02/19 | 755134 | 1,000.00 | 07/17/19 |
| 755070 | 7,205.68 | 07/03/19* | 755135 | 500.00 | 07/19/19 |
| 755090 | 20,000.00 | 07/01/19* | 755136 | 800.00 | 07/15/19 |
| 755097 | 10,416.35 | 07/03/19* | 755137 | 2,808.61 | 07/18/19 |
| 755099 | 20,000.00 | 07/12/19* | 755138 | 75.38 | 07/17/19 |
| 755100 | 20,000.00 | 07/12/19 | 755139 | 3,750.00 | 07/17/19 |
| 755102 | 500.00 | 07/02/19* | 755140 | 2,059.00 | 07/17/19 |
| 755103 | 3,888.00 | 07/03/19 | 755141 | 106,286.51 | 07/16/19 |
| 755104 | 575.00 | 07/22/19 | 755143 | 5,000.00 | 07/12/19* |
| 755106 | 500.00 | 07/05/19* | 755144 | 20,000.00 | 07/31/19 |
| 755107 | 3,750.00 | 07/01/19 | 755145 | 20,000.00 | 07/16/19 |
| 755109 | 15,000.00 | 07/03/19* | 755146 | 5,000.00 | 07/16/19 |
| 755110 | 2,102.56 | 07/02/19 | 755147 | 15,000.00 | 07/18/19 |
| 755111 | 300.00 | 07/11/19 | 755148 | 183.90 | 07/19/19 |
| 755113 | 7,134.90 | 07/09/19* | 755149 | 10,000.00 | 07/16/19 |
| 755115 | 5,000.00 | 07/01/19* | 755150 | 218.38 | 07/16/19 |
| 755116 | 5,000.00 | 07/01/19 | 755151 | 2,811.19 | 07/17/19 |
| 755117 | 5,000.00 | 07/05/19 | 755155 | 6,076.45 | 07/23/19* |
| 755118 | 3,796.00 | 07/02/19 | 755156 | 102,320.07 | 07/19/19 |
| 755119 | 10,350.00 | 07/05/19 | 755157 | 2,096.00 | 07/18/19 |
| 755121 | 3,020.00 | 07/12/19* | 755158 | 12,000.00 | 07/18/19 |
| 755122 | 100.00 | 07/12/19 | 755159 | 8,000.00 | 07/23/19 |
| 755123 | 14,283.74 | 07/11/19 | 755160 | 10,000.00 | 07/22/19 |
| 755124 | 5,066.85 | 07/08/19 | 755161 | 5,682.57 | 07/23/19 |
| 755126 | 20,000.00 | 07/12/19* | 755162 | 20,863.85 | 07/26/19 |
| 755127 | 20,000.00 | 07/18/19 | 755164 | 5,011.81 | 07/25/19* |
| 755130 | 48,050.00 | 07/12/19* | 755165 | 11,245.56 | 07/29/19 |
| 755131 | 5,000.00 | 07/12/19 | 755166 | 10,000.00 | 07/23/19 |
| 755132 | 1,000.00 | 07/17/19 | 755167 | 8,000.00 | 07/23/19 |
| 755133 | 4,499.95 | 07/22/19 | 755172 | 22,000.00 | 07/29/19* |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page     6

                                              Account      ▮0876

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755173 | 8,000.00 | 07/29/19 | 755181 | 50,000.00 | 07/31/19* |
| 755176 | 7,619.76 | 07/29/19* | 755184 | 15,000.00 | 07/31/19* |
| 755177 | 97.60 | 07/30/19 | 755187 | 11,261.79 | 07/31/19* |
| 755178 | 5,000.00 | 07/30/19 | 755190 | 2,144.40 | 07/31/19* |
| 755179 | 523.57 | 07/31/19 | 755196 | 77.18 | 07/31/19* |

*   Indicates Break In Sequence

Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 07/01/2019 | 117,761.44 | 07/17/2019 | 311,756.50 |
| 07/02/2019 | 76,766.80 | 07/18/2019 | 249,798.38 |
| 07/03/2019 | 38,096.26 | 07/19/2019 | 134,340.90 |
| 07/05/2019 | 4,304.00 | 07/22/2019 | 111,314.05 |
| 07/08/2019 | 10,093.31 | 07/23/2019 | 61,201.52 |
| 07/09/2019 | 4,074.98 | 07/24/2019 | 52,348.01 |
| 07/10/2019 | 1,914.47 | 07/25/2019 | 131,032.69 |
| 07/11/2019 | 408,719.84 | 07/26/2019 | 82,527.83 |
| 07/12/2019 | 266,389.33 | 07/29/2019 | 11,588.17 |
| 07/15/2019 | 492,813.66 | 07/30/2019 | 600,757.81 |
| 07/16/2019 | 339,549.22 | 07/31/2019 | 472,561.54 |

 **PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

```
TOBO CONSTRUCTION, INC.                                    Page      1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505
```

---

```
BUSINESS REGULAR CHECKING                    Account No        ███0876
                                          Statement Date    08/30/2019
                                     Last Statement Date    07/31/2019

  92                        Statement Period

Previous Balance           472,561.54    # Of Days-Stmt Period        30
  6 Deposits/Credits     1,118,472.21
202 Checks/Withdrawals   1,453,078.64    Average Balance      318,181.06
Ending Balance             137,955.11
Total Srv Chg Today             0.00     YTD Interest               0.00
```

---

### Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 08/05/19 | REGULAR DEPOSIT | 204,188.13 |
| 08/06/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 472,261.25 |
| 08/12/19 | INET XFER 08-12   FROM XXXXXXX3383 | 15,216.02 |
| 08/16/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 79,068.03 |
| 08/21/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 227,088.79 |
| 08/28/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC<br>ACH CREDIT UCLA DISBM 143914001 | 120,649.99 |

---

### Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/01/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003176986 | 1,087.50 |
| 08/01/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/01/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |
| 08/01/19 | SUNBELT RENTALS   Tobo<br>ACH DEBIT  E-Check   201907311358583 | 24,442.77 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION<br>ACH DEBIT   TAX       9250769 | 284.43 |
| 08/02/19 | TD AUTO FINANCE  SUZIE H NA<br>ACH DEBIT   WEB PAY   0001102065723 | 813.82 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                    Page      2

                                                  Account      ▓▓0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/02/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC. ACH DEBIT  EBF DEBIT  000000003182851 | 1,087.50 |
| 08/02/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/02/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC ACH DEBIT  KALAMATA  CD273398 | 2,393.00 |
| 08/02/19 | TESLA 8         TOBO CONSTRUCTION INC ACH DEBIT  WEB PYMNT  84621877 | 2,519.58 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250773 | 2,529.52 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250770 | 2,934.58 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250772 | 3,801.27 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250774 | 4,260.65 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250767 | 6,999.35 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250771 | 8,008.67 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9250768 | 8,595.75 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9251029 | 8,840.09 |
| 08/02/19 | LACOUNTY TTC PAY TOBO CONSTRUCTION ACH DEBIT  TAX  9251025 | 10,924.14 |
| 08/05/19 | INET XFER 08-05  TO XXXXXXX3383 | 12,000.00 |
| 08/05/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC ACH DEBIT  Policy Pmt AD20648228 | 281.75 |
| 08/05/19 | LEASE DIRECT     Tobo Construction Inc. ACH DEBIT  WEB PAY  64274036 | 650.12 |
| 08/05/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC. ACH DEBIT  EBF DEBIT  000000003188726 | 1,087.50 |
| 08/05/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC ACH DEBIT  38268558  38268558 | 1,983.33 |
| 08/05/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/05/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC ACH DEBIT  KALAMATA  CD273398 | 2,393.00 |
| 08/05/19 | CAPITAL ONE      OH MONICA ACH DEBIT  ONLINE PMT 921439910736383 | 3,500.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page     3

                                              Account      ■■■■0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/06/19 | INET XFER 08-06  TO XXXXXXX3383 | 18,027.50 |
| 08/06/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003194567 | 1,087.50 |
| 08/06/19 | CAPITAL ONE    OH MONICA<br>ACH DEBIT  ONLINE PMT 921739910651875 | 2,000.00 |
| 08/06/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/06/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |
| 08/07/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT  BILL PAYMT 385568613 | 1,030.05 |
| 08/07/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003200441 | 1,087.50 |
| 08/07/19 | HOME DEPOT      TOBO CONSTRUCTION INC.<br>ACH DEBIT  ONLINE PMT 143033946092422 | 1,154.53 |
| 08/07/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/07/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |
| 08/07/19 | HOME DEPOT COMM  TOBO CONSTRUCTION INC<br>ACH DEBIT  ONLINE PMT 113033943243792 | 4,335.74 |
| 08/07/19 | CAPITAL ONE    OH MONICA<br>ACH DEBIT  ONLINE PMT 921839910147513 | 20,000.00 |
| 08/08/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003206290 | 1,087.50 |
| 08/08/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/08/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |
| 08/09/19 | INET XFER 08-09  TO XXXXXXX3383 | 15,216.02 |
| 08/09/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003212165 | 1,087.50 |
| 08/09/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/09/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA   CD273398 | 2,393.00 |
| 08/12/19 | INET XFER 08-12  TO XXXXXXX3383 | 15,216.02 |
| 08/12/19 | INET XFER 08-12  TO XXXXXXX3383 | 38,720.00 |
| 08/12/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003218160 | 1,087.50 |
| 08/12/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  38439952   38439952 | 1,983.33 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    4

Account          ■0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/12/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/12/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 08/13/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT   BILL PAYMT 408900165 | 469.58 |
| 08/13/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003224145 | 1,087.50 |
| 08/13/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/13/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 08/13/19 | SUNBELT RENTALS   Tobo Construction<br>ACH DEBIT   E-Check   201908121653306 | 17,273.67 |
| 08/14/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003230373 | 1,087.50 |
| 08/14/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/14/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 08/15/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003236080 | 1,087.50 |
| 08/15/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/15/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 08/16/19 | GF              TOBO CONSTRUCTION<br>ACH DEBIT   Genesis Fi 1713811166 | 786.17 |
| 08/16/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003242109 | 1,087.50 |
| 08/16/19 | ROBERTSON'S      TOBO CONST. INC.<br>ACH DEBIT   CASH CONC   02130 | 1,570.15 |
| 08/16/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/16/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 08/19/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003248198 | 1,087.50 |
| 08/19/19 | ON DECK CAPITAL   TOBO CONSTRUCTION, INC<br>ACH DEBIT   38610814   38610814 | 1,983.33 |
| 08/19/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                          Page    5

Account        ████0876

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/19/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA    CD273398 | 2,393.00 |
| 08/20/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003254529 | 1,087.50 |
| 08/20/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/20/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA    CD273398 | 2,393.00 |
| 08/21/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003260342 | 1,087.50 |
| 08/21/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/21/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA    CD273398 | 2,393.00 |
| 08/21/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 923239910275734 | 10,000.00 |
| 08/22/19 | WFEF MDF        Tobo Construction Inc.<br>ACH DEBIT  WEB PAY      603-0182554-000 | 485.06 |
| 08/22/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003266415 | 1,087.50 |
| 08/22/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/22/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA    CD273398 | 2,393.00 |
| 08/23/19 | QUILL CORPORATIO TOBO CONSTRUCTION INC.<br>ACH DEBIT  BT0822    00000008767954 | 169.23 |
| 08/23/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003272529 | 1,087.50 |
| 08/23/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT  PREAUTHPMT RETAIL | 2,160.51 |
| 08/23/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT  KALAMATA    CD273398 | 2,393.00 |
| 08/23/19 | IPFS866-412-1821 TOBO CONSTRUCTION INC.<br>ACH DEBIT  IPFSPMTCAL 388862 | 7,759.16 |
| 08/23/19 | CAPITAL ONE      OH MONICA<br>ACH DEBIT  ONLINE PMT 923439910137445 | 10,000.00 |
| 08/26/19 | INET XFER 08-26  TO XXXXXXXX3383 | 5,652.30 |
| 08/26/19 | INET XFER 08-26  TO XXXXXXXX3383 | 10,658.01 |
| 08/26/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT  EBF DEBIT  000000003278689 | 1,087.50 |
| 08/26/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT  38781513    38781513 | 1,983.33 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.

Page    6

Account    ██0876

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 08/26/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/26/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |
| 08/27/19 | INET XFER 08-27  TO XXXXXXX3383 | 11,523.77 |
| 08/27/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003284844 | 1,087.50 |
| 08/27/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/27/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |
| 08/28/19 | INET XFER 08-28  TO XXXXXXX3383 | 9,635.00 |
| 08/28/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003290980 | 1,087.50 |
| 08/28/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/28/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |
| 08/29/19 | INET XFER 08-29  TO XXXXXXX4960 | 26,312.02 |
| 08/29/19 | SO CAL GAS        301601474126743483<br>ACH DEBIT   PAID SCGC   0239049456 | 21.27 |
| 08/29/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003297093 | 1,087.50 |
| 08/29/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/29/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |
| 08/30/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT   000000003303225 | 1,087.50 |
| 08/30/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 08/30/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA    CD273398 | 2,393.00 |

---

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 55182 | 20,000.00 | 08/06/19 | 755170 | 644.96 | 08/09/19* |
| 755125 | 30,892.63 | 08/05/19* | 755174 | 14,420.00 | 08/02/19* |
| 755154 | 20,000.00 | 08/01/19* | 755180 | 500.00 | 08/06/19* |

**In re Monica Oh and Jimi Chae (2:20-bk-11376)**
**Document Production re: Credibly 2004 Examination 022**

 **PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page      7

                                              Account      ████0876

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|---|---|---|---|---|---|
| 755183 | 4,250.00 | 08/05/19* | 755236 | 5,000.00 | 08/09/19 |
| 755185 | 4,565.00 | 08/06/19* | 755237 | 5,000.00 | 08/12/19 |
| 755186 | 7,134.90 | 08/13/19 | 755238 | 2,765.31 | 08/15/19 |
| 755188 | 2,250.00 | 08/01/19* | 755239 | 10,000.00 | 08/15/19 |
| 755189 | 6,811.97 | 08/07/19 | 755240 | 5,130.00 | 08/19/19 |
| 755192 | 31,724.06 | 08/05/19* | 755241 | 5,000.00 | 08/21/19 |
| 755193 | 23,760.00 | 08/06/19 | 755242 | 5,000.00 | 08/20/19 |
| 755194 | 3,888.00 | 08/02/19 | 755243 | 5,000.00 | 08/15/19 |
| 755195 | 3,750.00 | 08/01/19 | 755244 | 5,000.00 | 08/16/19 |
| 755197 | 10,000.00 | 08/05/19* | 755245 | 5,000.00 | 08/13/19 |
| 755199 | 2,335.47 | 08/01/19* | 755246 | 5,000.00 | 08/14/19 |
| 755200 | 20,000.00 | 08/13/19 | 755248 | 11,000.00 | 08/13/19* |
| 755201 | 3,796.00 | 08/01/19 | 755250 | 50,000.00 | 08/15/19* |
| 755202 | 120.00 | 08/27/19 | 755251 | 13,475.33 | 08/20/19 |
| 755203 | 100.00 | 08/09/19 | 755252 | 46,000.00 | 08/14/19 |
| 755204 | 14,283.74 | 08/01/19 | 755253 | 3,750.00 | 08/19/19 |
| 755205 | 1,300.00 | 08/06/19 | 755254 | 1,000.00 | 08/19/19 |
| 755206 | 5,066.85 | 08/06/19 | 755255 | 1,101.85 | 08/27/19 |
| 755207 | 10,350.00 | 08/06/19 | 755256 | 4,406.50 | 08/19/19 |
| 755208 | 9,900.00 | 08/22/19 | 755257 | 1,094.35 | 08/21/19 |
| 755209 | 380.95 | 08/05/19 | 755258 | 1,998.96 | 08/19/19 |
| 755210 | 1,408.00 | 08/20/19 | 755259 | 1,198.56 | 08/19/19 |
| 755211 | 5,265.11 | 08/07/19 | 755260 | 800.00 | 08/16/19 |
| 755212 | 576.61 | 08/09/19 | 755261 | 4,000.00 | 08/19/19 |
| 755213 | 5,000.00 | 08/06/19 | 755262 | 6,800.00 | 08/16/19 |
| 755215 | 8,082.00 | 08/06/19* | 755263 | 6,800.00 | 08/19/19 |
| 755216 | 63,254.42 | 08/06/19 | 755264 | 5,036.35 | 08/21/19 |
| 755217 | 11,980.00 | 08/12/19 | 755265 | 1,789.75 | 08/20/19 |
| 755218 | 25,000.00 | 08/12/19 | 755267 | 20,000.00 | 08/28/19* |
| 755219 | 30,000.00 | 08/19/19 | 755268 | 20,000.00 | 08/16/19 |
| 755222 | 5,985.00 | 08/13/19* | 755269 | 3,041.06 | 08/26/19 |
| 755223 | 800.00 | 08/12/19 | 755270 | 10,000.00 | 08/19/19 |
| 755224 | 3,120.00 | 08/13/19 | 755271 | 7,474.95 | 08/26/19 |
| 755225 | 5,400.00 | 08/12/19 | 755272 | 6,000.00 | 08/26/19 |
| 755227 | 31,787.93 | 08/12/19* | 755273 | 4,000.00 | 08/22/19 |
| 755229 | 500.00 | 08/14/19* | 755275 | 2,242.00 | 08/28/19* |
| 755230 | 13,383.21 | 08/13/19 | 755276 | 4,464.00 | 08/26/19 |
| 755231 | 1,913.55 | 08/13/19 | 755277 | 5,500.00 | 08/26/19 |
| 755232 | 4,576.81 | 08/13/19 | 755279 | 1,970.22 | 08/28/19* |
| 755233 | 23,345.00 | 08/13/19 | 755280 | 12,500.00 | 08/28/19 |
| 755234 | 100,700.00 | 08/09/19 | 755281 | 5,000.00 | 08/28/19 |
| 755235 | 5,000.00 | 08/09/19 | 755282 | 52,000.00 | 08/28/19 |

# PACIFIC CITY BANK

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                         Page      8

                                                    Account        ███0876

---

Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755285 | 20,000.00 | 08/30/19* | | | |

*   Indicates Break In Sequence

---

Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 08/01/2019 | 396,062.55 | 08/16/2019 | 199,210.79 |
| 08/02/2019 | 311,601.69 | 08/19/2019 | 123,302.43 |
| 08/05/2019 | 414,485.97 | 08/20/2019 | 95,988.34 |
| 08/06/2019 | 719,200.44 | 08/21/2019 | 296,305.42 |
| 08/07/2019 | 674,962.03 | 08/22/2019 | 276,279.35 |
| 08/08/2019 | 669,321.02 | 08/23/2019 | 252,709.95 |
| 08/09/2019 | 536,442.42 | 08/26/2019 | 202,295.29 |
| 08/12/2019 | 410,130.15 | 08/27/2019 | 183,908.66 |
| 08/13/2019 | 291,287.42 | 08/28/2019 | 195,570.42 |
| 08/14/2019 | 234,146.41 | 08/29/2019 | 163,596.12 |
| 08/15/2019 | 160,740.09 | 08/30/2019 | 137,955.11 |

---



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page      1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

---

BUSINESS REGULAR CHECKING                    Account No         ■■0876
                                             Statement Date   09/30/2019
                                        Last Statement Date   08/30/2019

   43                        Statement Period

Previous Balance            137,955.11   # Of Days-Stmt Period          31
  4 Deposits/Credits        437,811.37
103 Checks/Withdrawals      569,040.82   Average Balance         53,715.91
Ending Balance                6,725.66
Total Srv Chg Today               0.00   YTD Interest                 0.00

---

Deposits

| Date     | Description                                             | Amount     |
|----------|---------------------------------------------------------|------------|
| 09/09/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC                  | 170,838.19 |
|          | ACH CREDIT UCLA DISBM 143914001                         |            |
| 09/10/19 | REGULAR DEPOSIT                                          | 11,903.65  |
| 09/13/19 | REGULAR DEPOSIT                                          | 15,000.00  |
| 09/23/19 | UC LOS ANGELES    TOBO CONSTRUCTION INC                  | 240,069.53 |
|          | ACH CREDIT UCLA DISBM 143914001                         |            |

Withdrawals

| Date     | Description                                             | Amount   |
|----------|---------------------------------------------------------|----------|
| 09/03/19 | LEASE DIRECT     Tobo Construction Inc.                 | 624.15   |
|          | ACH DEBIT  WEB PAY   64632821                           |          |
| 09/03/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.                 | 1,087.50 |
|          | ACH DEBIT  EBF DEBIT  000000003311798                   |          |
| 09/03/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.                 | 1,087.50 |
|          | ACH DEBIT  EBF DEBIT  000000003311799                   |          |
| 09/03/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC                 | 1,983.33 |
|          | ACH DEBIT  38952538   38952538                          |          |
| 09/03/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC                  | 2,160.51 |
|          | ACH DEBIT  PREAUTHPMT RETAIL                            |          |
| 09/03/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC                  | 2,393.00 |
|          | ACH DEBIT  KALAMATA  CD273398                           |          |
| 09/03/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC                  | 2,393.00 |
|          | ACH DEBIT  KALAMATA  CD273398                           |          |
| 09/04/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.                 | 1,087.50 |
|          | ACH DEBIT  EBF DEBIT  000000003319878                   |          |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    2

                                               Account      ███0876

_____

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 09/04/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 09/04/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 09/04/19 | TESLA 8          TOBO CONSTRUCTION INC<br>ACH DEBIT   WEB PYMNT   86939996 | 2,519.58 |
| 09/04/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXXX3383 | 1,941.32 |
| 09/05/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC<br>ACH DEBIT   Policy Pmt AD20648228 | 281.75 |
| 09/05/19 | TD AUTO FINANCE   SUZIE H NA<br>ACH DEBIT   WEB PAY    0001102065723 | 813.82 |
| 09/05/19 | SO CAL EDISON CO Tobo Construction Inc<br>ACH DEBIT   BILL PAYMT 385568613 | 1,067.99 |
| 09/05/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT  000000003326021 | 1,087.50 |
| 09/05/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC<br>ACH DEBIT   ONLINE PMT CKF023924106POS | 2,000.00 |
| 09/05/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 09/05/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 09/06/19 | INET XFER 09-06  TO XXXXXXXX3383 | 8,058.68 |
| 09/06/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT  000000003331372 | 1,087.50 |
| 09/06/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 09/06/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 09/09/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT  000000003337581 | 1,087.50 |
| 09/09/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC<br>ACH DEBIT   39131639   39131639 | 1,983.33 |
| 09/09/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 09/09/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |
| 09/10/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC.<br>ACH DEBIT   EBF DEBIT  000000003343773 | 1,087.50 |
| 09/10/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC<br>ACH DEBIT   PREAUTHPMT RETAIL | 2,160.51 |
| 09/10/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC<br>ACH DEBIT   KALAMATA   CD273398 | 2,393.00 |

 **PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                         Page      3

                                                        Account        ████0876

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 09/10/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 5,944.12 |
| 09/11/19 | INET XFER 09-11  TO XXXXXXX3383 | 3,205.88 |
| 09/11/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC. | 1,087.50 |
| | ACH DEBIT  EBF DEBIT  000000003349917 | |
| 09/11/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
| | ACH DEBIT  PREAUTHPMT RETAIL | |
| 09/11/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC | 2,393.00 |
| | ACH DEBIT  KALAMATA   CD273398 | |
| 09/12/19 | SO CAL EDISON CO Tobo Construction Inc | 497.03 |
| | ACH DEBIT  BILL PAYMT 408900165 | |
| 09/12/19 | EBF PARTNERS LLC TOBO CONSTRUCTION INC. | 1,087.50 |
| | ACH DEBIT  EBF DEBIT  000000003356029 | |
| 09/12/19 | RETAIL CAPITAL L TOBO CONSTRUCTION INC | 2,160.51 |
| | ACH DEBIT  PREAUTHPMT RETAIL | |
| 09/12/19 | KALAMATA CAPITAL TOBO CONSTRUCTION INC | 2,393.00 |
| | ACH DEBIT  KALAMATA   CD273398 | |
| 09/12/19 | BK OF AMER VI/MC *TOBO CONSTRUCTION INC | 3,000.00 |
| | ACH DEBIT  ONLINE PMT CKF023924106POS | |
| 09/13/19 | STOP PAYMENT CHARGE | 30.00 |
| 09/13/19 | STOP PAYMENT CHARGE | 30.00 |
| 09/13/19 | STOP PAYMENT CHARGE | 30.00 |
| 09/13/19 | STOP PAYMENT CHARGE | 30.00 |
| 09/13/19 | CAPITAL ONE    OH MONICA | 1,000.00 |
| | ACH DEBIT  ONLINE PMT 925539910172356 | |
| 09/17/19 | INET XFER 09-17  TO XXXXXXX3383 | 2,130.00 |
| 09/17/19 | INET XFER 09-17  TO XXXXXXX3383 | 10,630.00 |
| 09/18/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 216.68 |
| 09/19/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 3,449.50 |
| 09/20/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC | 25.00 |
| | ACH DEBIT  39451226    39451226 | |
| 09/23/19 | OUTGOING WIRE FEE | 25.00 |
| 09/23/19 | INET XFER 09-23  TO XXXXXXX3383 | 4,100.00 |
| 09/23/19 | INET XFER 09-23  TO XXXXXXX3383 | 4,813.82 |
| 09/23/19 | INET XFER 09-23  TO XXXXXXX3383 | 6,967.63 |
| 09/23/19 | INET XFER 09-23  TO XXXXXXX3383 | 7,750.00 |
| 09/23/19 | INET XFER 09-23  TO XXXXXXX3383 | 12,384.08 |
| 09/23/19 | OUTGOING WIRE TRANSFER | 200,000.00 |
| 09/25/19 | TD AUTO FINANCE  SUZIE H NA | 8,138.20 |
| | ACH DEBIT  WEB PAY    0001102065723 | |
| 09/26/19 | ON DECK CAPITAL  TOBO CONSTRUCTION, INC | 10.00 |
| | ACH DEBIT  39595701    39595701 | |
| 09/27/19 | STOP PAYMENT CHARGE | 30.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                    Page    4

                                                    Account     █0876

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 09/27/19 | STATE COMP INS F TOBO CONSTRUCTION<br>ACH DEBIT   8887828338  2K0CRW3TGYZFA9C | 1,336.50 |
| 09/30/19 | TIME WARNER CABL TOBO CONSTRUCTION,*<br>ACH DEBIT   TWC EFTPMT 0011494215  SPA | 654.91 |

## Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755191 | 814.55 | 09/03/19 | 755308 | 118.39 | 09/05/19 |
| 755228 | 10,000.00 | 09/03/19* | 755309 | 83.71 | 09/05/19 |
| 755249 | 20,000.00 | 09/03/19* | 755310 | 312.90 | 09/05/19 |
| 755283 | 3,750.00 | 09/03/19* | 755312 | 25,000.00 | 09/10/19* |
| 755287 | 800.00 | 09/05/19* | 755314 | 1,000.00 | 09/16/19* |
| 755288 | 2,034.00 | 09/04/19 | 755315 | 500.00 | 09/18/19 |
| 755289 | 7,134.90 | 09/11/19 | 755316 | 800.00 | 09/16/19 |
| 755291 | 3,796.00 | 09/03/19* | 755317 | 500.00 | 09/17/19 |
| 755292 | 10,971.00 | 09/03/19 | 755318 | 3,750.00 | 09/20/19 |
| 755295 | 120.00 | 09/06/19* | 755319 | 35,000.00 | 09/11/19 |
| 755296 | 100.00 | 09/09/19 | 755320 | 30,000.00 | 09/10/19 |
| 755297 | 14,283.74 | 09/03/19 | 755321 | 1,272.52 | 09/17/19 |
| 755298 | 1,300.00 | 09/03/19 | 755322 | 431.24 | 09/18/19 |
| 755299 | 5,066.85 | 09/04/19 | 755323 | 5,000.00 | 09/25/19 |
| 755301 | 212.62 | 09/05/19* | 755324 | 5,000.00 | 09/13/19 |
| 755302 | 578.87 | 09/03/19 | 755325 | 13,000.00 | 09/16/19 |
| 755303 | 205.61 | 09/05/19 | 755326 | 3,800.60 | 09/24/19 |
| 755304 | 249.15 | 09/05/19 | 755328 | 5,652.34 | 09/18/19* |
| 755305 | 22.48 | 09/05/19 | 755329 | 3,500.00 | 09/19/19 |
| 755306 | 255.82 | 09/05/19 | 755332 | 6,000.00 | 09/30/19* |
| 755307 | 312.65 | 09/05/19 | | | |

*  Indicates Break In Sequence

## Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 09/03/2019 | 60,731.96 | 09/05/2019 | 31,151.30 |
| 09/04/2019 | 43,529.20 | 09/06/2019 | 17,331.61 |



3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                              Page      5

                                          Account      ████0876

_____

Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 09/09/2019 | 180,445.46 | 09/19/2019 | 31,441.87 |
| 09/10/2019 | 125,763.98 | 09/20/2019 | 27,666.87 |
| 09/11/2019 | 74,782.19 | 09/23/2019 | 31,695.87 |
| 09/12/2019 | 65,644.15 | 09/24/2019 | 27,895.27 |
| 09/13/2019 | 74,524.15 | 09/25/2019 | 14,757.07 |
| 09/16/2019 | 59,724.15 | 09/26/2019 | 14,747.07 |
| 09/17/2019 | 45,191.63 | 09/27/2019 | 13,380.57 |
| 09/18/2019 | 38,391.37 | 09/30/2019 | 6,725.66 |

_____

 **PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                          Page      1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

---

BUSINESS REGULAR CHECKING                    Account No        ████0876
                                             Statement Date    10/31/2019
                                             Last Statement Date 09/30/2019

     2                     Statement Period

Previous Balance            6,725.66   # Of Days-Stmt Period          31
  6 Deposits/Credits      191,466.85
 14 Checks/withdrawals    198,292.47   Average Balance          3,209.08
Ending Balance                99.96-
Total Srv Chg Today            10.00   YTD Interest                  0.00

---

Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 10/02/19 | REGULAR DEPOSIT | 11,000.00 |
| 10/09/19 | RETURN CHECK 755330 | 160,000.00 |
|          | INSUFFICIENT FUNDS | |
| 10/15/19 | INET XFER 10-15   FROM XXXXXXXX3383 | 18,406.85 |
| 10/17/19 | SUPREME RECOVERY TOBO CONSTRUCTI3165983 | 1,000.00 |
|          | RETURN ACH INSUFFICIENT FUNDS | |
| 10/18/19 | REVERSE NSF FEE W/O 10/17 & 10/18/19 | 60.00 |
| 10/18/19 | SUPREME RECOVERY TOBO CONSTRUCTI3171880 | 1,000.00 |
|          | RETURN ACH INSUFFICIENT FUNDS | |

---

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/04/19 | INET XFER 10-04  TO XXXXXXX3383 | 11,780.00 |
| 10/07/19 | VOYA RELIASTR415 TOBO CONSTRUCTION INC | 281.75 |
|          | ACH DEBIT  Policy Pmt AD20648228 | |
| 10/09/19 | NSF RETURNED CHARGE | 30.00 |
| 10/15/19 | SUPREME RECOVERY TOBO CONSTRUCTI3159342 | 1,000.00 |
|          | ACH DEBIT  KCG      3EY6RS-065021 | |
| 10/15/19 | TRANSFERRED TO DEPOSIT ACCT XXXXXXX3383 | 40.76 |
| 10/16/19 | SUPREME RECOVERY TOBO CONSTRUCTI3165983 | 1,000.00 |
|          | ACH DEBIT  KCG      3K2NRS-065021#2 | |
| 10/17/19 | NSF RETURNED CHARGE | 30.00 |
| 10/17/19 | SUPREME RECOVERY TOBO CONSTRUCTI3171880 | 1,000.00 |
|          | ACH DEBIT  KCG      3OMGRS-065021#3 | |
| 10/18/19 | NSF RETURNED CHARGE | 30.00 |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

**ACCOUNT STATEMENT**

TOBO CONSTRUCTION, INC.                                        Page    2

                                                Account        ████0876

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/31/19 | OVERDRAFT INTEREST CHARGE | 89.96 |
| 10/31/19 | MAINTENANCE FEE | 8.00 |
| 10/31/19 | PER CHECK CHARGE | 2.00 |

## Checks

| Check No | Amount | Date | Check No | Amount | Date |
|----------|--------|------|----------|--------|------|
| 755330 | 160,000.00 | 10/08/19 | 755340 | 23,000.00 | 10/15/19* |

*  Indicates Break In Sequence

## Daily Balance Summary

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 10/02/2019 | 17,725.66 | 10/15/2019 | 0.00 |
| 10/04/2019 | 5,945.66 | 10/16/2019 | 1,000.00- |
| 10/07/2019 | 5,663.91 | 10/17/2019 | 1,030.00- |
| 10/08/2019 | 154,336.09- | 10/18/2019 | 0.00 |
| 10/09/2019 | 5,633.91 | 10/31/2019 | 99.96- |



**PACIFIC CITY BANK**

3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                    Page    1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

---

BUSINESS REGULAR CHECKING                      Account No      ██0876
                                            Statement Date    11/29/2019
                                       Last Statement Date    10/31/2019

        0                      Statement Period

Previous Balance              99.96-   # Of Days-Stmt Period           29
  4 Deposits/Credits         381.71
  3 Checks/withdrawals       289.92    Average Balance              0.00
Ending Balance                 8.17-
Total Srv Chg Today            8.00    YTD Interest                 0.00

---

Deposits

  Date       Description                                    Amount
  --------   ------------------------------             ---------------
  11/04/19   REVERSED CHECK CHARGE W/O 10/31/2019              2.00
  11/04/19   REVERSED MAINTENANCE FEE W/O 10/31/2019           8.00
  11/04/19   REVERSED OD INT CHARGE W/O 10/31/2019            89.96
  11/06/19   ACH CREDIT ONLINE PYMT VOYA RELIASTR           281.75

---

Withdrawals

  Date       Description                                    Amount
  --------   ------------------------------             ---------------
  11/06/19   VOYA RELIASTR415 TOBO CONSTRUCTION INC        281.75
             ACH DEBIT  Policy Pmt AD20648228
  11/29/19   OVERDRAFT INTEREST CHARGE                       0.17
  11/29/19   MAINTENANCE FEE                                 8.00

---

Daily Balance Summary

  Date              Amount      Date              Amount
  ----------   ---------------   ----------   ---------------
  11/04/2019          0.00      11/29/2019          8.17-
  11/06/2019          0.00

---



3701 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Tel: (213) 210-2000
www.paccitybank.com

## ACCOUNT STATEMENT

TOBO CONSTRUCTION, INC.                                           Page      1
2500 PACIFIC COAST HIGHWAY
TORRANCE CA 90505

BUSINESS REGULAR CHECKING                          Account No        ████0876
                                              Statement Date     12/31/2019
                                         Last Statement Date     11/29/2019

    0                          Statement Period

Previous Balance              8.17-   # Of Days-Stmt Period              32
   2 Deposits/Credits         8.17
   0 Checks/withdrawals       0.00    Average Balance                  0.00
Ending Balance                0.00
Total Srv Chg Today           0.00    YTD Interest                     0.00

Deposits

  Date      Description                                          Amount
  --------  ------------------------------                 ---------------
  12/02/19  REVERSE MAINTENANCE FEE ON 11/29/19                      8.00
  12/02/19  REVERSE OD INT FEE ON 11/29/19                           0.17

Daily Balance Summary

  Date           Amount          Date              Amount
  ----------  ---------------    ----------     ---------------
  12/02/2019         0.00

# EXHIBIT 4

**STATE OF CALIFORNIA**                                                          *Gavin Newsom*, Governor

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT
LEGAL SECTION
Jenifer J. Aikman, Staff Counsel
300 Oceangate, #850
Long Beach, CA 90802
Phone: (562) 590-5461
Fax: (562) 499-6438
Email: jaikman@dir.ca.gov

May 29, 2019                                             Legal File No.: LB7351

*VIA EMAIL ksiebald@dir.ca.gov*          *VIA EMAIL kromke@huntortmann.com*
Lead Hearing Officer c/o Karen Siebald   Emily A. Kromke
OFFICE OF THE DIRECTOR – LEGAL UNIT      Huntortmann, Attorneys at Law
Department of Industrial Relations       301 North Lake Avenue, 7th Floor
355 S. Grand Avenue, Suite 1800          Pasadena, CA  91101-5118
Los Angeles, CA 90071


RE:    DLSE Case No.:         40-54384-757
       ODL Case No.:          19-0226-PWH
       Project Name:          Horizon View Mental Health Rehabilitation Center
       Awarding Body:         County of Ventura – ESD Dept. L. 1670
       Prime Contractor:      Tobo Construction, Inc.

Dear Ms. Kromke:

     This letter is to inform you that I now represent the Division of Labor Standards Enforcement (hereafter "DLSE") with regard to the Civil Wage and Penalty Assessment ("CWPA") issued on March 26, 2019 in the above captioned matter.

     Pursuant to California Code of Regulations, Title 8, Section 17224, you may, <u>at your own expense</u>, either: 1) inspect and copy the file(s) yourself; or, 2) obtain copies of the file(s) through a commercial copying service equipped to remotely copy the file(s) at Long Beach office, located at 300 Oceangate, Suite 850, Long Beach CA 90802 during our normal business hours of 8:00AM to 5:00PM, Monday through Friday.

     If you would like to arrange to view and/or copy the investigative file, please contact Derrick E. Nguyen at (562) 983-1453 or by email at DENguyen@dir.ca.gov to schedule an appointment directly with them.

     After you have had the opportunity to review the documents contained in the DLSE's file, please contact me if you would like to discuss possible resolution of the issues raised in our claim.

Very truly yours,

*Jenifer J. Aikman*

Jenifer J. Aikman
Attorney for the Labor Commissioner

cc:  Derrick E. Nguyen (*via email only*)

> **EXHIBIT**
> **3**
> Monica Oh/Jimi Chae
> 4/27/2020
> Darla Kmety - CSR#12956

# EXHIBIT 5

<div align="center">**LABOR VIOLATIONS; DLSE**</div>

| DLSE Case No | ODL Case No | DIR/DLSE | Company | Project | Laborers | Amount | Status |
|---|---|---|---|---|---|---|---|
| 40-61231-757 | 19-0336-PWH | Jenifer Aikman<br>DIR, 300 Oceangate, Suite 850<br>Long Beach CA 90802<br>562-590-5461 | Tobo | RALO ?? | | | Investigation |
| 40-57020-218 | | Claudia Canas<br>DIR, PO Box, 32889<br>Long Beach CA 90832<br>562-983-1892 | Tobo | FS27 | | LD, $511,477.64<br>Penalty, $395,675.00<br>Penalty, $56,680.00<br>Total, $963,832.64 | Penalty Assessed |
| 40-54384-757 | 19-0226-PWH | Karen Siebald<br>DIR, 355 S Grand Ave, Suite 1800<br>Los Angeles CA 90071 | Tobo | Horizon View | | LD, $800,585.90<br>Penalty, $537,025.00<br>Total, $1,337,883.90 | Penalty Assessed |
| 40-54317-132 | 18-0406-PWH | Steven McGinty<br>DIR, 300 Oceangate, Suite 850<br>Long Beach CA 90802<br>562-590-5461 | Tobo | WBF, WBR | | | Investigation |
| 40-65066-132 | | Norbert Flores<br>DIR, 300 Oceangate, Suite 850<br>Long Beach CA 90802<br>562-590-5461 | Tobo | WBR | | | Investigation |
| 40-60881-132 | | | Tobo | SSC | Numerous | $           2,998,536.05 | Plus penalties |
| 40-54388-132 | | Claudia Canas<br>DIR, PO Box, 32889<br>Long Beach CA 90832<br>562-983-1892 | Tobo | RALO | | LD, $800,585.90<br>Penalty, $537,025.00<br>Total, $1,337,883.90 | Penalty Assessed |
| 40-66318-716 | | Claudia Canas<br>DIR, PO Box, 32889<br>Long Beach CA 90832<br>562-983-1892 | Mega Air-Tobo | SHL | | LD, $25,747.17<br>Penalty, $29,700.00<br>Penalty, $23,400.00<br>Total, $78,887.17 | Penalty Assessed |
| 40-64276-716 | | Claudia Canas<br>DIR, PO Box, 32889<br>Long Beach CA 90832<br>562-983-1892 | Mega Air-Tobo | WBR | | LD, $36,139.26<br>Penalty, $15,480.00<br>Penalty, $23,920.00<br>Total, $75,539.26 | Penalty Assessed |

EXHIBIT 4

Monica Oh /Jimi Chae
4/27/2020
Daria Kmety - CSR#12956

**In re Monica Oh and Jimi Chae (2:20-bk-11376)**
**Document Production re: Credibly 2004 Examination 527**

# EXHIBIT 6

1  STATE OF CALIFORNIA
   DEPARTMENT OF INDUSTRIAL RELATIONS
2  DIVISION OF LABOR STANDARDS ENFORCEMENT
   By: SOTIVEAR SIM, SBN 260379
3  300 Oceangate, Suite 850
   Long Beach, CA 90802
4  Telephone: (562) 590-5461
   Fax: (562) 499-6438
5
   Attorney for the DIVISION OF LABOR STANDARDS ENFORCEMENT
6

7

8                          **STATE OF CALIFORNIA**

9                  **DEPARTMENT OF INDUSTRIAL RELATIONS**

10

11 | In The Matter of the Civil Wage and Penalty | CASE NO.:  18-0406-PWH |
   | Assessment of: | |

12 | **Tobo Construction, Inc.** | DLSE Case No.: 40-54317-132 |

13 |                        Respondent. | **DLSE'S EXHIBIT LIST** |

14 | | Date:    February 19, 2020 |
   | | Time:    10:00 a.m. |
15 | | Hearing Officer: Steven A. McGinty |

16

17     In accordance with the Hearing Officer's Order Setting Hearing on the Merits in the above-

18 captioned matter, directing the parties to submit an Exhibit List prior to the first day of the

19 Hearing, the DLSE submits the following list of exhibits.

20 **No.    Exhibit Description**

21 1.    Civil Wage and Penalty Assessment dated October 5, 2018 in DLSE Case No. 40-

22 54317-132

23 2.    Public Works Audit Worksheet in DLSE Case No. 40-54317-132

24 3.    Penalty Review in DLSE Case No. 40-54317-132

25 4.    Employee Affidavits

26         a. Candelario A. Zamora

27         b. Cesar Bolanos Zomora

28

---

**EXHIBIT
5**

Monica Oh/Jimi Chae
4/27/2020

Darla Kmety - CSR#12956

---

**DIVISION OF LABOR STANDARDS ENFORCEMENT EXHIBIT LIST**

# EXHIBIT 7

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS

In the Matter of the Request for Review of:

**Tobo Construction, Inc.**

Case No.:  **18-0406-PWH**

From a Civil Wage and Penalty Assessment issued by:

**Division of Labor Standards Enforcement**

## ORDER DISMISSING REQUEST FOR REVIEW

Based on the form dated February 14, 2020, from the Requesting Party withdrawing the Request for Review, IT IS ORDERED that the Hearing on the Merits set for February 19, 2020 is VACATED and this matter is hereby DISMISSED.

Dated: February 14, 2020

_Steven A. McGinty, Hearing Officer_

EXHIBIT
6
Monica Oh/Jimi Chae
4/27/2020

Darla Kmety - CSR#12956

# EXHIBIT 8

Labor Commissioner, State of Califo
Department of Industrial Relations
Division of Labor Standards Enforcement
Bureau of Field Enforcement- Public Works
300 Oceangate, Suite 850
Long Beach, CA 90802
TEL:    562-983-1082          FAX: 562-499-6439

Gavin Newsom, Governor

TOBO Construction Inc
2500 Pacific Coast Highway
Torrance CA 90505
Monica Oh

DATE
May 16, 2019

In Reply Refer to Case No.
40-65066-132

**NOTICE OF INVESTIGATION**

| Project Name | |
|---|---|
| 10889 Wilshire Bldg External Affairs Tenant Refurbishment | |
| Prime Contractor | Project No |
| TOBO Construction Inc | 947272.01 |
| Subcontractor | |

You are hereby advised that the Division of Labor Standards Enforcement is commencing an investigation to confirm compliance with the Public Work Laws (California Labor Code, Division 2, Part 7) by the above-named contractor(s). After an investigation, if it is determined that wages and/or penalties are due, a Civil Wage and Penalty Assessment will be issued pursuant to Labor Code section 1741.

STATE LABOR COMMISSIONER

By _Norbert Flores_

Norbert Flores
Deputy Labor Commissioner II

PW  11  (Revised 1-2015)

| EXHIBIT |
|---|
| 7 |
| Monica Oh/Jimi Chae |
| 4/27/2020 |
| Darla Kmety - CSR#12956 |

Labor Commissioner, State of Califo.
Department of Industrial Relations
Division of Labor Standards Enforcement
Bureau of Field Enforcement- Public Works
300 Oceangate, Suite 850
Long Beach, CA 90802
TEL:   562-983-1082
                        FAX: 562-499-6439

Gavin Newsom, Governor

TOBO Construction Inc
2500 Pacific Coast Highway
Torrance CA 90505
Monica Oh

DATE
May 16, 2019

In Reply Refer to Case No.
40-65066-132

## NOTICE OF APPRENTICESHIP COMPLIANCE

| Project Name | Awarding Body | |
|---|---|---|
| 10889 Wishire Bldg External Affairs Tenant Refurbishment | University of California Lso Angeles | Project No 947272.01 |
| Prime Contractor TOBO Construction Inc | | |
| Subcontractor | | |

[X] The Division of Labor Standards Enforcement (DLSE) has received a complaint alleging that you are not in compliance with Labor Code Section 1777.5.  The alleged violation(s) is/are as follows:

[X]  Failure to provide the applicable Apprenticeship Committee(s) with notice of contract award in a timely manner.

[X]  Failure to properly request dispatch of apprentices from the applicable Apprenticeship Committee(s) in a timely manner.

[X]  Failure to employ apprentices in compliance with required apprentice to journeyman ratio.

[_]  Failure to properly employ apprentice(s) by assigning apprentice(s) to perform work outside the craft or trade of the apprenticeable occupation.

[X]  Failure to make the required training fund contributions to an approved apprenticeship program or to the California Apprenticeship Council (CAC).

[ ] The Division of Labor Standards Enforcement (DLSE) is charged with ensuring compliance with the apprenticeship requirements of Labor Code Section 1777.5 and California Code of Regulations Title 8, §227 et seq. for public works projects.  Verification of compliance with these requirements is a routine part of DLSE's public works monitoring and investigation.

Please submit a response to the allegations above, if any, and the following evidence of compliance with the apprenticeship requirements of Labor Code Section 1777.5 postmarked by _____May 30, 2019_____ :

1.  DAS140 – Contract Award Information (or equivalent) with proof of submission to applicable apprenticeship committees;
2.  DAS142 – Request for Dispatch of an Apprentice (or equivalent) with proof of submission to applicable apprenticeship committees;
3.  Accounting and proof of payment of the training fund contributions to California Apprenticeship Council or approved apprenticeship program.

Non-compliance will result in civil penalties and/or denial of the right to bid on or receive public works contracts for a period of up to three (3) years per California Labor Code Section 1777.7.

STATE LABOR COMMISSIONER

By    _Norbert Fy_____

Norbert Flores
Deputy Labor Commissioner II

PW 11A   (Revised 7.2013)

# EXHIBIT 9

| Labor Commissioner, State of California | |
|---|---|
| Department of Industrial Relations | |
| Division of Labor Standards Enforcement | Gavin Newsom, Governor |
| Bureau of Field Enforcement- Public Works | |

| DATE | In Reply Refer to Case No: |
|---|---|
| October 24, 2019 | 40-57020/218 |

## CIVIL WAGE AND PENALTY ASSESSMENT

| Awarding Body | |
|---|---|
| County of Ventura | |
| Project Name | Work Performed in County of |
| Fire Station 27 Replacement-Fillmore | Ventura |
| Prime Contractor | Project No |
| TOBO Construction, Inc., a California corporation | 0 |
| Subcontractor | |

After an investigation concerning either the payment of wages to workers employed in the execution of the contract for the above-named public works project or compliance with the apprenticeship standards found in Labor Code section 1777.5, or both, the Division of Labor Standards Enforcement (the "Division") has determined that violations of the California Labor Code have been committed by the contractor and/or subcontractor identified above. In accordance with Labor Code section 1741, the Division hereby issues this Civil Wage and Penalty Assessment.

The nature of the violations of the Labor Code and the basis for the assessment are as follows:

Wage Violations:    Violation of Labor Code sections 1771, 1774; Failure to pay the required prevailing rate to all workers. Failure to pay required training contributions. Failure to pay overtime.
Penalties assessed at $200.00 pursuant to Labor Code section 1775 and 1813.

Apprenticeship Violations:  Violations of Labor Code section 1771.5; Failure to submit contract information for all crafts as required; Failure to employ apprentices in the required ratio or at all.
Penalties assessed pursuant to Labor Code section 1777.7 at $40.00 per violation.

The attached Audit Summary further details the basis for this Assessment and itemizes the calculation of wages and penalties due under Labor Code sections 1775 and 1813.

The Division has determined that the total amount of wages due is:              $511,477.64

The Division has determined that the total amount of penalties assessed under Labor Code sections 1775 and 1813 is:              $395,675.00

The Division has determined that the amount of penalties assessed under Labor Code section 1777.7 is:              $56,680.00

The Division has determined that the amount of penalties assessed under Labor Code section 1776 against TOBO Construction, Inc., a California corporation              is:        $0.00

Please refer to page 5 for specific withholding obligations pertaining to these amounts.

STATE LABOR COMMISSIONER

By _M. Morton_

Rachel Morton
Deputy Labor Commissioner II

PW 33 (Revised - 7/2013)

> **EXHIBIT**
> **9**
> Monica Oh/Jimi Chae
> 4/27/2020
> Darla Kmety - CSR#12956

**In re Monica Oh and Jimi Chae (2:20-bk-11376)**
**Document Production re: Credibly 2004 Examination 492**

# EXHIBIT 10

| Labor Commissioner, State of California | |
|---|---|
| Department of Industrial Relations<br>Division of Labor Standards Enforcement<br>Bureau of Field Enforcement- Public Works<br><br>TEL: (562) 983-1082      FAX: (562) 499-6439 | Gavin Newsom, Governor |
| DATE:<br>November 14, 2019 | In Reply Refer to Case No:<br>40-54388-132 |

## CIVIL WAGE AND PENALTY ASSESSMENT

| Awarding Body<br>Bonita Unified School District | Work Performed in County of<br>Los Angeles |
|---|---|
| Project Name<br>New Gymnasium @ Ramona Middle School and Lone Hill Middle School | Project No.<br>15-16 04 |
| Prime Contractor<br>Tobo Construction, Inc., a California corporation | |
| Subcontractor | |

After an investigation concerning either the payment of wages to workers employed in the execution of the contract for the above-named public works project or compliance with the apprenticeship standards found in Labor Code section 1777.5, or both, the Division of Labor Standards Enforcement (the "Division") has determined that violations of the California Labor Code have been committed by the contractor and/or subcontractor identified above. In accordance with Labor Code section 1741, the Division hereby issues this Civil Wage and Penalty Assessment.

The nature of the violations of the Labor Code and the basis for the assessment are as follows:
Wage Violations:               Violation of Labor Code 1771,1774, wherin the contractor failed to pay the required prevailing wage rate to workers employed in the execution of this public works contract. In addition, all workers were not reported on the certified payroll, wages were under reported, and the contractor failed to pay all required training funds to an applicable apprenticeship committee, or the California Apprenticeship Council.

Violation of Labor Code 1813: The contractor failed to pay the required overtime rate.

The attached Audit Summary further details the basis for this Assessment and itemizes the calculation of wages and penalties due under Labor Code sections 1775 and 1813.

The Division has determined that the total amount of wages due is:          $800,858.90

The Division has determined that the total amount of penalties assessed under Labor Code sections 1775 and 1813 is:          $537,025.00

The Division has determined that the amount of penalties assessed under Labor Code section 1777.7 is:          $0.00

The Division has determined that the amount of penalties assessed under Labor Code section 1776 against Tobo Construction, Inc.          is:          $0.00

Please refer to page 5 for specific withholding obligations pertaining to these amounts.

STATE LABOR COMMISSIONER

By _Norbert Flores_
Norbert Flores
Deputy Labor Commissioner II

PW  33  (Revised - 7/2013)

> **EXHIBIT 10**
> Monica Oh/Jimi Chae
> 4/27/2020
> Darla Kmety - CSR#12956

In re Monica Oh and Jimi Chae (2:20-bk-11376)
Document Production re: Credibly 2004 Examination 475

# EXHIBIT 11

| Labor Commissioner, State of California<br>Department of Industrial Relations<br>Division of Labor Standards Enforcement<br>Bureau of Field Enforcement- Public Works<br><br>TEL:   (213) 897-7994           FAX: (213) 897-6020 | Gavin Newsom, Governor |
|---|---|
| DATE:<br>October 31, 2019 | In Reply Refer to Case No:<br>40-66318-716 |

### CIVIL WAGE AND PENALTY ASSESSMENT

| Awarding Body<br>City of Signal Hill, a political subdivision of the state of California | Work Performed in County of<br>Los Angeles |
|---|---|
| Project Name<br>Signal Hill Public Library Project | Project No.<br>0 |
| Prime Contractor<br>Tobo Construction, Inc., a corporation | |
| Subcontractor<br>Mega Air Co., Inc., a corporation | |

After an investigation concerning either the payment of wages to workers employed in the execution of the contract for the above-named public works project or compliance with the apprenticeship standards found in Labor Code section 1777.5, or both, the Division of Labor Standards Enforcement (the "Division") has determined that violations of the California Labor Code have been committed by the contractor and/or subcontractor identified above. In accordance with Labor Code section 1741, the Division hereby issues this Civil Wage and Penalty Assessment.

The nature of the violations of the Labor Code and the basis for the assessment are as follows:

Wage Violations:            Failure to pay prevailing wages to Sheet Metal Workers and failure to report all hours worked in violation of Labor Code sections 1771, 1774, and 1776. Therefore is subject to penalties authorized by Labor Code section 1775.

Apprenticeship Violations:   Failure to submit Contract Award Information to applicable apprenticeship committees (Sheet Metal Worker) within 10 days of the date of the execution of the prime contract, but no later than the 1st day in which the contractor has workers on the the public works per Labor Code Section 1777.5 (e) & CA Code of Regs, Title 8, Section 230. Failure to employ apprentices in compliance with the minimum ratio of work hours performed by apprentices to journeymen (employed as Sheet Metal Workers) per Labor Code Section 1777.5(d) and CA Code of Regs, Title 8, Section 230.1

The attached Audit Summary further details the basis for this Assessment and itemizes the calculation of wages and penalties due under Labor Code sections 1775 and 1813.

The Division has determined that the total amount of wages due is:          $25,747.17

The Division has determined that the total amount of penalties assessed under Labor Code sections 1775 and 1813 is:          $29,700.00

The Division has determined that the amount of penalties assessed under Labor Code section 1777.7 is:          $23,440.00

The Division has determined that the amount of penalties assessed under Labor Code section 1776 against Mega Air Co., Inc.                                    is:          $0.00

**Please refer to page 5 for specific withholding obligations pertaining to these amounts.**

STATE LABOR COMMISSIONER

By _____
Christopher Hightower
Industrial Relations Representative

PW 33  (Revised - 7/2013)

<div style="border:2px solid black; text-align:center;">
EXHIBIT<br>
11<br>
Monica Oh/Jimi Chae<br>
4/27/2020<br>
Darla Kmety - CSR#12956
</div>

**In re Monica Oh and Jimi Chae (2:20-bk-11376)**
**Document Production re: Credibly 2004 Examination 289**

# EXHIBIT 12

| Labor Commissioner, State of California |   |
|---|---|
| Department of Industrial Relations | Gavin Newsom, Governor |
| Division of Labor Standards Enforcement |   |
| Bureau of Field Enforcement- Public Works |   |
| TEL:   (213) 897-7994        FAX: (213) 897-6020 |   |
| DATE:<br>October 31, 2019 | In Reply Refer to Case No:<br>40-64276-716 |

## CIVIL WAGE AND PENALTY ASSESSMENT

| Awarding Body | Work Performed in County of |
|---|---|
| University of California, Los Angeles - Contracts Administration, a political subdivision of the state of California | Los Angeles |
| Project Name | Project No. |
| 10889 Wilshire Building - External Affairs Tenant | 0 |
| Prime Contractor | |
| Tobo Construction, Inc., a corporation | |
| Subcontractor | |
| Mega Air Co., Inc., a corporation | |

After an investigation concerning either the payment of wages to workers employed in the execution of the contract for the above-named public works project or compliance with the apprenticeship standards found in Labor Code section 1777.5, or both, the Division of Labor Standards Enforcement (the "Division") has determined that violations of the California Labor Code have been committed by the contractor and/or subcontractor identified above. In accordance with Labor Code section 1741, the Division hereby issues this Civil Wage and Penalty Assessment.

The nature of the violations of the Labor Code and the basis for the assessment are as follows:

Wage Violations:            Failure to pay prevailing wages to Sheet Metal Workers and failure to report all hours worked in violation of Labor Code sections 1771, 1774, and 1776. Failure to pay training fund contributions in violation of Labor code section 1777.5. Therefore is subject to penalties authorized by Labor Code sections 1775.

Apprenticeship Violations:   Failure to submit Contract Award Information to applicable apprenticeship committees (Sheet Metal Worker) within 10 days of the date of the execution of the prime contract, but no later than the 1st day in which the contractor has workers on the the public works per Labor Code Section 1777.5 (e) & CA Code of Regs, Title 8, Section 230. Failure to employ apprentices in compliance with the minimum ratio of work hours performed by apprentices to journeymen (employed as Sheet Metal Workers) per Labor Code Section 1777.5(d) and CA Code of Regs, Title 8, Section 230.1

The attached Audit Summary further details the basis for this Assessment and itemizes the calculation of wages and penalties due under Labor Code sections 1775 and 1813.

The Division has determined that the total amount of wages due is:          $36,139.26

The Division has determined that the total amount of penalties assessed under Labor Code sections 1775 and 1813 is:          $15,480.00

The Division has determined that the amount of penalties assessed under Labor Code section 1777.7 is:          $23,920.00

The Division has determined that the amount of penalties assessed under Labor Code section 1776 against Mega Air Co, Inc.          is:          $0.00

Please refer to page 5 for specific withholding obligations pertaining to these amounts.

STATE LABOR COMMISSIONER

By _____

Christopher Hightower
Industrial Relations Representative

PW  33   (Revised - 7/2013)

> **EXHIBIT
> 12**
> Monica Oh/Jimi Chae
> 4/27/2020
> Darla Kmety - CSR#12956

# EXHIBIT 13

| LABOR VIOLATIONS; DLSE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DLSE Case No | ODL Case No | DIR/DLSE | Company | Project | Laborers | Amount | | | |
| 40-61231-757 | 19-0336-PWH | Luong Chau | Tobo | | Claudia Canas | | | | |
| 40-54384-757 | 19-0226-PWH | Karen Siebald | Tobo | Horizon View | | | | | |
| 40-54317-132 | 18-0406-PWH | Steven McGinty | Tobo | WBF, WBR | Candelario Zamora | | | | |
| 40-60881-132 | | | Tobo | SSC | Numerous | $        2,998,536.05 | Plus penalties | | |
| | | | Tobo | SSC | 200131, Per Emily, CWPA $5,776,436,.05 | | | | |
| | | | Tobo | RALO | 200131, Per Emily, CWPA $1,337,883.90 | | | | |



In re Monica Oh and Jimi Chae (2:20-bk-11376)
Document Production re: Credibly 2004 Examination 206

EXHIBIT
13
Monica Oh/ Jimi Chae
4/27/2020
Darla Kmety - CSR#12956

# EXHIBIT 14

FILED: NASSAU COUNTY CLERK 09/18/2019 10:40 AM    INDEX NO. 612903/2019
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/18/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

KALAMATA CAPITAL GROUP

Plaintiff,

-against-

TOBO CONSTRUCTION, INC DBA TOBO    and
MONICA SHIUN OH

Defendants

Index No.:

**VERIFIED
COMPLAINT**

Plaintiff KALAMATA CAPITAL GROUP ("Plaintiff"), by its attorney, Ariel Bouskila Esq.,
for its complaint herein against TOBO CONSTRUCTION, INC DBA TOBO ("Company
Defendant") and MONICA SHIUN OH ("Guarantor") (Company Defendant and Guarantor
collectively "Defendants"), alleges as follows:

**The Parties**

1.    At all relevant times, Plaintiff was and is a Limited Liability Company organized
and existing under the laws of the State of New York.

2.    Upon information and belief, at all relevant times, Company Defendant was and is a
company organized and existing under the laws of the State of CA.

3.    Upon information and belief, at all relevant times, Guarantor was and is an individual
residing in the State of CA.

**The Facts**

4.    On or about July 15, 2019, Plaintiff and Defendants entered into an agreement (the
"Agreement") whereby Plaintiff agreed to purchase all rights to Company Defendant's future
receivables having an agreed upon value of $335,000.00.

5.    Pursuant to the Agreement, Company Defendant agreed to have one bank account

> EXHIBIT
> 15
> Monica Oh/Jimi Chae
> 4/27/2020
> Darla Kmety - CSR#12956

# EXHIBIT 15

1   Ali Salamirad (SBN 209043)
    Jeffrey D. Hook (SBN 216229)
2   **SMTD LAW LLP**
    17901 Von Karman Avenue, Suite 500
3   Irvine, California 92614
    949-537-3800
4   949-537-3822 (f)
    as@smtdlaw.com; jh@smtdlaw.com
5
    Attorneys for Plaintiff
6   INTERNATIONAL FIDELITY INSURANCE
    COMPANY
7
8                 **UNITED STATES DISTRICT COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10  INTERNATIONAL FIDELITY                    **CASE NO.**
    INSURANCE COMPANY, a New
11  Jersey Corporation,
                                              **COMPLAINT FOR:**
12             Plaintiff,
                                              **(1) BREACH OF CONTRACT-**
13         v.                                 **AGREEMENT OF**
                                              **INDEMNITY;**
14  TOBO CONSTRUCTION, INC., a
    California corporation; MONICA S.         **(2) BREACH OF CONTRACT-**
15  OH, an individual; JIMI CHAE, an          **PROMISSORY NOTE;**
    individual; JC DEVELOPMENT
16  LLC., a California limited liability      **(3) BREACH OF CONTRACT-**
    company; GREEN CONTRACTOR            **FINANCING AGREEMENT;**
17  STUDIO, INC., a California
    corporation; PACIFIC CITY BANK,          **(4) JUDICIAL FORECLOSURE ON**
18  a California corporation; VICTORIA        **DEED OF TRUST;**
    CAPITAL TRUST, a Delaware
19  statutory trust; JAIME HUERTA            **(5) CONSTRUCTIVE TRUST;**
    CONSTRUCTION, INC., a
20  California corporation; JAIME            **(6) VIOLATION OF CALIFORNIA'S**
    HUERTA, an individual; CW                 **UNIFORM FRAUDULENT**
21  INSITE, INC. a Delaware                   **TRANSFERS ACT;**
    corporation; DELGADO TILE &
22  STONE, INC., a California                 **(7) VIOLATION OF CALIFORNIA'S**
    corporation; CHAE, INC., a                **UNIFORM FRAUDULENT**
23  California corporation; MI SOON           **TRANSFERS ACT;**
    KIM, an individual; DEBORAH B.
24  HUH, an individual; STEPHEN H.            **(8) VIOLATION OF CALIFORNIA'S**
    CHANG, an individual; KAYLEEN             **UNIFORM FRAUDULENT**
25  Y. CHANG, an individual, and              **TRANSFERS ACT;**
    DOES 1 through 30, inclusive,
26                                            **(9) QUIA TIMET**
               Defendants.
27
28

SMTD LAW LLP
A LIMITED LIABILITY
PARTNERSHIP

_____
              **INTERNATIONAL FIDELITY INSURANCE COMPANY'S COMPLAINT**

Plaintiff INTERNATIONAL FIDELITY INSURANCE COMPANY ("IFIC") alleges the following against defendants TOBO Construction, Inc., JC Development LLC., Monica S. Oh, and Jimi Chae (collectively referred to as the "Indemnitor/Defendants" all of whom are Jointly and Severally liable to IFIC), Green Contractor Studio, Inc., Pacific City Bank, Victoria Capital Trust, Jaime Huerta Construction, Inc., Jaime Huerta, CW Insite, Inc., Delgado Tile & Stone, Inc., Chae, Inc., Mi Soon Kim, Deborah B. Huh, Stephen H. Chang, and Kayleen Y. Chang (collectively "Defendants").

## PARTIES

1.    IFIC is a corporation incorporated under the laws of the State of New Jersey, with its principal place of business in Newark, New Jersey. IFIC is, and at all relevant times was, qualified and authorized to transact business in the State of California as a surety.

2.    Defendant TOBO Construction, Inc. ("TOBO") is a corporation incorporated under the laws of the State of California, with its principal place of business in Torrance, California.

3.    Defendant Monica S. Oh is an individual who at all relevant times has resided in Rancho Palos Verdes, California.

4.    Defendant Jimi Chae is an individual who at all relevant times has resided in Rancho Palos Verdes, California.

5.    Defendant JC Development, LLC. ("JCD") is a limited liability company that was formed under the laws of the State of California, with its principal place of business in Rancho Palos Verdes, California.

6.    Defendant Green Contractor Studio, Inc. ("GCS") is a corporation incorporated under the laws of the State of California, with its principal place of business in Buena Park, California.

/ / /

/ / /

SMTD LAW LLP
A LIMITED LIABILITY
PARTNERSHIP

- 1 -

**INTERNATIONAL FIDELITY INSURANCE COMPANY'S COMPLAINT**

7.      Defendant Pacific City Bank ("PCB") is a corporation incorporated under the laws of the State of California, with its principal place of business in Los Angeles, California.

8.      Defendant Victoria Capital Trust ("VCT") is a Delaware statutory trust formed under the laws of the State of Delaware.

9.      Defendant Jaime Huerta Construction, Inc. ("JHC") is a corporation incorporated under the laws of the State of California, with its principal place of business in West Covina, California.

10.     Defendant Jaime Huerta is an individual who at all relevant times has resided in West Covina, California.

11.     Defendant CW Insite, Inc ("CW") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Huntington Beach, California.

12.     Defendant Delgado Tile & Stone, Inc., ("DELGADO") is a corporation incorporated under the laws of the State of California, with its principal place of business in Chino Hills, California.

13.     Defendant Chae, Inc., ("CHAE INC.") is a corporation incorporated under the laws of the State of California, with its principal place of business in Palos Verdes Estate, California.

14.     Defendant Mi Soon Kim ("KIM") is an individual who at all relevant times has resided in La Cañada, California.

15.     Defendant Deborah B. Huh ("HUH") is an individual who at all relevant times has resided in La Cañada, California.

16.     Defendant Stephen H. Chang ("S. CHANG") is an individual who at all relevant times has resided in Rolling Hills Estate, California.

17.     Defendant Kayleen Y. Chang is an individual who at all relevant times has resided in Rolling Hills Estate, California ("K. CHANG").

/ / /

SMTD LAW LLP
A LIMITED LIABILITY
PARTNERSHIP

**INTERNATIONAL FIDELITY INSURANCE COMPANY'S COMPLAINT**

18.    The names and capacities, whether corporate, individual or otherwise, of defendants named in this complaint as DOES 1 through 30, inclusive, are unknown to IFIC. IFIC is informed and believes and thereon alleges that each of the fictitiously named defendants is liable to IFIC on the causes of action herein alleged and, therefore, IFIC sues said defendants by their fictitious names.

19.    IFIC is informed and believes and thereon alleges that at all times herein mentioned, the Defendants, and each of them, was an agent, servant, employee, co-conspirator and/or joint venturer of every other of the remaining Defendants, and performed the acts and omissions complained of herein in the course and scope of such agency, service, employment, conspiracy and/or joint venture.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because: (i) there is complete diversity of citizenship between IFIC and Defendants, since IFIC is a citizen of the State of New Jersey for diversity purposes and the Defendants are all citizens of States other than New Jersey, and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to IFIC's claims occurred within the Central District of California.

## GENERAL ALLEGATIONS

22.    IFIC issued multiple performance, payment and commercial line surety bonds (collectively the "Bonds") on behalf of TOBO, as the bond principal, in connection with multiple construction projects in the State of California.

23.    On or about April 25, 2014, to induce IFIC to issue the Bonds, and as partial consideration for the Performance of the Bonds, Indemnitor/Defendants executed an Agreement of Indemnity ( "Indemnity Agreement") in favor of IFIC under which they promised to completely indemnify and hold IFIC harmless from

- 3 -

1   all damage, loss or expense IFIC incurs as a result of having issued the Bonds. The

2   Indemnity Agreement was amended on or about November 15, 2016 pursuant to

3   "Rider to Agreement of Indemnity Adding Additional Indemnitor." A true and

4   correct copy of the Indemnity Agreement, as amended, is attached hereto as

5   **Exhibit "1"** and incorporated herein by this reference.

6        24.    TOBO entered into various contracts to construct projects ("Projects")

7   and requested that IFIC furnish the Bonds for these Projects. Relying on, among

8   other things, the Indemnitor/Defendants' promises contained in the Indemnity

9   Agreement, IFIC issued the Bonds.

10        25.    TOBO has since acknowledged and admitted that it is in default of its

11   contractual obligations on several of the Projects, in that, among other things,

12   TOBO cannot fulfill its obligation to complete the Projects and pay its obligations,

13   which has resulted, and will continue to result, in IFIC incurring substantial losses,

14   costs and expenses as a result of having issued the Bonds, which losses are all

15   recoverable under the express terms of the Indemnity Agreement and California

16   law.

17        26.    From October 2018 through November 2019, TOBO has been served

18   with multiple Civil Wage and Penalty Assessment ("CWPA") issued by Labor

19   Commissioner, State of California, Division of Labor Standards Enforcement

20   ("DLSE") on several of the Projects. The DLSE alleges that TOBO has failed to

21   pay its laborers, collectively, no less than $3,669.664, exclusive of interest,

22   penalties and liquidated damages.

23        27.    IFIC is informed and believes and thereon alleges that based on an

24   investigation conducted by the DLSE, defendants TOBO, JHC, Jaime Huerta, CW

25   and DELGADO are alleged to have participated in a complex scheme involving

26   kickbacks, wage theft and intentional violations of California's prevailing wages

27   laws on the Projects, including the projects commonly known as the Student

28   Services Center project that TOBO was performing for the El Camino Community

- 4 -

**INTERNATIONAL FIDELITY INSURANCE COMPANY'S COMPLAINT**

SMTD Law LLP
A LIMITED LIABILITY
PARTNERSHIP

1    College District in Los Angeles County and the Fire Station No. 27 Replacement

2    project for the County of Ventura ("Fire Station Project").

3         28.    IFIC has paid $250,000.00 to the DLSE in response to the CWPA

4    against TOBO on the Fire Station Project, and is actively investigating and

5    attempting to resolve additional DLSE claims.

6         29.    IFIC is informed and believes and thereon alleges that in November

7    2019, Defendant Monica S. Oh fraudulently transferred assets in order to avoid

8    satisfying her obligations to IFIC by, among other things, selling two residential

9    properties located in the County of Los Angeles in an effort to hinder and deprive

10   IFIC from the benefit of these assets.  IFIC is further informed and believes and

11   thereon alleges that these real properties were sold without having been publicly

12   listed for sale and for less than fair market value. IFIC is informed and believes and

13   thereon alleges that the Defendants have and will continue to conspire with one

14   another to fraudulently transfer additional assets.

15        30.    To date, IFIC has paid out and suffered a loss of no less than

16   $3,200,000 as a result of TOBO's failure and inability to satisfy its obligations on

17   the Projects.  Based on the information currently available to it, IFIC anticipates

18   that its net loss will exceed $4,000,000.  The Indemnitor/Defendants are obligated

19   to fully indemnify and reimburse IFIC for these and any other losses under the

20   Indemnity Agreement.

21        31.    TOBO's financial inability to complete the Projects has resulted in

22   IFIC receiving multiple claims against the Bonds.  The claim activity necessitated

23   the hiring of legal counsel and consultants to assist IFIC in its investigation of the

24   merits of each of the Bond claims.  The Indemnitor/Defendants are obligated to

25   reimburse IFIC for these expenses, and others, under the express terms of the

26   Indemnity Agreement.

27   / / /

28   / / /

SMTD LAW LLP
A LIMITED LIABILITY
PARTNERSHIP

**INTERNATIONAL FIDELITY INSURANCE COMPANY'S COMPLAINT**

# EXHIBIT 16

COPY

David N. Ingrassia (#010936)
DAVID N. INGRASSIA, P.C.
3961 E. Chandler Boulevard, Suite 111-119
Phoenix, AZ 85048
Telephone: (602) 604-0099
Facsimile:  (602) 604-0110
Email: david.ingrassia@cox.net
Attorney for Plaintiff

JAN 1 4 2020

CLERK OF THE SUPERIOR COURT
K. MELZER
DEPUTY CLERK

IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

RETAIL CAPITAL LLC, a New York
limited liability company, doing business
as CREDIBLY,

        Plaintiff,

vs.

TOBO CONSTRUCTION INC., a
California corporation, doing business as
TOBO CONSTRUCTION, JC
DEVELOPMENT LLC, a California
limited liability company, MONICA OH,
an individual, and DOES 1-5,

        Defendants.

Case No.    CV2020-000191

**COMPLAINT FOR:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF PERSONAL GUARANTY; AND**
3. **INTENTIONAL MISREPRESENTATION**

        Plaintiff Retail Capital LLC doing business as Credibly (hereinafter "Credibly" or "Plaintiff"), for its Complaint against Defendants, alleges the following based upon information and belief:

                                **Parties and Jurisdiction**

        1.      Credibly, is a New York limited liability company doing business in Maricopa County, Arizona.

        2.      Defendant, Tobo Construction Inc. doing business as Tobo Construction ("Merchant"), is a California corporation that has caused events to occur within

-1-

1   Maricopa County, Arizona out of which the causes of action herein alleged arise.

2       3.     Defendant, JC Development LLC ("JC Development" and when

3   referenced with Merchant, "Merchants"), is a California limited liability company that

4   has caused events to occur within Maricopa County, Arizona out of which the causes of

5   action herein alleged arise.

6       4.     Defendant, Monica Oh, ("Oh" and when referenced collectively with

7   Merchants, "Defendants"), that has caused events to occur within Maricopa County,

8   Arizona out of which the causes of action herein alleged arise.

9       5.     Defendant Does 1-5 are persons or entities that may be responsible for

10  some or all of the events giving rise to Credibly's claims in this action, or may otherwise

11  bear legal responsibility for some or all of Credibly's damages herein, but whose identity

12  is presently unknown to Credibly. Credibly will seek leave to amend the Complaint to

     name any such persons or entities upon learning their identity.

13       6.     The contract that is at issue in this dispute, entitled "Business Loan and

14  Security Agreement" (the "Agreement"), contains at Section 15, a jurisdiction and

15  governing law provision.

16       7.     By signing the Agreement, Defendants consented to this Court's

17  jurisdiction, and agreed that venue is proper in this Court.

18       8.     This is an action for damages of more than $50,000 but less than $300,000

19  and is therefore is Tier 2 case as that term is defined in Rule 26.2, Ariz. R. Civ. Proc.

20                           **General Allegations**

21       9.     Credibly repeats and incorporates all the allegations of this Complaint set

     forth above.

22      10.    Credibly is in the business of providing small to medium sized businesses

23  with business financing. For its Loan Product, merchants receive a loan (the "Principal

24  Amount") in exchange for daily or weekly repayment obligations (the "Payment

25  Amount") until the agreed contractual amount has been satisfied in full ("Total

1    Repayment Amount"). This is a fixed term contract.

2        11.    On or about May 15, 2019, Merchant entered into the Agreement with

3    Credibly wherein Oh personally guaranteed the payment and performance of Merchant.

4    In addition, on or about May 15, 2019, JC Development entered into the Addendum to

5    Business Loan Agreement and agreed to be jointly and severally liable for the

6    obligations of Merchant under the Agreement (when referenced collectively with

7    Agreement, "Agreements"). A true and correct copy of the Agreements are attached

8    hereto as **Exhibit 1** and **Exhibit 2** respectively.

9        12.    Pursuant to the Agreement, the Merchants agreed to pay late fees as stated

10   at Section 5 ( e): if we have not received the scheduled payments as of the last day of

11   each month, a late fee equal to 5% of the sum of all Repayment Amounts due but unpaid

12   as of that close of that period (we may assess this late fee once each month until you

     have paid all of your obligations to us in full).

13       13.    Pursuant to the Agreement, the Merchants agreed to pay a default fee as

14   stated at Section 5 (g): in the event You breach the terms of Section 21 of this

15   Agreement, You shall immediately pay to the Company an amount equal to 10% of the

16   original Principal Amount. The fee shall not be construed as a waiver and is in addition

17   to and not in lieu of any other rights or remedies provided hereunder or at law at equity.

18   The fee is not a penalty and instead reflects the increased risk to the Company of

19   receiving the Repayment Amount.

20       14.    Pursuant to the Agreement, the Merchants agreed to pay Collection Costs

21   and Fees as stated at Section 10.13: To the extent not prohibited by applicable law, you

22   shall pay to us any and all expenses, including collection costs, attorneys' fees and

23   expenses, expert fees and expenses, and all other expenses which may be incurred by us

24   in the prosecution, defense, settlement and/or other resolution of any claim, demand,

25   action or proceeding arising out of or relating to this Agreement, the Collateral or any of

     our related rights or interests, regardless of whether you are a party to that action or

1 | proceeding or made aware of the claim or demand before it is resolved.

2 |     15.    Pursuant to the Section 10.1 (f) of the Agreement, Defendants represented
3 | and warranted that: you are not subject to any charter, corporate or other legal
4 | restriction, or any judgment, award, decree, order, governmental rule or regulation or
5 | contractual restriction that could have a materially adverse effect on your financial
6 | condition, business or prospects.

7 |     16.    Pursuant to the Section 10.1 (h) of the Agreement, Defendants represented
8 | and warranted that: there is no action, suit, proceeding or investigation pending or, to
9 | your knowledge, threatened against or affecting you or any of your assets before or by
10 | any court or other governmental authority which, if determined adversely to you, would
11 | have a material adverse effect on your financial condition, business or prospects or the
| value of the Collateral.

12 |     17.    Pursuant to the Agreement, Merchant contracted for the receipt of funds in
13 | the Principal Amount of $325,000.00 in exchange for a daily Payment Amount of
14 | $2,160.51 with a Total Repayment Amount of $380,250.00.

15 |     18.    From May 10, 2019 to September 12, 2019, Defendants performed its
16 | obligations under the Agreements. On or about September 13, 2019, Defendants
17 | defaulted on the Agreements by issuing a stop payment to Credibly from its designated
18 | business bank account.

19 |     19.    As of September 13, 2019, Defendants have repaid $175,001.31 to
| Credibly under the Agreement.

20 |     20.    Defendants have an outstanding balance, including fees accrued to date, of
21 | $248,588.22 due and owing to Credibly (the "Outstanding Balance").

22 |     21.    On or about November 20, 2019, Credibly sent Defendants a demand letter
23 | (the "Demand") to Defendants, notifying Defendants that the Outstanding Balance had
24 | been accelerated pursuant to Section 8.2 of the Agreement entitled "Remedies" and
25 | payment needed to be made within 15 calendar days from the date of the Demand. A

1   true and correct copy of the Demand is attached hereto as **Exhibit 3**.

2       22.    To date, Defendants have failed and continue to fail to make any payments

3   towards the Outstanding Balance.

4                          **<u>FIRST CAUSE OF ACTION</u>**

5                        **(Breach of Contract as to Merchants)**

6       23.    Credibly repeats and incorporates all the allegations of this Complaint set

7   forth above.

8       24.    The Agreements constitute a binding agreement between Credibly and

    Merchants.

9       25.    On or about May 15, 2019, pursuant to contract, Credibly provided

10  Merchant with funds in the Principal Amount of $325,000.00 in exchange for a Total

11  Repayment amount of $380,250.00.

12      26.    Credibly performed all of its obligations and duties under the Agreements

13  prior to default by the Merchants.

14      27.    On or about September 13, 2019, Merchants breached the Agreements by

15  failing to make payments to Credibly as required under the Agreements.

16      28.    Merchants' breach of the Agreements has caused, and will continue to

17  cause, Credibly damage based on the loss of its monies.

18      29.    The damage that is due and owing for principal and interest is

19  $205,248.69.

20      30.    The damage that is due and owning for fees pursuant to contract are in the

    amount of $43,339.53.

21

22      31.    The total damages owed by the Merchants is $248,588.22 plus any

23  collection costs and fees that are accrued during the litigation of this matter until the full

    sum is collected.

24

25

## SECOND CAUSE OF ACTION

### (Breach of Guaranty as to Oh)

32.   Credibly repeats and incorporates all the allegations of this Complaint set forth above.

33.   The Agreements constitute a binding agreement between Credibly and Oh.

34.   Credibly would not have loaned monies to Merchant without the personal guarantee of payment and performance from Oh.

35.   Credibly performed all of its obligations and duties under the Agreements prior to the default by the Merchants.

36.   On or about September 13, 2019, Oh breached the Agreements by failing to make payments to Credibly as required under the Agreement and is personally liable for the damages to Credibly.

37.   Oh's breach of the Agreements has caused, and will continue to cause, Credibly damage based on the loss of its monies.

38.   The damage that is due and owing for principal and interest is $205,248.69.

39.   The damage due and owning for fees pursuant to contract are in the amount of $43,339.53.

40.   The total damages owed by the Merchants is $248,588.22 plus any collection costs and fees that are accrued during the litigation of this matter until the full sum is collected.

## THIRD CAUSE OF ACTION

### (Intentional Misrepresentation as to Defendants)

41.   Credibly repeats and incorporates all the allegations of this Complaint set forth above.

42.   Defendants made material representations with regard to the financial stability and situation with its business operations which were in fact false and inaccurate.

-6-

43.    Defendants representations were material and sufficiently important and done with the intent for the Plaintiff to rely on.

44.    Defendants intended that the Plaintiff would act upon the representations in the manner contemplated by the Defendants which was for the Plaintiff to loan the Defendants money in the amount of $325,000.00.

45.    Defendants knew their representations were false.

46.    Plaintiff was not aware that these representations were false and did so rely on them to enter into a contract with the Defendants and loan them the sum of $325,000.00.

47.    The Plaintiff relied on the representations made by the Defendants because the Agreement is clear in Section 10.1(f) and Section 10.1(h) that the Defendants were acknowledging and signing the Agreement which states that their representations were true and accurate and the Plaintiff's reliance was justified under the circumstances.

48.    As a result of the Defendant's material misrepresentations, the Plaintiff has been damaged in the sum of $248,588.22.

**WHEREFORE**, Retail Capital LLC, a New York limited liability company doing business as Credibly, prays for Judgment of and from Defendants, Tobo Construction Inc., a California corporation doing business as Tobo Construction, JC Development LLC, a California limited liability company, Monica Oh, an individual, and Does 1-5 as follows:

a)  for actual damages in the amount of $248,588.22;

b)  for all court costs and reasonable attorney's fees as provided by Section 10.13 of the Agreement and applicable law;

c)  for post judgment interest pursuant ARS 44-1201 from entry of judgment until paid in full; and

1       d) for such further and other relief, both general and special, at law or in

2          equity, as the Court deems appropriate.

3

4      **RESPECTFULLY SUBMITTED** this 14th day of January, 2020

5

6                          **DAVID N. INGRASSIA, P.C.**

7

8                         David N. Ingrassia
                         3961 E. Chandler Boulevard, Suite 111-119

9                         Phoenix, AZ  85048
                         Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Retail Capital Partners, LLC, a New York limited liability company doing business as Credibly | Monica Shiun Oh and Jimi P. Chae |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Christopher R. Dryden (SBN 234476) / Joshua J. Herndon (SBN 244106) Global Legal Law Firm, 380 Stevens Ave., Suite 311, Solana Beach CA  92075 / Tel: (888) 846-8901 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor      ☐ Other<br>☐ Trustee | ☒ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Retail Capital Partners, LLC alleges that Debtors have violated 11 U.S.C. §523(a)(2)(A), when debtors made representations they knew to be false and violated 11 U.S.C. §523(a)(6) because the debtors misrepresentations and non-disclosures constitute a willful and malicious injury to Retail Capital Partners, LLC.  Retail Capital Partners, LLC seeks an Order finding that Debtors' indebtedness to Retail Capital Partners, LLC, constitutes a non-dischargeable debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $  248,588.22 |

Other Relief Sought

Amount sought with pre-judgment and post-judgment interest, as well as reasonable attorneys fees, costs, and expenses.

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>  MONICA SHIUN OH AND JIMI P. CHAE | BANKRUPTCY CASE NO.<br>  2:20-bk-11376-BB | |
| DISTRICT IN WHICH CASE IS PENDING<br>  Central District of California | DIVISION OFFICE<br>  Los Angeles | NAME OF JUDGE |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>  /s/ Joshua J. Herndon, Esq. | | |
| DATE<br>  May 11, 2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>  Joshua J. Herndon, Esq., Attorney for Creditor/<br>  Plaintiff, Retail Capital Partners, LLC | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:


A true and correct copy of the foregoing document entitled (*specify*): _____
_____
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


_____    _____    _____
Date                                     Printed Name                                                    Signature

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

Case 2:20-bk-11376-BB    Doc 63    Filed 05/11/20    Entered 05/11/20 16:33:00    Desc
Main Document    Page 259 of 259

# PROOF OF SERVICE OF DOCUMENT
Attachment Page

1. Service Information Continued

**Merdaud Jafarnia**    bknotice@mccarthyholthus.com,
mjafarnia@ecf.inforuptcy.com

**John P Pringle (TR)**    brenfro@rpmlaw.com, jpp@trustesolutions.net;
jpringle@rpmlaw.com

**Rachel M Sposato**    rsposato@hindslawgroup.com,
mduran@hindslawgroup.com

**United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov